# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TAMENANG CHOH and GRACE KIRK, individually and on behalf of all others similarly situated,

               Plaintiffs,

   v.

BROWN UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, HARVARD UNIVERSITY, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, PRINCETON UNIVERSITY, YALE UNIVERSITY, and THE IVY LEAGUE COUNCIL OF PRESIDENTS,

               Defendants.

Case No. 3:23-cv-00305-AWT

May 15, 2023

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 5

    A.    The National Collegiate Athletics Association ..................................... 5

    B.    The Ivy League ..................................................................................... 6

    C.    Previous Antitrust Challenges To NCAA Rules ................................... 7

    D.    This Suit ............................................................................................. 10

LEGAL STANDARD ............................................................................................... 11

ARGUMENT .......................................................................................................... 11

I.      PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A *PER SE* ANTITRUST
      VIOLATION ..................................................................................................... 11

II.    PLAINTIFFS FAILED TO STATE A CLAIM UNDER THE RULE OF REASON ........... 17

    A.    Plaintiffs Have Not Plausibly Alleged Any Properly Defined
        Market ................................................................................................ 18

        1.    Both alleged primary markets exclude obvious and
            conceded reasonable substitutes ................................................ 19

        2.    The alternative alleged markets are insufficiently defined ....... 21

        3.    Plaintiffs implausibly assume, without explanation, a
            single, generic "sports" market consisting of dozens of
            different sports ........................................................................... 23

    B.    Plaintiffs Have Not Plausibly Alleged Market-Wide Direct
        Anticompetitive Effects In Any Plausible Relevant Market ................. 28

III.   PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE ANTITRUST INJURY-IN-FACT ........ 30

IV.   THE STATUTE OF LIMITATIONS BARS PLAINTIFF CHOH'S CLAIM ..................... 32

CONCLUSION ....................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021).............................................................28

*American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010)............................13, 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................11

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983).....................................................................................31

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990).............................................31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................11

*California Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ..................................................................12

*Cenedella v. Metropolitan Museum of Art*, 348 F. Supp. 3d 346 (S.D.N.Y. 2018)................18, 29

*Chapman v. New York State Division for Youth*, 546 F.3d 230 (2d Cir. 2008)................18, 19, 24

*Cinema Village Cinemart, Inc. v. Regal Entertainment Group*, 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) ................................................................................................30

*City of New York v. Group Health Inc.*, 649 F.3d 151 (2d Cir. 2011)....................................18, 21

*Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286 (2d Cir. 1974)............................................18

*Creative Copier Services v. Xerox Corp.*, 2005 WL 2175138 (D. Conn. Sept. 2, 2005) .........................................................................................................................32

*Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963 (W.D. Tenn. 2004) ..............................23

*Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005) ......................31

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240 (2d Cir. 1997)...........................................................................................28

*Freedom Holdings, Inc. v. Spitzer*, 447 F. Supp. 2d 230 (S.D.N.Y. 2004) ..................................15

*FTC v. Facebook, In*c., 560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................23

*GateGuard, Inc. v. Amazon.com Inc.*, 2023 WL 2051739 (S.D.N.Y. Feb. 16, 2023) ............................................................................................................................24, 25

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68 (2d Cir. 2013)...................31

*Giordano v. Saks Inc.*, 2023 WL 1451534 (ED.M. Feb. 1, 2023) ...........................................15, 29

*Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000)..............................19, 20

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ..............................................................20

*In re Actos End-Payor Antitrust Litigation*, 848 F.3d 89 (2d Cir. 2017) ......................................32

*In re Google Digital Advertising Antitrust Litigation*, 2022 WL 4226932
(S.D.N.Y. Sept. 13, 2022) .................................................................................................28

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*, 2019 WL 1593939 (N.D. Cal.) .....................9

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*, 375 F. Supp. 3d 1058 (N.D.
Cal. 2019) ..................................................................................................................8, 9, 20, 21

*Laboratoires Majorelle SAS v. Apricus Biosciences, Inc.*, 2018 WL 11222863
(S.D.N.Y. Sept. 21, 2018) .................................................................................................22

*Madison 92nd Street Associates, LLC v. Courtyard Management Corp.*,
624 F. App'x 23 (2d Cir. 2015) .......................................................................................19, 21

*Madison Square Garden, L.P. v. National Hockey League*, 2008 WL 4547518
(S.D.N.Y. Oct. 10, 2008) ..................................................................................................33

*Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290
(2d Cir. 2008) ..................................................................................................................13, 15

*McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1988) .................................................................13

*Moccio v. Cablevision System Corp.*, 208 F. Supp. 2d 361 (E.D.N.Y. 2002) ..............................22

*NCAA v. Alston*, 141 S.Ct. 2141 (2021)...........................................2, 8, 9, 10, 12, 13, 16, 17, 21

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984) ..........8, 12, 13, 16, 17

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
883 F.3d 32 (2d Cir. 2018)...........................................................................................12, 13, 17

*O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015)..............................................................13, 17

*Ohio v. American Express*, 138 S.Ct. 2274 (2018).......................................................................17

*OmniMax International, Inc. v. Anlin Industries, Inc.*, 2019 WL 2516121
(D. Colo. June 17, 2019) ..................................................................................................30

*Pennsylvania v. NCAA*, 948 F. Supp.2d 416 (M.D. Pa. 2013) ...............................................28, 29

*Planetarium Travel, Inc. v. Altour International, Inc.*, 97 F. Supp. 3d 424
(S.D.N.Y. 2015) ................................................................................11, 23

*Polk Brothers, Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985) .....................15

*Prescient Medicine Holdings, LLC v. Laboratory Corporation of America
Holdings*, 2019 WL 635405 (D. Del. Feb. 14, 2019) ........................................22

*Prime Healthcare Services, Inc. v. Service Employees International Union*,
2012 WL 3778348 (S.D. Cal. 30, 2012) ...........................................................11

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57
(3d Cir. 2010) ................................................................................................13

*Rock v. NCAA*, 928 F. Supp. 2d 1010 (S.D. Ind. 2013) ..............................14, 24, 25, 29

*Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998) ................................................................13

*Spinelli v. National Football League*, 903 F.3d 185 (2d Cir. 2018) ............................30

*Stouter v. Smithtown Central School District*, 687 F. Supp. 2d 224 (E.D.N.Y.
2010) ................................................................................................................32

*Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001) ..............21

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ............................................................12, 15

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998) ....................18

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ............................................................................22

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) ....................................................11, 15

*United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993) ......................................16

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85 (2d Cir. 2021) ...........................5

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ........................33

*Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004) ..........................................33

*Vital Pharmaceuticals, Inc. v. Berlin Packaging LLC*, 2022 WL 4552094
(N.D. Ill. Sept. 29, 2022) ................................................................................22

*Vitale v. Marlborough Gallery*, 1994 WL 654494 (S.D.N.Y. July 5, 1994) .................33

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp.
2d 270 (S.D.N.Y. 2007) ....................................................................................29

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)........................................32

**Statutes and Rules**

15 U.S.C.
  § 1.............................................................................................................................7, 10
  § 15...............................................................................................................................31
  § 15b.............................................................................................................................32

Fed. R. Evid. 201(b)....................................................................................................................5

**Other Authorities**

*Athletics*, MIT, http://catalog.mit.edu/mit/campus-life/athletics/
  (visited May 8, 2023)................................................................................................27

Brown University Athletics Website, https://brownbears.com/
  (visited May 8, 2023)................................................................................................25

Columbia University Athletics Website, https://gocolumbialions.com/
  (visited May 8, 2023)................................................................................................25

Cornell University Athletics Website, https://cornellbigred.com/
  (visited May 8, 2023)................................................................................................25

Dartmouth College Athletics Webiste, https://dartmouthsports.com/
  (visited May 8, 2023)................................................................................................25

*Division II partial-scholarship model*, https://www.ncaa.org/sports/2014/9/25/
  division-ii-partial-scholarship-model.aspx (visited May 8, 2013)......................................5

*Division III Championships*, https://www.ncaa.org/sports/2021/5/11/division-iii-
  championships.aspx (visited May 8, 2023)............................................................................5

Hamilton, Brian, *How Princeton women's basketball created the blueprint for
  national prominence in the Ivy League*, The Athletic (Nov. 2, 2022),
  https://theathletic.com/3748734/2022/11/02/princetonivy-league-womens-
  basketball/ ................................................................................................................26

Harvard University Athletics Website, https://gocrimson.com/
  (visited May 8, 2023)................................................................................................25

*Men's Lacrosse*, Big Ten, https://bigten.org/sports/mlax (visited May 8, 2023) ........................27

*National Collegiate*, https://www.ncaa.org/sports/2021/5/4/championships.aspx
  (visited May 8, 2023)..................................................................................................5

*NCAA Division I Manual 2022-23*, https://web3.ncaa.org/lsdbi/reports/
  getReport/90008.............................................................................................................6

*Our Division I Story*, https://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx (visited May 8, 2023)....................................................................................5, 6

*Our Division III Story*, https://www.ncaa.org/sports/2021/2/16/our-division-iii-story.aspx (visited May 8, 2023)....................................................................................5

Penn Athletics Website, https://pennathletics.com/ (visited May 8, 2023)...................................25

Princeton University Athletics Website, https://goprincetontigers.com/ (visited May 8, 20123)....................................................................................25

*Schools*, EISA, https://www.eisaskiing.org/schools (visited May 8, 2023) ................................27

The Ivy League Website, ivyleague.com (visited May 8, 2023)...................................25

*Women's Lacrosse*, Big Ten, https://bigten.org/sports/womens-lacrosse (visited May 8, 2023)....................................................................................27

Yale University Athletics Website, https://yalebulldogs.com/ (visited May 8, 2023)....................................................................................25

**INTRODUCTION**

Defendants are the Ivy League Council of Presidents and the eight universities that make up the Ivy League. The Ivy League is just one of dozens of Division I athletic conferences that include over 350 different schools. The Ivy League has independently chosen not to offer athletic scholarships because its eight member schools have long sought to foster campus cultures that do not prioritize athletics over other aspects of their educational mission and instead treat *all* exceptional students equally while still offering student-athletes the opportunity to play competitive Division I sports in an athletic conference with a relatively level playing field. Furthermore, this policy ensures that students' ability to afford an Ivy League education is not conditioned on continuing to play varsity sports throughout their tenure at the university. The result is an expansion of consumer choice for student-athletes who may pick and choose among the hundreds of schools—including schools outside of the Ivy League that the complaint concedes are viable substitutes—based on the balance of athletics and academics that each student prefers, together with the countless other considerations that influence students' school selection.

In this case, Plaintiffs seek to reject those choices and instead misuse the antitrust laws to force the Ivy League to change the policies that help define both the nature of Ivy League athletics and the broader undergraduate experiences available at the Ivy League's member institutions. The antitrust laws cannot and should not be used to deny prospective varsity athletes and other students the very options these Plaintiffs had when making their college selections—indeed, to deny future students the choice that *these Plaintiffs knowingly made*.

Yet that is precisely what Plaintiffs ask the Court to do here. Plaintiffs allege that the Ivy League's prohibition on athletic scholarships is one of the exceedingly rare agreements so obviously anticompetitive that it is *per se* illegal, *i.e.*, condemned without ever analyzing any

potential procompetitive benefits. That position contradicts decades of precedent from the Supreme Court, Second Circuit, and elsewhere in the country. The most recent entry in that long list of authority is the very Supreme Court decision, *NCAA v. Alston*, 141 S.Ct. 2141 (2021), that Plaintiffs place at the center of their case. That decision both applied the rule of reason and recognized that individual conferences may write their own rules, including rules even more restrictive than the scholarship limitations at issue in *Alston* and certainly than those challenged here. Plaintiffs thus ask this Court to strike down the very type of agreement the Supreme Court just two years ago said continues to be permissible.

Regulation of league sports, as here, is a textbook example of agreements that require analysis under the "rule of reason." Competitors in a sports league *must* reach agreements to help define the nature of the product they offer. Such agreements thus increase consumer choice, precluding *per se* condemnation. The Ivy League's athletic scholarship rule fits squarely within this well-settled principle. The rule credibly ensures that member schools can offer prospective student-athletes the option of attending an undergraduate institution that treats its athletes and non-athletes equally, where the sports teams still have a fair shot in competition against conference opponents, all while playing in Division I and competing for championships against the highest performing teams in the country. The challenged rule thus helps the Ivy League establish a particular athletic experience and campus culture, which in turn expands consumer choice by creating an alternative to the various different models offered by hundreds of other Division I schools. Plaintiffs allege no basis to ignore these facially credible procompetitive benefits. As a matter of law, the agreement alleged is thus not *per se* illegal. *See infra* § I.

Plaintiffs' claim therefore must be evaluated under the rule of reason, and it fails on its face at the very first steps. To succeed, Plaintiffs must first identify a plausible product market,

and then plausibly allege facts that, if proven, would show either that (a) Defendants have the requisite power within that market to harm competition or (b) the regulation has had direct anticompetitive effects in that market *as a whole*. They have done none of this.

Plaintiffs' principal alleged product markets—one for the sale of undergraduate education to high-achieving student-athletes and one for the so-called purchase of their athletic services— are defined to consist solely of the eight schools in the Ivy League. Common sense and precedent confirm that a single athletic conference in the NCAA is not an antitrust market. That very finding was central to the injunction the district court issued in *Alston* permitting individual conference-level compensation rules for student-athletes. Indeed, Plaintiffs' own allegations affirmatively concede that high-achieving student-athletes consider, and many attend, numerous other academically and athletically rigorous schools. Those schools must be included in the relevant market. *See infra* § II.A.1. Recognizing these obvious points, Plaintiffs half-heartedly offer two alternative markets consisting of the Ivy League and some unknown number of other schools. But without defining the boundaries of those markets, Plaintiffs cannot plausibly allege facts showing either that they include all reasonable substitutes or that Defendants have the requisite market power. *See infra* § II.A.2. Separately, both sets of proposed markets fail because Plaintiffs implausibly aggregate more than 40 different sports into a single "all sports" market with no reference to reasonable substitutability among individual sports at different schools. *See infra* § II.A.3.

Plaintiffs' conclusory and speculative allegations of direct anticompetitive effects cannot save their claim. The only direct effect they allege is that the Ivy League does not offer athletic scholarships. That allegation is facially insufficient because it does not suggest *market-wide* harm (or any harm) to competition. Other schools in other conferences—including many

academically selective schools that compete in Division I—offer athletic scholarships and the undergraduate athletic experience that comes along with those priorities. Student-athletes who prefer that option are free to choose it. The rule against athletic scholarships thus does not plausibly harm competition or consumers. Because Plaintiffs offer no facts to the contrary, and instead focus myopically on the Ivy League, they have not plausibly alleged any facts that, if proven, would establish direct anticompetitive effects across the whole of any plausibly defined market. *See infra* § II.B.

Plaintiffs' claim also fails because their alleged injuries are too speculative to satisfy the bedrock requirement of demonstrating antitrust injury-in-fact. Plaintiffs allege no *facts* to support the conclusion that any Defendant school would offer any athletic scholarships but for the alleged agreement. And they certainly allege no facts showing that *these* Plaintiffs would have received any athletic scholarship at all from any Defendant, much less the *full* athletic scholarships they claim they would have received. Plaintiffs' conjecture is legally insufficient. *See infra* § III.

Finally, the complaint establishes that Mr. Choh's claim plainly accrued outside the Sherman Act's four-year limitations period, and no tolling doctrine applies or is even alleged. Mr. Choh matriculated at Brown in the fall of 2017, more than four years before this suit was brought in March 2023. At that time, Brown and other Ivy League schools had a well-established and well-publicized policy not to award athletic scholarships or any other compensation to student-athletes. Mr. Choh's claim is time-barred on its face. *See infra* § IV.

# BACKGROUND

## A.    The National Collegiate Athletics Association

The NCAA has overseen intercollegiate athletics as an integral component of college education for more than 115 years.[1]  The NCAA has three different athletic Divisions—I, II, and III.  Compl. ¶ 1 n.1.  Division I schools can offer athletic scholarships up to the full cost of attendance.[2]  Division II schools generally offer only partial athletic scholarships,[3] while those in Division III cannot offer athletic scholarships.[4]  For most sports, the schools in each Division compete primarily against others in the same Division, both during the regular season and in postseason national championship tournaments.  But there are also "11 NCAA championships that are considered 'National Collegiate,' which feature cross-division competition."[5]

"[T]here are more than 350 Division I schools that field more than 6,000 athletics teams and provide opportunities for more than 170,000 student-athletes to compete in NCAA sports each year."[6]  The vast majority of the schools in Division I belong to one of dozens of

---

[1] This Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," as well as "document[s] integral to the complaint."  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (cleaned up).  It may also judicially notice facts that are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

[2] Compl. ¶ 1 n.1; *Our Division I Story*, https://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx.

[3] *Division II partial-scholarship model*, https://www.ncaa.org/sports/2014/9/25/division-ii-partial-scholarship-model.aspx.

[4] *Our Division III Story*, https://www.ncaa.org/sports/2021/2/16/our-division-iii-story.aspx.

[5] *National Collegiate*, https://www.ncaa.org/sports/2021/5/4/championships.aspx.  They are Men's and Women's Water Polo and Gymnastics; Mixed Skiing, Rifle, and Fencing; Men's Volleyball; and Women's Beach Volleyball, Bowling, and Ice Hockey.  *See also Division III Championships*, https://www.ncaa.org/sports/2021/5/11/division-iii-championships.aspx.

[6] *Our Division I Story*, https://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx.

conferences, like the Ivy League, across many of the varsity sports the school offers. The schools compete primarily against other members of their conference during the regular season, and then exclusively with the other schools in their conference for a postseason conference championship.[7]

**B.    The Ivy League**

Brown University, Columbia University, Cornell University, Dartmouth College, Harvard University, the University of Pennsylvania, Princeton University, and Yale University (collectively, "University Defendants") are the eight Division I institutions that constitute one athletic conference, called the Ivy League. Compl. ¶¶ 25, 96-97.[8] The Ivy League Council of Presidents is "the governing body of the Ivy League" and "coordinates the common rules, procedures, and initiatives among the University Defendants." *Id.* ¶ 5. The University Defendants compete against each other and opponents from other conferences in dozens of sports ranging from football to fencing to rowing. *Id.* at App. D; Decl. of Seth Waxman dated May 15, 2023 ("Waxman Decl."), Ex. 1 ("Ivy Manual") 102. Distinct NCAA and Ivy League rules governing eligibility, recruiting, training, travel, competition, and scheduling apply to different NCAA and Ivy League sports.[9]

In 1945, the University Defendants first "entered into an agreement regarding football, with the purpose of maintaining the values of the game in the service of higher education." Ivy

---

[7] *See* Compl. ¶¶ 82, 92; *id.* at App. D.

[8] Division I is further subdivided into three groups based on football sponsorship: the Football Bowl Subdivision, the Football Championship Subdivision, and a third that does not sponsor football at all. Compl. ¶ 1 n.1. Ivy League football teams compete in Division I FCS, formerly known as Division 1-AA. *See id.* (citing *Our Division I Story*).

[9] *See, e.g.*, *NCAA Division I Manual 2022-23*, art. 17 (eff. Aug. 1, 2022), (regulating seasons sport by sport), https://web3.ncaa.org/lsdbi/reports/getReport/90008; Ivy Manual 101-125 ("Athletic Administration: Special Regulations in Particular Sports").

Manual 151, Appendix A.  In 1954, they named themselves "The Ivy Group" and arrived at the "Ivy Group Agreement" based on their shared "conviction that [the] proper conditions [for] intercollegiate competition in organized athletics … require that the players shall be truly representative of the student body and not composed of a group of specially recruited athletes." *Id*. (¶ III).  To strengthen that balance between athletics and academics, the Ivy Group "reaffirm[ed] their prohibition of athletic scholarships" and determined that "[a]thletes shall be admitted as students and awarded financial aid only on the basis of the same academic standards and economic need as are applied to all other students."  *Id.* at 152 (¶ IV.A.6).

Today, Ivy League schools continue to share substantially the same understanding of the role athletics should play in campus life at the member institutions.  "[N]eed as the basis for financial aid for student-athletes is a cornerstone of Ivy belief."  Ivy Manual 5 (¶ D.5).  The current Ivy Manual provides: "All the Ivy League institutions follow the common policy that any financial aid for student-athletes will be awarded and renewed on the sole basis of economic need with no differentiation in amount or in kind (e.g. packaging) based on athletic ability or participation."  Compl. ¶ 134 (quoting Ivy Manual 149).  Students do not attend simply because of athletic scholarships, nor are they required to continue playing varsity sports to maintain the scholarships that allow them to attend.  This policy thus ensures that student-athletes and non-athletes alike can fully engage in all aspects of the Ivy League college experience, and that student-athletes can continue to obtain an Ivy League education should they opt to cease playing sports or suffer an injury.

### C.      Previous Antitrust Challenges To NCAA Rules

The Supreme Court has twice considered whether certain NCAA rules violated the Sherman Act's prohibition on any "contract, combination …, or conspiracy, in restraint of trade or commerce among the several States," 15 U.S.C. § 1, and applied the rule of reason each time.

In the first case, *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), the Court reviewed NCAA rules limiting the number of intercollegiate football games that could be televised and setting the price teams could charge for the right to broadcast their games. *Id.* at 85, 94-96. These rules, which the Court characterized as both horizontal price-fixing (meaning an agreement between competitors to charge a certain price) and a horizontal output limitation (meaning an agreement to reduce the quantity of a product), *id.* at 99-100, were "analy[zed] … under the Rule of Reason" because the case "involve[d] an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101, 103. Thus, the Court held that it must consider "the NCAA's justifications for the restraints" to undertake "a fair evaluation of their competitive character." *Id.* at 103.

Two years ago, in *NCAA v. Alston*, 141 S.Ct. 2141 (2021), the Supreme Court again considered whether certain NCAA rules violated the antitrust laws. The plaintiffs in *Alston* alleged that the defendants, "the NCAA and 11 Division I conferences," violated Section 1 of the Sherman Act by agreeing to adopt an "interconnected set of NCAA rules that limit the compensation [student-athletes] may receive in exchange for their athletic services." *Id.* at 2151 (cleaned up). They asserted three separate "national markets" "for athletic services"—"in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *Id.* at 2151-2152 (cleaned up).

Applying the rule of reason, as *Board of Regents* requires, the district court first found that the challenged rules had anticompetitive effects because the NCAA "enjoys 'near complete dominance of, and exercised monopsony power in, the relevant markets.'" *Alston*, 141 S.Ct. at 2151-2152 (quoting *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019)) (cleaned up). Next, the court found that the NCAA had shown that the

challenged rules "have procompetitive effects to the extent they prohibit compensation unrelated to education, akin to salaries seen in professional sports leagues." *Id.* at 2162 (quoting *NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1082-1083) (cleaned up). Nevertheless, the court found the challenged rules unlawful because the plaintiffs had proven that less-restrictive alternatives were available, including allowing "[i]ndividual conferences to set or maintain limits on education-related benefits that the NCAA will not be allowed to cap." *NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1088. Because "no individual conference dominates nearly the entire market, like the NCAA does," the district court found that such restrictions at the individual conference level "would not have an anticompetitive effect." *Id.*

The district court's injunction therefore expressly provided that "any NCAA member conference may, individually, fix or limit compensation or benefits related to education that may be made available from that conference or its member schools to Division I women's and men's basketball and FBS football student-athletes on top of a grant-in-aid." *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 2019 WL 1593939, at *2 (N.D. Cal. Mar. 8, 2019).

The Ninth Circuit and Supreme Court affirmed the district court's decision. In its unanimous opinion, the Supreme Court repeatedly highlighted that, under the district court's injunction, "individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still." *Alston*, 141 S.Ct. at 2164. It noted, for example, that the district court "emphasized that its injunction applied only to the NCAA and multi-conference agreements—thus allowing individual conferences (and the schools that constitute them) to impose tighter restrictions if they wish." *Id.* at 2154. And the Supreme Court itself echoed the district court's emphasis that "individual conferences may restrict internships however they wish," and that "individual conferences may adopt even stricter" rules than those the NCAA

defended.  *Id.* at 2165.  The reason is straightforward:  Individual conferences (unlike the broader NCAA) are not standalone antitrust product markets, and individual conferences lack market power.

### D.  This Suit

Plaintiff Tamenang Choh is a graduate of Brown who played on its men's basketball team.  Compl. ¶ 3.  Plaintiff Grace Kirk is a current student at Brown, where she plays on the women's basketball team.  *Id.*  Both Plaintiffs were recruited to play basketball by Brown and other Division I colleges, and both received full athletic scholarship offers from other (unspecified) Division I schools.  *Id.* ¶¶ 23-24.  Both Plaintiffs rejected their scholarship offers from other schools and instead chose to enroll at Brown, where they each received need-based financial aid but not athletic scholarships.  *Id.*

Plaintiffs commenced this putative class action in March 2023, alleging that the Ivy League's rule prohibiting the University Defendants from awarding their student-athletes scholarships based on their athletic performance or participation ("Ivy League Agreement") violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  They principally contend that the Ivy League Agreement amounts to horizontal price-fixing to limit the compensation member schools can pay student-athletes, rendering it *per se* unlawful.  Compl. ¶¶ 130-131, 141-144, 190.

Alternatively, Plaintiffs allege that the agreement fails under the rule of reason.  Compl. ¶ 198.  In connection with their claims, Plaintiffs posit two primary markets, and a modified alternative to each.  The first purported market is the so-called "AAHA [meaning athletically and academically high-achieving] Educational Services Market," in which schools "compete to offer educational services to AAHA students."  *Id.* ¶ 201; *see also id.* ¶ 7 (defining "AAHA").  The second purported market is "AAHA Athletic Services Market," in which students allegedly "sell their athletic services to" schools.  *Id.* ¶ 212.  Plaintiffs lead with the proposition that each of

these alleged markets comprises only the schools in the Ivy League—i.e., the University Defendants—offering as a fallback alleged markets that add "a small number of other academically selective universities," such as—but not limited to—"Stanford, Notre Dame, Duke, and Rice." *Id.* ¶¶ 210, 218. Plaintiffs assert that the Ivy League Agreement has an anticompetitive effect in these markets, and that there are no countervailing procompetitive benefits, that such benefits are outweighed by the harms, or that they can be achieved by less restrictive alternatives. *Id.* ¶ 228.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "[N]aked assertion[s]" unsupported by factual allegations "will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). "Determining whether a complaint states a plausible claim" in light of the non-conclusory facts alleged "requires the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 679. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## ARGUMENT

## I. PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A *PER SE* ANTITRUST VIOLATION

Plaintiffs have not plausibly alleged a *per se* violation of the Sherman Act. The "threshold determination as to which analytical framework under the Sherman Act … should be applied … rais[es] a question of law" appropriately resolved on a motion to dismiss. *United States v. Aiyer*, 33 F.4th 97, 113 (2d Cir. 2022); *see also Planetarium Travel, Inc. v. Altour Intern., Inc.*, 97 F. Supp. 3d 424, 431 (S.D.N.Y. 2015) (holding on a motion to dismiss that "the *per se* rule is inappropriate, and the rule of reason applies"); *Prime Healthcare Servs. Inc. v.*

*Service Emps. Int'l Union*, 2012 WL 3778348, at *6 (S.D. Cal. Aug. 30, 2012) ("Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss." (cleaned up)).

Well-established precedent requires that Plaintiffs' claim be assessed under the rule of reason. "Determining whether a restraint is undue for purposes of the Sherman Act presumptively calls for … rule of reason analysis." *NCAA v. Alston*, 141 S.Ct. 2141, 2151 (2021) (cleaned up). The rule of reason applies whenever a restraint "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition." *California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999). Indeed, courts "take special care not to deploy" *per se* liability unless they "have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Alston*, 141 S.Ct. at 2156. *Per se* treatment is especially inappropriate when a plaintiff challenges "restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006).

"Regulation of league sports [provides] a textbook example of when the rule of reason applies." *North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018). As the Supreme Court has explained, "the NCAA and its member institutions market … competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which competitors agreed to create and define the competition to be marketed." *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984). Accordingly, the rule of reason applies not only to the "playing rules," such as "rules affecting … the size of the field [or] the number of players on a team," but also to the rules

governing athlete "eligibility" and "recruiting," such as rules requiring that "athletes must not be paid, must be required to attend class, and the like," because they "preserve the character and quality of the 'product.'" *Id.* at 88, 101-102. Such rules "widen consumer choice[,] … and hence can be viewed as procompetitive." *Id.* at 102.

The Supreme Court has affirmed this principle repeatedly. *Alston*, which applied the rule of reason to NCAA-wide rules limiting compensation for student-athletes, is the most recent example. *See* 141 S.Ct. at 2156-2157. *American Needle, Inc. v. National Football League*, which concluded that a professional football league's licensing agreement "must be judged according to the flexible Rule of Reason," is another. 560 U.S. 183, 203 (2010). Similarly, every circuit, including the Second Circuit, to have considered league sports agreements like the one challenged here has held that these agreements are to be analyzed under the rule of reason. *E.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 334 (2d Cir. 2008); *North Am. Soccer League*, 883 F.3d at 41; *O'Bannon v. NCAA*, 802 F.3d 1049, 1069 (9th Cir. 2015); *Smith v. NCAA*, 139 F.3d 180, 186-187 (3d Cir. 1998), *vacated on other grounds by* 525 U.S. 459 (1999); *McCormack v. NCAA*, 845 F.2d 1338, 1344 (5th Cir. 1988); *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 74 (3d Cir. 2010). Far from the "considerable experience" establishing universal illegality that is necessary to warrant *per se* treatment, *see Alston*, 141 S.Ct. at 2156, these cases underscore that courts routinely apply rule of reason analysis to sports league regulations, and frequently uphold the challenged rules.

The Ivy League Agreement falls squarely within this settled doctrine and therefore, as a matter of law, is not illegal *per se*. The complaint alleges that "[t]he 'Ivy League' is an athletic conference" in which its members, the eight University Defendants, compete against each other in various sports. Compl. ¶¶ 25, 96. The complaint also alleges that the Ivy League Agreement

is a pact among the University Defendants to provide scholarships to student-athletes based only on financial need. *Id.* ¶¶ 131-134. The Ivy League Agreement is thus a policy governing how the various members of a sports league recruit and compensate players. As explained above, league rules of this sort (and even rules far more attenuated from an individual league's underlying product, like the NCAA-wide television broadcast restrictions in *Board of Regents*) are subject to the rule of reason because they offer facially credible procompetitive benefits in enhancing consumer choice.

Here, the Ivy League has aimed to provide a framework for intercollegiate athletic competition among schools that have deliberately chosen not to offer athletic scholarships to ensure that, "[i]n the total life of the campus, emphasis upon intercollegiate competition [is] kept in harmony with the essential educational purposes of the institution." Ivy Manual 151, Appendix A (¶ IIII). The challenged rule helps broaden consumer choice by offering a campus culture and college experience where student-athletes and non-student-athletes are treated equally and financial assistance provided to student-athletes is not conditioned on their continued participation in varsity sports, while preserving a measure of competitive balance within the athletic conference and still allowing student-athletes the opportunity to play competitive Division I sports. *See Rock v. NCAA*, 928 F. Supp. 2d 1010, 1026 (S.D. Ind. 2013) (Division III rule against athletic scholarships "widen[s] consumer choice" by "distill[ing] amateurism to an even purer form because the student-athletes do not receive free or reduced tuition in exchange for their participation"). By ensuring that this option is available to consumers, the Ivy League Agreement credibly enhances competition. In contrast, preventing the Ivy League from continuing to adhere to its longstanding rule, and so encouraging the University Defendants to

mimic other schools' admissions and financial aid priorities, plausibly *narrows* consumer choice by taking that option away.

Furthermore, rule-of-reason treatment is required because the agreement challenged is at most an ancillary restraint to the procompetitive collaboration between the University Defendants. "[A]ncillary restraints" are "part of a larger endeavor whose success they promote." *Major League Baseball Props.*, 542 F.3d at 339 (Sotomayor, J., concurring) (quoting *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–189 (7th Cir. 1985)); *see also Dagher*, 547 U.S. at 7 (an "ancillary restraint" is one "imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities"). Ancillary restraints are "exempt[] … 'from the per se [treatment].'" *Aiyer*, 33 F.4th at 115. It cannot be credibly disputed (and Plaintiffs do not dispute) that *some* form of collaboration regarding the recruitment and compensation of student-athletes is reasonably necessary to have a functioning league with a relatively level playing field. And here, the challenged conduct enables the collaboration to offer its differentiated product to student-athletes. Therefore, on the face of the complaint, the ancillary restraints doctrine squarely applies and precludes *per se* treatment. *See, e.g.*, *Giordano v. Saks Inc.*, 2023 WL 1451534, at *14 (E.D.N.Y. Feb. 1, 2023) (*per se* treatment is improper as a matter of law where the "pleadings include details of (1) a procompetitive collaboration between defendants *and* (2) details illustrating how the challenged agreement is related to that procompetitive collaboration"), *appeal pending*, No. 23-600 (2d Cir.).

In contrast, only so-called "naked" restraints are condemned *per se* under the antitrust laws. *See, e.g.*, *Freedom Holdings, Inc. v. Spitzer*, 447 F. Supp. 2d 230, 249 (S.D.N.Y. 2004). A naked restraint is one where "the restriction on competition is unaccompanied by new production or products." *Major League Baseball Props.*, 542 F.3d at 339 (Sotomayor, J., concurring).

From the face of the complaint, it is obvious that the challenged agreement is not "naked" and so cannot be treated as *per se* illegal. The complaint necessarily concedes that Defendants are engaged in a joint effort to offer various league sports. *See, e.g.*, Compl. ¶¶ 5, 96-100. As a matter of law, the *per se* rule does not apply to that collaboration because it helps make Ivy League sports available.

Plaintiffs allege two purported bases for *per se* liability, neither of which remotely overcomes the well-settled principle that these types of rules among participants in a sports league are subject to the rule of reason. *First*, Plaintiffs allege that the Ivy League Agreement is *per se* illegal because it is a "horizontal agreement[] on price restraints with respect to commercial activities." Compl. ¶ 141. Assuming, for purposes of this motion only, that Plaintiffs accurately characterize the Ivy League Agreement (and they do not), *Board of Regents* expressly rejected the proposition that an NCAA rule was *per se* unlawful despite characterizing the rule as horizontal price-fixing. 468 U.S. at 103. *Alston* likewise applied the rule of reason to NCAA-wide limitations on the education-related compensation at issue in that case. 141 S.Ct. at 2156-2157. Plaintiffs have not, and cannot, offer any reason, or plead any facts, as to why the Ivy League Agreement should not be analyzed under the same rubric.

*Second*, relying on *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), Plaintiffs contend that the Ivy League Agreement is *per se* illegal "because the University Defendants' athletic operations are commercial enterprises and are not purely altruistic," but rather "seek to maximize revenue." Compl. ¶¶145-146. Even if that were true (and it is not), it is irrelevant. *Brown* does not articulate a basis for applying the *per se* rule to sports league regulations. In fact, *Brown* neither involved a sports league nor applied the *per se* rule to the challenged conduct before it. *See* 5 F.3d at 661 (reviewing under rule of reason agreement "to

distribute financial aid exclusively on the basis of need and to collectively determine the amount of financial assistance commonly admitted students would be awarded"). Moreover, the NCAA has repeatedly been called "commercial," yet the Supreme Court and lower courts consistently apply the rule of reason to evaluate its rules. *See, e.g.*, *Alston*, 141 S.Ct. at 2149 (noting long history of "commercialism" and "profitab[ility]" in college sports); *O'Bannon*, 802 F.3d at 1065 (similar); *Board of Regents*, 468 U.S. at 100-101 n.22 (similar). And, as *American Needle* and the other precedent cited above shows, the Supreme Court and the courts of appeals, including the Second Circuit, have also held that the rule of reason governs the agreements of professional sports leagues, which are indisputably commercial and profit-maximizing entities. *See American Needle*, 560 U.S. at 186 (case involves "the business of the 32 teams in the National Football League"); *accord supra* p.13 (citing cases from applying to rule of reason to various other professional sports leagues).

## II.    PLAINTIFFS FAILED TO STATE A CLAIM UNDER THE RULE OF REASON

Plaintiffs' complaint also fails under the rule of reason as a matter of law. Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. American Express*, 138 S.Ct. 2274, 2284 (2018). Plaintiffs can carry this burden either "directly or indirectly." *Id.* "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (cleaned up). To proceed indirectly, Plaintiffs must plausibly allege facts "showing that the defendant[s] ha[ve] sufficient market power to cause an adverse effect on competition," along with some "other grounds for believing the challenged restraint harms competition." *North Am. Soccer League*, 883 F.3d at 42 (cleaned up).

Either way, "[i]n pleading an adverse effect, the plaintiff must show that the challenged action had an effect on competition 'as a whole in the relevant market.'" *Cenedella v. Metropolitan Museum of Art*, 348 F. Supp. 3d 346, 362 (S.D.N.Y. 2018) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)). To allege harm to market-wide competition, plaintiffs necessarily "must allege a plausible relevant market in which competition will be impaired." *City of N.Y. v. Group Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). An alleged market that excludes obvious substitutes or includes obvious non-substitutes fails as a matter of law. *See Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008); *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974). Here, Plaintiffs fail to state a claim under the rule of reason because their alleged markets are fatally flawed and because they offer no facts—only conclusory speculation—about direct anticompetitive effects.

## A. Plaintiffs Have Not Plausibly Alleged Any Properly Defined Market

Both primary proposed markets focus on only the eight universities that together make up the Ivy League. Plaintiffs' purported "AAHA Educational Services Market," a term manufactured for this litigation, consists solely of the schools in the Ivy League, "which all compete to offer educational services to AAHA students." Compl. ¶ 201. Plaintiffs' purported "AAHA Athletic Services Market," another of Plaintiffs' inventions, consists of student athletes who supposedly "sell their athletic services to the University Defendants." *Id.* ¶ 212. Plaintiffs also offer alternative definitions for each market, which would cover the schools in the Ivy League "and a few other schools, including Stanford, Notre Dame, Duke, and Rice." *Id.* ¶ 210; *see also id.* ¶ 218. Each proposed market definition fails as a matter of law.

### 1. Both alleged primary markets exclude obvious and conceded reasonable substitutes

"Where the plaintiff … alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman*, 546 F.3d at 238 (cleaned up). Applying this well-settled principle, the Second Circuit has affirmed dismissal of an antitrust complaint predicated on an alleged product market consisting solely of a Yale undergraduate education, holding that the "annual rankings of colleges and universities in *U.S. News and World Report* … illustrates the obvious: there are many institutions of higher learning providing superb educational opportunities." *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000). If prospective students did not like the Yale policy they were challenging, "they could matriculate elsewhere." *Id.* at 86-87; *see also Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 29 (2d Cir. 2015) (affirming dismissal of complaint alleging a market of "labor services provided by nonmanagerial Hotel employees working or seeking work in Marriott-managed hotels in New York City" as implausibly narrow on its face).

The question, therefore, is whether Plaintiffs have alleged facts making it plausible that athletically and academically high achieving student-athletes consider only the eight University Defendants when deciding which college to attend. The answer is so obviously "no" that Plaintiffs' own allegations concede it. Plaintiffs allege that these eight schools are unique because of "both the high-level Division I athletics programs and the rigorous academic programs" that they offer. Compl. ¶ 202. But Plaintiffs *also* allege that there are *non*-Ivy League schools that "maintain stellar academic standards while competing for excellent athletes," and indeed they identify by name some of those schools, all of which offer athletic

scholarships to compete in Division I. *Id.* ¶ 11. If the market is defined by offering "high-level Division I athletics programs" and "rigorous academic programs," *id.* ¶ 202, then the other schools that Plaintiffs allege also "maintain stellar academic standards while competing for excellent athletes," *id.* ¶ 11, necessarily must be included in the relevant market.

Even if Plaintiffs had not conceded the point, "judicial experience and common sense" confirm that these markets are implausibly narrow. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (affirming dismissal of antitrust claim alleging market for "in-play" advertising during golf tournaments, as distinct from advertising during commercial breaks). The Ivy League is just one conference of just eight schools. Discovery is not necessary to know some student-athletes considering a school in the Ivy League might choose instead a full athletic scholarship from UVA, Michigan, Berkeley, UCLA, Duke, UNC Chapel Hill, Stanford, Georgetown, Rice, Notre Dame, Vanderbilt, or scores of other schools that offer "high-level Division I athletics programs" and "rigorous academic programs." Compl. ¶ 202. As the Second Circuit put it, if prospective student-athletes do not like the balance of academic and athletic experiences that the Ivy League offers, then "they could matriculate elsewhere." *Hack*, 237 F.3d at 86-87.

This self-evident point was fundamental to the decision in *Alston*. The district court found that allowing "[i]ndividual conferences to set or maintain limits on education-related benefits that the NCAA will not be allowed to cap" was a less restrictive means of achieving the same procompetitive benefits as the challenged NCAA-wide rules precisely because "no individual conference dominates nearly the entire market, like the NCAA does." *NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1088. Because no conference is itself a standalone antitrust market, and therefore no individual conference has market power, restrictions at the

individual conference level "would not have an anticompetitive effect." *Id.* The Supreme Court, in turn, rejected the NCAA's argument that the injunction constrained the NCAA from delivering "the same procompetitive benefits as its current rules," *Alston*, 141 S.Ct. at 2163, in part because under the district court's injunction, "individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still," *id.* at 2164; *accord id.* at 2165.

At most, these two Plaintiffs have alleged that they individually wanted to attend an Ivy League school and play varsity sports. But an alleged product market "is legally insufficient" if "it is defined by the [plaintiff's] preferences, not according to the rule of reasonable interchangeability and cross-elasticity of demand." *City of N.Y.*, 649 F.3d at 156. The Ninth Circuit, for example, rejected as a matter of law an alleged market consisting solely of UCLA's women's soccer program because "nothing beyond [the plaintiff's] personal preferences suggests that UCLA was the only potential option." *Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001). Likewise, Plaintiffs' asserted preference here to attend an Ivy League school cannot define an antitrust product market, particularly when their complaint itself affirmatively concedes the existence of materially comparable schools outside the Ivy League.

Precedent, common sense, and Plaintiffs' own allegations confirm the obvious: Plaintiffs' "attempt to carve up" the nationwide market for higher education for student-athletes "into an artificially small" Ivy-League-only market "is sufficiently implausible to render dismissal appropriate at the pleading stage." *Madison*, 624 F. App'x at 29 (cleaned up).

### 2. The alternative alleged markets are insufficiently defined

Recognizing the implausibility of a market consisting of just eight schools, Plaintiffs offer alternative markets that include "a few other schools, including Stanford, Notre Dame, Duke, and Rice." Compl. ¶ 210; *see also id.* ¶ 218. But plaintiffs "have not pled the scope or

boundaries" of these alternative markets. *Moccio v. Cablevision Sys. Corp.*, 208 F. Supp. 2d 361, 380 (E.D.N.Y. 2002). And antitrust plaintiffs necessarily cannot plausibly allege market power in markets they have not defined. Plaintiffs thus doubly fail to carry their burden.

*First*, these proposed market definitions fail for the simple reason that Plaintiffs do not actually propose the contours of a relevant market. The complaint makes clear that it has not listed all the schools in these alleged markets—just those in the Ivy League and four other examples that are also "includ[ed]." Compl. ¶ 210. A great many schools offer academic excellence and competitive sports teams. Which are included? Which are excluded? Why or why not? These fuzzy allegations do not "allow the Court to perform an analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products," and therefore fail to state a claim. *Laboratoires Majorelle SAS v. Apricus Biosciences, Inc.*, 2018 WL 11222863, at *5 (S.D.N.Y. Sept. 21, 2018) (cleaned up); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) ("Without an explanation of the other insurance companies involved, … the court cannot determine the boundaries of the relevant product market and must dismiss the case for failure to state a claim."); *Vital Pharms., Inc. v. Berlin Packaging LLC*, 2022 WL 4552094, at *4 (N.D. Ill. Sept. 29, 2022) (granting motion to dismiss because "failure to clearly identify the product and market at issue disables the court from engaging in the necessary consideration of potential substitutes"); *Prescient Med. Holdings, LLC v. Laboratory Corp. of Am. Holdings*, 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019) (dismissing complaint that "does not identify which laboratory services are a part of the relevant product market, let alone which services are reasonably interchangeable").

*Second*, the absence of any meaningful market definition makes it impossible to evaluate whether Plaintiffs have plausibly alleged that Defendants have the market power necessary to

withhold athletic scholarships and other athletics-based aid without losing athletically and academically high-achieving student-athletes to other excellent schools in these alternative markets. *See Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (granting motion to dismiss because, "[w]ithout a more specific definition and accounting of the brands and suppliers to be included in the relevant market, the Court cannot determine the boundaries of the market" and is "unable to assess Defendants' market power").

Plaintiffs allege only that, in their view, the alternative markets consist of "a small handful of schools other than the University Defendants." Compl. ¶ 226. But antitrust plaintiffs cannot meet their pleading burden by alleging product markets that consist of defendants and all sellers of reasonably interchangeable products, promising there are few. They must allege *facts* that render plausible their claimed market and defendants' market power in it. Indeed, courts consistently reject allegations of market power that provide far more context than Plaintiffs do here. *See, e.g., FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (collecting cases dismissing complaints that allege actual percentages of market power); *Planetarium Travel, Inc. v. Altour Int'l Inc.*, 622 F. App'x 40, 41 (2d Cir. 2015) (affirming dismissal where the complaint's "factual allegations provide no indication that such market share gives rise to market power"). Plaintiffs cannot state a claim by simply gesturing at an alternative, undefined market.

### 3. Plaintiffs implausibly assume, without explanation, a single, generic "sports" market consisting of dozens of different sports

Plaintiffs' proposed markets also independently fail because they nowhere allege any facts to explain how a *single* market for student-athletes can plausibly consist of *dozens* of different sports. In an instructive opinion, the district court in *Rock* dismissed a similar claim based on a similarly overbroad alleged market. There, the plaintiffs brought an antitrust suit against the NCAA and proposed a relevant "nationwide market for the labor of student athletes."

928 F. Supp. 2d at 1019-1020.  This proposed market failed as a matter of law because all "NCAA schools are not necessarily adequate substitutes for each other."  *Id.* at 1021-1022.  "Plaintiffs' decision to lump all NCAA schools into the same market regardless of material distinctions in division, sport offered by gender, or athletic success proves that their proposed market is not legally cognizable."  *Id.* at 1022.  Most notably, for example, it is "implausible for Plaintiffs to suggest that a school without a football team is an adequate substitute for a school with a football team, from the perspective of a student-athlete who wants to play football."  *Id.*

So too here.  Plaintiffs allege a *single* market of "educational services for athletically and academically high-achieving … students who seek to graduate from college and play Division 1 sports in the [NCAA]" and a *single* market of "the athletic services of the AAHA students who seek to play for the University Defendants."  Compl. ¶ 7.  They do not even try to distinguish among the different individual sports that athletically and academically high-achieving students play and that allegedly form the basis for their decisions about which undergraduate institution to attend.  Certainly, Plaintiffs plead no facts to explain the inclusion of these disparate sports in a single market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand," as is their burden at the pleading stage.  *Chapman*, 546 F.3d at 238 (cleaned up).

Nor could they.  No sports team at any school is a reasonable substitute for a team that plays a *different* sport at any other school.  *See GateGuard, Inc. v. Amazon.com Inc.*, 2023 WL 2051739, at *18 (S.D.N.Y. Feb. 16, 2023) (dismissing antitrust complaint alleging "e-commerce delivery market" because plaintiff's "residential intercom device" was "lumped into the same market as e-commerce retailers, order-fulfillment centers, and shipping couriers").  An aspiring collegiate volleyball player does not consider any school's cross-country or gymnastics team to

be a reasonable substitute.  This "[f]ailure to define the [relevant] market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." *Id.*

This is no mere formality.  Plaintiffs use a single, generic "sports" market to bulldoze over obvious market differences as to particular sports.  But those differences are critical, and the failure to address them with reference to the rule of reasonable interchangeability and cross-elasticity of demand is fatal to Plaintiffs' claim.

As in *Rock*, the eight University Defendants in this case do not offer all the same sports. 928 F. Supp. 2d at 1022.  Plaintiffs allege that Harvard offers 41 different Division I sports, whereas Columbia offers only 33.  Compl. ¶¶ 40, 57; *see also id.* ¶¶ 34, 45, 50, 63, 69, 75 (other University Defendants alleged to offer different numbers of NCAA sports).  Plaintiffs' complaint concedes that Columbia does not offer men's lacrosse, and Yale and Dartmouth do not offer wrestling.  *See id.* at App. D.  Not all Ivy League schools offer varsity ice hockey, men's fencing, equestrian sports, women's rugby, polo, skiing, archery, squash, women's sailing, golf, or men's volleyball.[10]  The Ivy League schools that do not offer those sports cannot be reasonable substitutes for those that do.

Nor do Plaintiffs allege facts suggesting that any specific sports teams at different Ivy League schools are reasonable substitutes for each other.  In fact, Plaintiffs' only sport-specific allegations *confirm* that the teams in the Ivy League are *not* all reasonably interchangeable.

---

[10] *See* ivyleague.com (cited in Compl. ¶¶ 7, 108, 125, 213, and App. D) (each sport's website shows Ivy League standings in that sport, where schools that do not have the relevant team are not included); *see also* https://brownbears.com/ (hover over "Sports"); https://cornellbigred.com/ (hover over "Men's Sports" and "Women's Sports"); https://gocolumbialions.com/ (hover over "Teams"); https://dartmouthsports.com/ (click on "Teams"); https://gocrimson.com/ (hover over "Teams"); https://pennathletics.com/ (click on the menu icon, then "Teams"); https://goprincetontigers.com/ (hover over "Sports"); https://yalebulldogs.com/ (hover over "Sports").

Plaintiffs allege that "there is little competitive balance within the Ivy League, by sport," Compl. ¶ 230, and summarize in Appendix D the different degrees of athletic success each school has had in different sports. Consider Princeton's women's basketball team. Plaintiffs refer to its "total domination since 2010," *id*. at App. D, and cite an article reporting that it has "16 conference losses, total, since 2009" and recently "reached the NCAA Tournament for the ninth time in the last 11 postseasons in which they've been eligible to compete," Waxman Decl., Ex. 2, Hamilton, *How Princeton women's basketball created the blueprint for national prominence in the Ivy League*, THE ATHLETIC (Nov. 2, 2022) (cited in Compl. ¶ 233).[11]  No other Ivy League women's basketball team has *ever* been ranked in the top 25 nationally. *Id.*  Far from pleading facts showing that the typical women's basketball player considers all the teams in the Ivy League to be reasonably interchangeable—as is their burden—Plaintiffs' allegations and incorporated material suggest precisely the opposite, both as to women's basketball and numerous other sports. *See generally* Compl. at App. D.

Plaintiffs' decision to allege just a single market that includes dozens of different sports also highlights both the implausibility of their Ivy-League-only market and their failure to identify a coherent set of schools in the undefined "Ivy League *et al.*" markets.  For example, Plaintiffs' allegations make clear that a female basketball player considering Princeton is highly likely to consider other universities outside the Ivy League that have comparably successful basketball programs and strong academics.  Or consider an academically talented skier.  She might apply to Harvard and Dartmouth—the only two University Defendants that offer Division I skiing.  But she will also likely consider selective liberal arts colleges like Bates, Bowdoin,

---

[11] *Available at* https://theathletic.com/3748734/2022/11/02/princetonivy-league-womens-basketball/.

Colby, Middlebury, or Williams, each of which has a varsity ski team that competes in the same conference as Harvard and Dartmouth—the Eastern Intercollegiate Ski Association—and for the same national collegiate championship together with all other ski teams, regardless of Division.[12] On Plaintiffs' allegations, those schools must be included in the purported market for a competitive skier, but would not be included for, say, a football player. Similarly, the NCAA hosts just one national championship for Divisions I, II, and III for each of men's water polo, men's and women's fencing, and men's and women's gymnastics. *See supra* p.5 & n.5. Johns Hopkins plays Division I lacrosse in the Big Ten Conference, and MIT offers Division I rowing.[13] The complaint fails to even attempt to plead any facts plausibly showing why skiers, fencers, rowers, and water polo and lacrosse players would not consider these other academically selective schools whose teams compete in Division I.

The Court need not wade into these facts to dismiss the complaint (although they are either plain from the face of the complaint or capable of judicial notice). These examples simply illustrate Plaintiffs' complete failure to explain their decision to lump some 40-odd sports into a single generic "sports" market. To survive a motion to dismiss, they must offer plausible factual allegations showing that the teams at schools within the proposed market are both (1) reasonably interchangeable with each other and (2) not reasonably interchangeable with teams at schools outside the proposed market. They have not remotely done so.

---

[12] *Schools*, EISA, https://www.eisaskiing.org/schools.

[13] *Women's Lacrosse*, Big Ten, https://bigten.org/sports/womens-lacrosse; *Men's Lacrosse*, Big Ten, https://bigten.org/sports/mlax; *Athletics*, MIT, http://catalog.mit.edu/mit/campus-life/athletics/.

**B. Plaintiffs Have Not Plausibly Alleged Market-Wide Direct Anticompetitive Effects In Any Plausible Relevant Market**

Plaintiffs' conclusory allegations of direct anticompetitive effects do not save their claim, as those allegations turn entirely on their implausible alleged product market. "[P]leadings alleging rule of reason violations are frequently dismissed for failure to adequately allege market harm." *In re Google Digital Advert. Antitrust Litig.*, 2022 WL 4226932, at *18 n.18 (S.D.N.Y. Sept. 13, 2022) (collecting cases). Antitrust plaintiffs cannot meet their pleading burden under the rule of reason by alleging "output reductions, increased prices, or reduced quality" among just *some* market participants; they must plausibly allege those outcomes "*in the market as a whole*." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 & n.11 (2d Cir. 2021) (per curiam) (emphasis added). An allegation that some sellers have raised prices does not suggest a harm to competition or consumers where other sellers can offer a reasonable substitute at a lower price. "Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted." *Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) (dismissing complaint alleging diminished output from one cell phone supplier because "[o]ther allegations in the amended complaint, as well as common knowledge, make it clear that other large competitors … compete in the cellular telephone market").

Accordingly, courts regularly dismiss complaints that attempt to show "direct anticompetitive effects" by alleging harms to only *some* market participants rather than the market as a whole. In *Pennsylvania v. NCAA*, for example, Penn State alleged that certain NCAA sanctions had direct anticompetitive effects because they would require Penn State to "offer fewer scholarships." 948 F. Supp. 2d 416, 431 (M.D. Pa. 2013). The court rejected that argument because Penn State did not "*plausibly* support its allegation that the reduction of

scholarships at Penn State will result in a market-wide anticompetitive effect" in the relevant "*nationwide* market for Division I football players." *Id.* The court rejected a similar argument in *Rock* because allegations regarding "three Division I men's basketball teams and one Division I FBS football team" did not "support[] a reasonable inference" of anticompetitive effects "across divisions and in all sports." 928 F. Supp. 2d at 1024.

Other examples abound. In *Giordano*, four plaintiffs claimed that luxury retail companies' horizontal no-hire agreement created "an adverse effect on competition market-wide" in the national market for employees' labor, but alleged only that they were denied several jobs for which they were qualified. 2023 WL 1451534, at *2-3, *19 (cleaned up). The court held that the plaintiffs "ha[d] not pleaded facts to support the no-hire agreements' direct adverse effect on competition market-wide," explaining that "[e]ven at the pleading stage, without supporting facts, such conclusory statements are insufficient." *Id.* at *19 (cleaned up). Another court dismissed an antitrust claim where the plaintiff alleged anticompetitive effects by claiming "that the works of a select few artists have increased in price." *Cenedella*, 348 F. Supp. 3d at 362. That allegation was insufficient because it did "not show an actual adverse effect on competition" without additional "pleadings suggesting that this impacts the entire market," which "includes more than 1,000 galleries, seventy-five museums, and thirty art fairs." *Id.* Similarly, in *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, there was no "plausible inference of market-wide harm to competition" where "60% of the advertising market is free to compete … by offering better services to advertising consumers." 516 F. Supp. 2d 270, 294 (S.D.N.Y. 2007).

Plaintiffs' allegations of direct anticompetitive effects must likewise fail because they focus entirely on purported effects in the Ivy League alone. As just shown, the eight schools in

the Ivy League do not constitute a plausible product market.  *See supra* Part II.A.  The decision

by just eight schools to not offer athletic scholarships has no effect on the numerous obvious

competitor schools that do offer athletic scholarships—including those schools that offered

Plaintiffs full athletic scholarships.  *See* Compl. ¶¶ 23-24.  Plaintiffs therefore have not plausibly

alleged a direct anticompetitive impact in anything resembling an antitrust market.  Plaintiffs'

allegations do not plausibly suggest direct anticompetitive effects in the market as a whole, and

so cannot support their claim.

What is more, Plaintiffs' allegations of direct anticompetitive effects, Compl. ¶¶ 191-195,

include "no examples, data, or other facts to support their assertion, and a conclusory allegation

that prices have increased will not suffice to state [an] anticompetitive effect," *Spinelli v.*

*National Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (affirming grant of motion to

dismiss); *see also Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 2016 WL 5719790, at \*5

(S.D.N.Y. Sept. 29, 2016) (granting motion to dismiss in part because "the harm to competition

alleged … is wholly conclusory" and plaintiff alleges no "facts showing … how consumer

choice is restricted"), *aff'd*, 708 F. App'x 29 (2d Cir. 2017); *OmniMax Int'l, Inc. v. Anlin Indus.,*

*Inc.*, 2019 WL 2516121, at \*5 (D. Colo. June 17, 2019) (dismissing claim where "threadbare,

singular allegation—that the Agreements have anticompetitive effects because they tend to limit

the entry of new companies into the Colorado market—is assumptive, conclusory, not colored by

any facts permitting that inference").  Because such "assumptive, conclusory" theorizing is no

substitute for alleging facts, Plaintiffs' assertion of direct anticompetitive effects woefully fails

and provides an independent ground for dismissal.  *OmniMax*, 2019 WL 2516121, at \*5.

## III.  PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE ANTITRUST INJURY-IN-FACT

The complaint should also be dismissed because Plaintiffs fail to allege facts that

plausibly demonstrate injury-in-fact as required by the antitrust laws.  Only plaintiffs who have

been "injured in [their] business or property by reason of anything forbidden by the antitrust laws" may bring antitrust claims. 15 U.S.C. § 15(a); *see also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 81 (2d Cir. 2013). Thus, "[j]ust as in common-law tort and contract litigation, concepts such as 'foreseeability and proximate cause, directness of injury, [and] certainty of damages'" limit "a party's right to recovery, so in antitrust actions" inadequate allegations of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them" mandate dismissal. *Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005) (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 532-533, 535-536 (1983)). This bedrock requirement of an antitrust case must be established regardless of whether a claim proceeds under the *per se* rule or the rule of reason. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

Here, Plaintiffs offer no plausible connection between the Ivy League Agreement and their asserted injury. Plaintiffs blankly assert that Brown "would have awarded" each of them a "full athletic scholarship and compensated/reimbursed" them "for the athletic services" they provided. Compl. ¶¶ 23-24. But Plaintiffs allege no facts suggesting that, but for the Ivy League Agreement, Brown (or any other University Defendant) would choose to offer athletic scholarships or other compensation at all, much less for any particular sport or in any particular amount. Certainly, they offer none to show that these two Plaintiffs in particular would have received such scholarships, especially given the larger pool of athletic talent available to a school offering athletic scholarships. Nor do Plaintiffs allege facts contradicting the obvious point that their need-based aid awards would have been reduced if they also received athletic scholarships to help fund their undergraduate education.

Given these shortcomings, Plaintiffs have not plausibly alleged that they have suffered an injury caused by the purported anticompetitive conduct or redressable through this suit. "Plaintiffs are due all reasonable inferences, but they must allege some factual basis from which to make those inferences." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 99 (2d Cir. 2017). Plaintiffs' failure to allege facts showing any realistic antitrust injury is an independent reason that should compel this Court to dismiss the complaint.

## IV.    THE STATUTE OF LIMITATIONS BARS PLAINTIFF CHOH'S CLAIM

The antitrust statute of limitations runs for four years "after the cause of action accrued." 15 U.S.C. § 15b. Accrual occurs when "a defendant commits an act that injures" a plaintiff. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Plaintiff Choh alleges he was injured because, "[b]ut for the Ivy League Agreement, Brown would have awarded Choh a full athletic scholarship and compensated/reimbursed him for the athletic services he provided to Brown." Compl. ¶ 23. But Choh enrolled more than four years before this lawsuit was filed on March 7, 2023. *See id.* (Choh "attended Brown University from September 2017 until May 2022"). As alleged, his matriculation was subject to the final decision not to offer him any athletic scholarship or other compensation for his participation in varsity sports. And he does not allege that he requested an athletic scholarship at any point thereafter. His claim, if any, accrued when he matriculated.

The continuing violation doctrine does not save Choh's untimely claim. "As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010). To restart the limitations period, "an act must (1) be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Creative Copier Servs.*

*v. Xerox Corp.*, 2005 WL 2175138, at *1 (D. Conn. Sept. 2, 2005). "Under any meaningful definition," the mere "'renewal' of policies in existence" before the limitations period qualifies as "mere affirmation" that does not restart the limitations period. *Madison Square Garden, L.P. v. National Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008). Likewise, the continuing violation doctrine does not save a plaintiff's claim if injuries suffered within the limitations period were the result of a "final" decision made outside the limitations period. *Vitale v. Marlborough Gallery*, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("[E]ach supracompetitive price charged … pursuant to the 2006 contract was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract.").

That Plaintiff Choh did not receive an athletic scholarship or other compensation after he matriculated is simply the "unabated inertial consequence[]" of Brown's longstanding policy and final decision not to offer him (or anyone) an athletic scholarship or other compensation. *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004). That is "a single act [that] do[es] not restart the statute of limitations." *Id.* Plaintiff Choh's claim is therefore time-barred on the face of the complaint.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims.

Dated:   May 15, 2023                       Respectfully submitted,

*/s/ Seth P. Waxman*
Seth P. Waxman (phv03095)
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com

Alan Schoenfeld (phv207237)
David Gringer (phv207236)
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
david.gringer@wilmerhale.com

*Attorneys for Defendant The Trustees of the
University of Pennsylvania*

Deirdre M. Daly (ct23128)
David R. Allen (ct30827)
FINN DIXON & HERLING LLP
Six Landmark Square
Stamford, CT 06901
Tel.: (203) 325-5000
Fax: (203) 325-5001
ddaly@fdh.com
dallen@fdh.com

*Attorneys for Defendants*

Noah J. Kaufman (phv207186)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel.: (617) 341-7590
noah.kaufman@morganlewis.com

Jon R. Roellke (phv207185)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel.: (202) 739-5754
jon.roellke@morganlewis.com

*Attorneys for Defendant Brown University*

Karen Hoffman Lent (phv207216)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
Room 40-216
New York, NY 10001-8602
Tel.:  212-735-3276

Fax: 917-735-3276
karen.lent@skadden.com

Amy Van Gelder (phv207221)
John Kocoras (phv207222)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel.: 312-407-0903
amy.vangelder@skadden.com
john.kocoras@skadden.com

*Attorneys for Defendant The Trustees of Columbia
University in the City of New York*

Norm Armstrong (phv207230)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006
Tel.: (202) 737-0500
narmstrong@kslaw.com

Zachary T. Fardon (phv207217)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel.: (312) 995-6333
zfardon@kslaw.com

*Attorneys for Defendant Cornell University*

Terri L. Mascherin (phv207218)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
tmascherin@jenner.com

Ishan K. Bhabha (phv207234)
Douglas E. Litvack (phv10727)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001-4412
Tel.: (202) 637-6327
ibhabha@jenner.com
dlitvack@jenner.com

35

*Attorneys for Defendant Trustees of Dartmouth College*

Renata Hesse (phv207214)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
Tel.: (202) 956-7500
Fax: (202) 293-6330
hesser@sullcrom.com

Diane L. McGimsey (phv207215)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
Tel.: (310) 712-6600
Fax: (310) 712-8800
mcgimseyd@sullcrom.com

*Attorneys for Harvard University*

Juan A. Arteaga (phv05032)
Rosa Morales (phv207245)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel.: (212) 803-4000
Fax: (212) 223-4134
jarteaga@crowell.com
rmorales@crowell.com

Jordan Ludwig (phv11097)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel.: (213) 443-5524
Fax: (213) 622-2690
jludwig@crowell.com

*Attorneys for Defendant Princeton University*

Charles A. Loughlin (phv207263)
Benjamin F. Holt (phv01665)
Christopher M. Fitzpatrick (phv207257)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW

Washington, DC 20004
Tel.: (202) 637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
chris.fitzpatrick@hoganlovells.com

*Attorneys for Defendant Yale University*

Derek Ludwin (phv207232)
Meaghan Ryan (phv207233)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Tel: (202) 662-5429
Fax: (202) 778-5429
dludwin@cov.com
mryan@cov.com

*Attorneys for Defendant Council of Ivy Group Presidents*

**CERTIFICATE OF SERVICE**

I, Seth P. Waxman, hereby certify that, on May 15, 2023, I caused a copy of this Memorandum of Law in Support of Defendants' Motion to Dismiss to be served on all registered counsel electronically via the Court's ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by U.S. mail, postage prepaid, to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Seth P. Waxman*
Seth P. Waxman (phv03095)