**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TAMENANG CHOH and GRACE KIRK, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **No. 3:23-cv-00305-AWT** |
| v. | |
| BROWN UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, HARVARD UNIVERSITY, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, PRINCETON UNIVERSITY, YALE UNIVERSITY, and COUNCIL OF IVY GROUP PRESIDENTS, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

# **Table of Contents**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 5

   A.   College Athletics Are Big Business............................................................ 6

   B.   The University Defendants Operate as Commercial Enterprises ....................... 6

   C.   Defendants Act with Commercial and Revenue-Maximizing Motives ............................ 7

   D.   The Challenged Conduct Occurs in Related Markets, Reflecting the Unique, Well-Established Ivy League Brand........................................................................ 8

   E.   The Agreement's Limit on Price Competition for Athletes Is an Aberration.................... 9

   F.   The Ivy League Agreement Causes Antitrust Injury ......................................... 11

LEGAL STANDARD.................................................................................................. 11

ARGUMENT ......................................................................................................... 12

   A.   The Ivy League Agreement Is a *Per Se* Violation of Sherman Act Section 1 .................. 12

      1.   The Agreement Is a Classic *Per Se* Violation of the Sherman Act.............................. 12

      2.   Relevant Precedent Does Not Support Applying the Rule of Reason. ......................... 13

      3.   The Ancillary Restraints Doctrine Does Not Apply. ........................................... 17

      4.   The Court Need Not Resolve Now Which Mode of Analysis to Apply. ....................... 18

   B.   The Ivy League Agreement Is Unlawful Under the Rule of Reason ............................... 20

      1.   The Ivy League Agreement Causes Substantial Anticompetitive Effects. ..................... 20

      2.   Plaintiffs Plausibly Define the Relevant Markets and Allege Market Power. ............... 22

      3.   The Ivy League Agreement Lacks Valid Procompetitive Justifications........................ 29

   C.   The "Conference Carve Out" in *Alston* Is Inapplicable...................................... 35

   D.   Plaintiffs Suffered Antitrust Injury ....................................................... 36

   E.   Plaintiff Choh's Claim Is Not Time-Barred.................................................. 37

CONCLUSION......................................................................................................... 40

# Table of Authorities

**Cases Page(s)**

*1-800 Contacts, Inc. v. FTC*,
  1 F.4th 102 (2d Cir. 2021) ..................................................................................... 21

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ................................................................................... 23

*In re Aggrenox Antitrust Litig.*,
  199 F. Supp. 3d 662 (D. Conn. 2016) ..................................................................... 22

*Am. Needle v. NFL*,
  560 U.S. 183 (2010) ................................................................................................ 14

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ................................................................................... 12

*Apple v. Pepper*,
  139 S. Ct. 1514 (2019) ............................................................................................ 36

*Arizona v. Maricopa Cnty. Med. Soc'y*,
  457 U.S. 332 (1982) ................................................................................................ 13

*Atl. Richfield Co. v. USA Petrol. Co.*,
  495 U.S. 328 (1990) ................................................................................................ 12

*Bartold v. Wells Fargo Bank, N.A.*,
  No. 14-cv-865, 2015 WL 7458504 (D. Conn. Nov. 24, 2015) .......................... 38, 39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 11

*Blanton v. Domino's Pizza Franchising LLC*,
  No. 18-cv-13207, 2019 WL 2247731 (E.D. Mich. May 24, 2019) .......................... 19

*Borozny v. Raytheon Techs. Corp.*,
  No. 3:21-cv-1657, 2023 WL 348323 (D. Conn. Jan. 20, 2023) .............. 4, 19, 24, 30

*Brady v. NFL*,
  779 F. Supp. 2d 992 (D. Minn. 2011) ..................................................................... 14

*Brown v. Pro Football, Inc.*,
  518 U.S. 231 (1996) ................................................................................................ 14

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ........................................................................................... 13, 19

*Carbone v. Brown Univ.*,
   621 F. Supp. 3d 878 (N.D. Ill. 2022) ................................................... 36

*Cenedella v. Metro. Museum of Art*,
   348 F. Supp. 3d 346 (S.D.N.Y. 2018) .................................................. 24

*Chapman v. New York State Div. for Youth*,
   546 F. 3d 230 (2d Cir. 2008) ............................................................... 25

*Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*,
   No. 15-cv-5488, 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) ............ 20

*City of New York v. Grp. Health Inc*,
   649 F.3d 151 (2d Cir. 2011) ................................................................ 25

*Clarett v. NFL*,
   369 F.3d 124 (2d Cir. 2004) ................................................................ 14

*Clearspan Fabric Structures Int'l, Inc. v. Wildwood Dev. Corp.*,
   No. 3:20-cv-175, 2021 WL 430050 (D. Conn. Feb. 8, 2021) ............... 40

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
   817 F.3d 46 (2d Cir. 2016) .................................................................. 12

*Coniglio v. Highwood Servs., Inc.*,
   495 F.2d 1286 (2d Cir. 1974) .............................................................. 25

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ........................................................................... 20

*Creative Copier Servs. v. Xerox Corp.*,
   344 F. Supp. 2d 858 (D. Conn. 2004) .................................................. 24

*Creative Copier Servs. v. Xerox Corp.*,
   No. 3:01-cv-155, 2005 WL 2175138 (D. Conn. Sep. 2, 2005) .............. 39

*In re Crude Oil Commodity Futures Litig.*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012) .................................................... 24

*Davitashvili v. Grubhub Inc.*,
   No. 20-cv-3000, 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) ............ 13, 22, 29

*In re Delta Dental Antitrust Litig.*,
   484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................................... 19

*Fisk v. Bd. of Trs. of Cal. State Univ.*,
   No. 22-cv-173, 2023 WL 2919317 (S.D. Cal. Apr. 21, 2023) ............... 29

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*,
  129 F.3d 240 (2d Cir. 1997) ................................................................. 21

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  681 F. Supp. 2d 141 (D. Conn. 2009) .................................................... 12

*Frame-Wilson v. Amazon.com, Inc.*,
  591 F. Supp. 3d 975 (W.D. Wash. 2022) ............................................... 28

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ................................................................... 22, 30

*FTC v. Lundbeck, Inc.*,
  650 F.3d 1236 (8th Cir. 2011) .............................................................. 27

*FTC v. Staples*,
  970 F. Supp. 1066 (D.D.C. 1997) .................................................... 27, 28

*FTC v. Staples Inc.* ("Staples II"),
  190 F. Supp. 3d 100 (D.D.C. 2016) ...................................................... 28

*FTC v. Sup. Ct. Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) .......................................................................... 30

*FTC v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) ...................................................... 27

*Fuentes v. Royal Dutch Shell PLC*,
  No. 18-cv-5174, 2019 WL 7584654 (E.D. Pa. Nov. 25, 2019) .............. 19

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ................................................................. 12

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004) ..................................................... 24, 26, 27

*Giordano v. Saks, Inc.*,
  No. 20-cv-833, 2023 WL 1451534 (E.D.N.Y. Feb 1, 2023)................... 18

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975) .......................................................................... 13

*GreenCycle Paint, Inc. v. PaintCare, Inc.*,
  250 F. Supp. 3d 438 (N.D. Cal. 2017) .................................................. 19

*Hack v. President & Fellows of Yale College*,
  237 F.3d 81 (2d Cir 2000) ................................................................... 26

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*,
   No. 3:11-cv-282, 2012 WL 162361 (D. Conn. Jan. 19, 2012)...................................... 38

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ....................................................................................... 25

*In re High-Tech Employee Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. 2012) ..................................................... 13, 22, 27, 36

*Le v. Zuffa, LLC*,
   216 F. Supp. 3d 1154 (D. Nev. 2016) ............................................................................ 27

*Legos A/S v. Zuru, Inc.*,
   No. 3:18-cv-2045, 2020 WL 13145135 (D. Conn. Apr. 22, 2020)................................ 24

*Licari v. Semple*,
   No. 3:16-cv-2124, 2018 WL 3974731 (D. Conn. Aug. 20, 2018) ................................ 11

*Lima LS PLC v. PHL Variable Ins. Co.*,
   No. 3:12-cv-1122, 2013 WL 3327038 (D. Conn. July 1, 2013) ................................... 24

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
   624 F. App'x. 23 (2d Cir. 2015)..................................................................................... 26

*In re Magnesium Oxide Antitrust Litig.*,
   No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011)......................................... 23

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   No. 13-cv-2680, 2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014).................................... 29

*McCormack v. NCAA*,
   845 F.2d 1338 (5th Cir. 1998)....................................................................................... 16

*In re Mercedes-Benz Antitrust Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) ............................................................................... 13

*Meredith Corp. v. SESAC LLC*,
   1 F. Supp. 3d 180 (S.D.N.Y. 2014)................................................................................ 23

*Meyer v. Kalanick*,
   174 F. Supp. 3d 817 (S.D.N.Y. 2016)............................................................................ 29

*MLB Properties, Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)............................................................................. 14, 15, 18

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018)............................................................................................ 14

*Nat'l Soc'y of Prof'l Engineers v. United States.*,
    435 U.S. 679 (1978) ................................................................................... 30

*Navarro v. Allied World Surplus Lines Ins. Co.*,
    544 F. Supp. 3d 229 (D. Conn. 2021) .................................................. 39, 40

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021) ..................................................................... *passim*

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984) ........................................................................... *passim*

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2020) .................................................... 35

*NHL Players Ass'n v. Plymouth Whalers Hockey Club*,
    419 F.3d 462 (6th Cir. 2005) ................................................................... 14

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015) .......................................................... *passim*

*OBG Tech. Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*,
    503 F. Supp. 2d 490 (D. Conn. 2007) ...................................................... 38

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ............................................................... 12, 13, 20

*OmniMax Int'l, Inc. v. Anlin Indus., Inc.*,
    No. 18-cv-1830, 2019 WL 2516121 (D. Colo. June 17, 2019)................... 20

*Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*,
    213 F.3d 118 (3d Cir. 2000) .................................................................... 13

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*,
    No. 3:18-cv-825, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) ............... 19

*Peretti v. Authentic Brands Grp. LLC*,
    33 F.4th 131 (2d Cir. 2022).................................................................... 11

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
    97 F. Supp. 3d 424 (S.D.N.Y. 2015) ...................................................... 19

*Polk Bros. v. Forest City Enters.*,
    776 F.2d 185 (7th Cir. 1985).................................................................. 18

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
    No. 11-cv-2652, 2012 WL 3778348 (S.D. Cal. Aug. 30, 2012) ............... 19

*Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ................................................................ 14

*Rahman v. Gen. Elec. Corp.*,
  No. 20-cv-1524, 2022 WL 13916448 (D. Conn. Oct. 24, 2022) ............................... 38

*Robinson v. Jackson Hewitt, Inc.*,
  No. 19-9066, 2019 WL 5617512 (D.N.J. Oct. 31, 2019) ...................................... 19

*Rock v. NCAA*,
  928 F. Supp. 2d 1010 (S.D. Ind. March 1, 2013) ................................... 16, 33

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019) ..................................................... 13

*SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  Nos. 21-cv-2697, 21-cv-2699, 2023 WL 2620041 (2d Cir. Mar. 24, 2023) ................ 38

*Smith v. NCAA*,
  139 F.3d 180 (3d Cir. 1998) ............................................................... 14

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978) .............................................................. 27

*Snow v. Align Tech., Inc.*,
  586 F. Supp. 3d 972 (N.D. Cal. 2022) ..................................................... 30

*Spinelli v. NFL*,
  903 F.3d 185 (2d Cir. 2018) ............................................................... 20

*St. Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*,
  No. 3:22-cv-50, 2023 WL 1967133 (D. Conn. Feb. 13, 2023) ................................ 24

*In re Sulfuric Acid Antitrust Litig.*,
  743 F. Supp. 2d 827 (N.D. Ill. 2010) ..................................................... 33

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ......................................................................... 18

*Theophilous v. Bridgeport Mental Health Ctr.*,
  No. 3:18-cv-2151, 2020 WL 4449949 (D. Conn. Aug. 2, 2020) .......................... 39, 40

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ..................................................... 21, 24, 25

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) .............................................................. 28

*TSI Prods., Inc. v. Armor All/STP Prods. Co.*,
   Nos. 3:18-cv-1682, No. 3:17-cv-1131, 2019 WL 4600310 (D. Conn. Sept. 23, 2019) ............ 24

*United States. v. Aiyer*,
   33 F.4th 97 (2d Cir. 2022) ................................................................................................ 12, 19

*United States v. Aiyer*,
   470 F. Supp. 3d 383 (S.D.N.Y. 2020) ...................................................................................... 12

*United States. v. Archer-Daniels-Midland Co.*,
   866 F.2d 242 (8th Cir. 1988) .................................................................................................... 27

*United States. v. Brown Univ.*,
   5 F.3d 658 (3d Cir. 1993) .................................................................................................. 17, 19

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) .................................................................................. 13

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ................................................................................................................ 28

*United States v. Hutcheson*,
   312 U.S. 219 (1941) ................................................................................................................ 14

*United States. v. Sargent Elec. Co.*,
   785 F.2d 1123 (3d Cir. 1986) .................................................................................................. 23

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ................................................................................................................ 13

*United States v. Teva Pharms.*,
   No. 20-cr-200, 2022 WL 7578988 (E.D. Pa. Oct. 13, 2022) .................................................. 23

*United States. v. Topco Assocs.*,
   405 U.S. 596 (1972) ................................................................................................................ 12

*United States v. Usher*,
   No. 17-CR-19, 2018 WL 2424555 (S.D.N.Y. May 4, 2018) .................................................. 13

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) .................................................................................................... 27

*Wacker v. JP Morgan Chase & Co.*,
   678 F. Appx. 27 (2d Cir. 2017) ........................................................................................ 12, 24

*Walker v. Accenture PLC*,
   511 F. Supp. 3d 169 (D. Conn. 2020) .......................................................................... 38, 39, 40

*Washington v. Franciscan Health Sys.*,
    388 F. Supp. 3d 1296 (W.D. Wash. 2019) .................................................................. 19

*In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) ...................................................................... 19

*Wood v. NBA*,
    809 F.2d 954 (2d Cir. 1987) ........................................................................................ 14

**Statutes**

The Sherman Act, 15 U.S.C. § 1 .......................................................................... *passim*

Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681, 1687 ......................... 28

**Other Authoritie*s***

*Antitrust in the Not-for-Profit Sector*,
    52 J. L. & Econ. 1 (Feb. 2009) ................................................................................... 13

# Glossary of Abbreviations and Terms

For the Court's convenience, Plaintiffs include the following Glossary of Abbreviations and Terms used throughout Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

| Abbreviation | Definition |
|---|---|
| AAHA students | Academically and athletically high-achieving students |
| Complaint or Compl. | Plaintiffs' Class Action Complaint, ECF No. 1 |
| COA | Cost of Attendance, referring to an amount calculated by a school's financial aid office that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the school. |
| Defendants | The University Defendants and Defendant Council of Ivy Group Presidents |
| Ivy League Athletes | Students who compete on one or more of the University Defendants' Division I athletic teams |
| The Ivy League | The NCAA Division I athletic conference in which the University Defendants compete |
| The Ivy League Agreement or the Agreement | University Defendants' horizontal agreement as alleged in the Complaint |
| Motion or Mot. | Defendants' Memorandum of Law in Support of Motion to Dismiss, ECF No. 153-1 |
| NCAA | National Collegiate Athletic Association |
| NIL | "Name, Image, and Likeness" rights |
| Plaintiffs | Tamenang Choh and Grace Kirk |
| University Defendants, Ivy League schools, and Ivies | Brown University, The Trustees of Columbia University in the City of New York, Cornell University, Trustees of Dartmouth College, Harvard University, The Trustees of the University of Pennsylvania, Princeton University, and Yale University |

**INTRODUCTION**

The Ivy League athletic conference comprises eight of the wealthiest commercial organizations in America. They each earn substantial revenues from patent royalties, commercial real estate investments, partnerships in private equity, and venture capital funds. All but one operates a major medical center with cash flow in the hundreds of millions. Each also has multiple billionaires and millionaires willing to write seven-, eight-, and nine-figure checks— often to support Ivy League athletics. The Ivies have collective endowments exceeding $170 billion. Like the other Division I schools, the Ivies use their prestigious brands and wealthy supporters as revenue streams for athletics. The Ivy League has its own media rights deals, including with ESPN. The Ivy League is big business.

These eight institutions are unique amongst the more than 350 NCAA Division I schools not simply for their rare combination of wealth and prestige. They also stand out for their miserliness toward their athletes. The Ivies are the only Division I entities left that continue to enforce an illegal pact not to offer athletic scholarships. This refusal to allow a segment of their students to benefit from competition for their services does not stem from some principled stand against competition. In fact, these institutions compete amongst themselves, without agreed limits, for faculty, administrative staff, trustees, and other university professionals, including their highly compensated university presidents. The Ivies also compete for athletic coaches, trainers, analysts, sports psychologists, and other staff members of athletic departments. But for the Ivies, the benefits of competition stop at the edge of playing fields and the gyms.

The ability of universities like the Ivies to deprive their athletes—Plaintiffs and members of the proposed Class—of the benefits of competition is finally coming to an end. The first major blow came in the form of *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015). In *O'Bannon*, the Ninth Circuit upheld a ruling that found aspects of "the NCAA's amateurism rules violate[d] the

antitrust laws." *Id*. at 1053. It upheld an injunction that barred NCAA members from colluding to prohibit their institutions from offering awards to athletes of stipends (above tuition, room, & board) up to the full cost of attendance ("COA"). *Id*. at 1075-76.

As a result of *O'Bannon*, by the time the issue had reached the Supreme Court in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the NCAA had already lifted its restrictions on athletic scholarships and economic benefits to cover athletes' COA. Nevertheless, the NCAA continued to prohibit economic and other education-related benefits for athletes *over and above* the COA. In *Alston*, the Supreme Court deemed even those restrictions illegal, affirming an injunction striking down certain limits on economic and other education-related benefits over and above the full COA as invalid under the Sherman Act. The Supreme Court has thus deemed illegal universities' enforcement of rules less exploitative than those at issue here.

Despite these significant legal developments, the Ivies have continued conspiring to prohibit athletic scholarships. Defendants seek to justify their Agreement by claiming that only by colluding in this way can they offer students the "choice" of attending schools with unique campus "cultures" where athletes and non-athletes are purportedly subject to "equal treatment." Mot. at 14. This assertion is effectively a restatement of the NCAA's discredited "amateurism" defense. It is also factually unsupported, contrived for litigation, and constitutes a legally invalid challenge to competition itself. Defendants fail to explain where the Ivy Manual (or any other document outside of Defendants' brief) provides that athletic scholarships *to pay for education* are not in "harmony" with these schools' "educational purposes"; how singling out athletes for economic exploitation constitutes "equal treatment"; or how Defendants' newfound policy of allowing their athletes to earn sports-related licensing fees constitutes "equal treatment" of athletes and non-athletes, but athletic scholarships paying COA or the higher *Alston*-approved

2

sums do not. The Ivies' asserted "procompetitive" justification is also a legally invalid challenge to Plaintiffs' claim that the Agreement violates Section 1 of the Sherman Act because it essentially repeats a defense rejected in *Alston*, namely, "relabel[ing] a restraint as a product feature and declar[ing] it 'immune from § 1 scrutiny.'" *Alston*, 141 S. Ct. at 2163. As Justice Kavanaugh put it in his *Alston* concurrence: "Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate." *Id.* at 2169.

There is yet another reason the Ivies' defense fails: as a "naked" price restraint among horizontal competitors, the Agreement is a *per se* violation of the Sherman Act. As such, Plaintiffs need not allege a relevant market, market power, market-wide anticompetitive effects, or refute justifications. Instead, the Ivy League Agreement is presumed to be anticompetitive. Defendants attempt to escape *per se* treatment by arguing: (1) that *Alston* purportedly held that individual NCAA athletic conferences are entitled to fix compensation and scholarships offered to athletes, and (2) that the Ivy League Agreement is supposedly "ancillary" to a procompetitive collaboration. Neither argument should be decided on the pleadings, and both are wrong. *Alston* did not hold that NCAA conferences could collude to prohibit scholarships below the full COA (like those at issue here) because *Alston* only considered restrictions on and other education-related benefits *over and above COA*. Moreover, in *Alston*, no party sought to establish that individual conferences had market power. Plaintiffs here, however, plausibly allege that the Ivy League *does* have market power.

Further, the Agreement is not ancillary to a procompetitive collaboration (and is therefore not subject to the rule of reason), because Plaintiffs do not allege, and Defendants do not claim, that restraints on scholarships are reasonably necessary to achieve the Ivy League's purpose of

3

having "a functioning league with a relatively level playing field." Mot. at 15. Nor could Defendants plausibly make such an argument because no other Division I conference prohibits athletic scholarships. At minimum, the Court should reserve judgment on this issue to allow for discovery on Defendants' defenses as another court in this District recently did in an analogous case, *Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323 (D. Conn. Jan. 20, 2023). In *Borozny*, the court declined to dismiss a case involving an alleged horizontal conspiracy to suppress aerospace employees' wages, finding that such a conspiracy plausibly warranted *per se* treatment, that the applicability of the ancillary restraints doctrine could not be decided on the pleadings, and that even if the defendants comprised a relatively small share of the relevant market, the court could not find that the alleged anticompetitive effects (artificially suppressed compensation) were inadequately pleaded.

Even if the Court were to decide now that the rule of reason is the correct framework, Plaintiffs allege facts sufficient to state a claim. The fact-intensive questions under the rule of reason include whether the restraint has anticompetitive effects, whether there are any procompetitive benefits, and whether the procompetitive benefits could be achieved by less restrictive means. Plaintiffs meet their burden.

Plaintiffs allege that the Agreement has anticompetitive effects in the form of artificially reduced compensation and artificially inflated prices. These are paradigmatic anticompetitive effects. *See, e.g., O'Bannon*, 802 F.3d at 1071 ("The athletes accept grants-in-aid, and no more, in exchange for their athletic performance, because the NCAA schools have agreed to value the athletes' NILs at zero," which is "an anticompetitive effect." (quotation omitted)). More specifically, Plaintiffs allege that the Agreement targets a distinct group of students who attend their institutions—those who are academically and athletically high-achieving ("AAHA").

Plaintiffs also allege that Defendants had the power to impose these anticompetitive effects on students by conspiring through the Agreement, which power is, by definition, *market* power. Having alleged market power and anticompetitive effects directly, Plaintiffs do not need to allege a relevant market. Moreover, the Second Circuit and this Court have repeatedly denied motions to dismiss on relevant market grounds since market definition is a deeply fact-intensive inquiry.

Nonetheless, were proof of a relevant market necessary, Plaintiffs have plausibly alleged that the Ivies provide a unique blend of educational services and Division I athletics to AAHA students, and that the Ivies are unique buyers of the athletic services of AAHA students. In addition, Plaintiffs plausibly allege antitrust injury—namely, that they paid artificially inflated prices and received artificially reduced compensation due to the Agreement. Plaintiffs were recruited for and did play basketball at Brown, a sport in which every Division I school outside of the Ivy League offers full COA athletic scholarships. Thus, it is plausible that Plaintiffs would have received full athletic scholarships, or would have otherwise received some additional compensation, but for the Agreement prohibiting such benefits.

Finally, Plaintiff Choh's claims are timely, a conclusion unchanged by the fact that his freshman year was more than four years prior to filing this suit. Brown decided each year that Choh attended, in compliance with the Agreement, not to award him an athletic scholarship for attendance. Accordingly, each year, through the Agreement, Brown inflicted new and accumulating injury on him. The Motion should be denied.

## **BACKGROUND**

This action arises out of Defendants' ongoing agreement not to provide athletic scholarships to their Division I athletes and not to compensate those athletes for their athletic services. Compl. ¶ 1. Division I contains approximately 350 schools and reflects the NCAA's highest level of athletic competition. The NCAA requires all conferences other than the Ivy

League to provide full scholarships and COA stipends. *Id*. ¶ 1 n.1.

Plaintiffs bring suit on behalf of a proposed Class of all persons recruited to play a sport by one or more University Defendants, and who, within the period of March 7, 2019, to the date the conduct challenged as illegal in the Complaint ceases (the "Class Period"), attended one of the University Defendant's undergraduate programs while playing a sport for that school. *Id*. ¶ 2. Plaintiff Choh played for Brown's men's basketball team from 2017 to 2022, *id*. ¶ 23, and Plaintiff Kirk has played for Brown's women's basketball team since 2020, *id*. ¶ 24. They each were recruited to play a sport by at least one of the University Defendants and received full COA athletic scholarship offers from at least one other Division I college. *Id*. ¶¶23-24. Brown awarded Plaintiffs only need-based financial aid that did not cover their full costs of attendance without any other payment or reimbursement for their athletic services to the school. *Id*. ¶ 3.

### A. College Athletics Are Big Business

The NCAA brings in approximately $1 billion annually from the sale of television rights for its March Madness basketball tournament and approximately $470 million annually from television rights revenue from its Football Bowl Subdivision games. *Id*. ¶¶ 90-91. Division I athletic conferences earn substantial revenue from athletic events through ticket sales and multi-year television rights deals. Many Division I schools receive substantial payments from apparel companies that "sponsor" athletes on the field. *Id*. ¶ 93.

### B. The University Defendants Operate as Commercial Enterprises

The University Defendants' intercollegiate athletics operations are a commercial activity. Each receives substantial revenue—via ticket sales, televisions rights fees, merchandise sales, and other sources—from its intercollegiate sports programs. *Id*. ¶ 153. The University Defendants' direct annual sports revenues range from $24 million annually at Brown to $47 million at Yale, with an average of $33 million. *Id*. ¶ 154 & Appx. B. They also all seek and

publicize donations from alumni and other sources to support athletic programs. *Id*. ¶¶ 156-60. In connection with these operations, they each employ over 100 people. *Id*. ¶ 5. The Ivy League itself has commercial activities, too. Its official website, ivysports.com, is a commercial website, offering Ivy League-branded merchandise for sale, ticket purchasing for Ivy League athletic events, and general information. *Id*. ¶ 149. Under the Agreement, the Ivy League retains all rights to negotiate television broadcasts of its athletic competitions. *Id*. ¶ 152.

### C. Defendants Act with Commercial and Revenue-Maximizing Motives

Defendants seek to maximize revenue, broadly defined to include both operating revenue and donations, through various means in pursuit of each of their goals to maintain or augment prestige. *Id*. ¶ 177. In particular, the University Defendants monetize athletic services through intercollegiate athletic competitions, including ticket sales, television rights, merchandise sales, and increased donations from alumni. *Id*. ¶¶ 86, 146, 156, 160.

The University Defendants' revenue-generating activities extend beyond delivering post-secondary education, including substantial research funding, patent royalties on faculty-developed innovations, earnings from commercial real estate investments, and their massive investments across a broad range of assets, including limited partnerships in private equity and venture capital funds. *Id*. ¶ 178. As a result, in the last two decades, the growth of the University Defendants' endowments has substantially outpaced the growth in their annual revenues and operating expenses, and the economy generally, and now collectively exceed $170 billion. *Id*. ¶ 172. These endowments, from 1992 to 2013, averaged annualized returns of 10.9%, substantially more than the annualized 4.5% drawdown rate on those endowments. *Id*. ¶ 173. The excess of the rates of return over the endowment drawdown rates demonstrates that the University Defendants could each award more financial aid than they do without reducing their endowment values. That they do not is evidence they do not operate with purely altruistic motives. *Id*. ¶ 174.

Further, all but one of the University Defendants own and operate major medical centers with annual budgets in the hundreds of millions of dollars, some over $1 billion, which typically account for less than half of each of these school's total annual revenues. *Id*. ¶ 180. Defendants also have critical advantages that more traditional businesses do not have. Their operations and earnings, including from their endowments, are generally exempt from state and federal income taxes. In addition, donations from alumni and other donors are tax-exempt for the donors, unlike funding sources like loans and equity shares issued by private companies, which the providers of those funds cannot deduct for tax purposes. *Id*. ¶ 181.

Since 1993, the University Defendants have substantially increased their revenues and the scope of their activities in ways that maximize the annual increase in their net assets, the functional equivalent of profits. *Id*. ¶ 182. In sum, taking all sources of annual revenue into account, at a minimum, most Defendants earn revenues exceeding expenditures in the hundreds of millions of dollars. *Id*. ¶ 184 & Appx. C. They also seek to enhance their prestige and influence—all using the "Ivy League" brand that is synonymous with prestige in their marketing—to maximize revenue. *Id*. ¶ 175. In addition, they admit and enroll only a small fraction of their students from low-income families. For example, all give admissions preferences to "legacy" applicants—namely, those with parents who graduated from the same university—to maximize donations. *Id*. ¶ 176.

### D.  The Challenged Conduct Occurs in Related Markets, Reflecting the Unique, Well-Established Ivy League Brand

The misconduct at issue occurs in two related markets: (1) the market for educational services sold to AAHA students, who seek to graduate from college and play Division I sports, and (2) the market for purchasing athletic services provided by AAHA students in Division I sports. *Id*. ¶ 7. Out of the over 350 institutions whose students participate in Division I athletics,

only the University Defendants conspire to prohibit athletic scholarships. *Id*. ¶ 8.

The name "Ivy League" has brand value, which each Ivy uses in marketing efforts to attract students and faculty and to sell tickets and media rights to athletic competitions. *Id.* ¶ 101. The Ivy League rules require prominent display of the "Ivy League" logo at events and in promotional materials. *Id*. Even before the NCAA and the Ivy League itself permitted athletes to earn money from their NIL rights, as an article in the *Harvard Crimson* recognized in 2018, the Ivy League had entered a "new commercial age" and was "increasingly embracing the 'normal' economic model of larger Division I conferences: using its prestigious school brands, select sports, and high-income supporter base as revenue streams for athletic departments." *Id*. ¶ 102.

The Ivy League has its own media rights deals, including a 2018 agreement with ESPN granting it exclusive media rights (streaming and television) to over 1,100 Ivy League athletic events for undisclosed benefits to the Ivy League. *Id*. ¶ 105. In addition, each University Defendant publicly promotes that it is part of a Division I conference for students who excel both athletically and academically. *Id*. ¶¶ 110-11. Industry participants recognize the Ivy League's unique and distinct status in offering academic and athletic excellence. *Id*. ¶ 113.

### E.  The Agreement's Limit on Price Competition for Athletes Is an Aberration

The University Defendants aggressively compete with each other—without any agreed limits—on compensation paid to their employees, including their highly-compensated presidents, athletic directors, and contractors. *Id*. ¶ 9. In January 2023, the NCAA's "Division I Transformation Committee" recommended that the NCAA extend additional benefits to Division I athletes. *Id*. ¶ 122.[1] The Committee included representatives for all Division I athletic

---

[1] The additional benefits that the Transformation Committee recommended include enhanced mental health support; greater participation by athletes in decision-making processes affecting them; increased career preparation, and support; ongoing education and programming; additional health and safety measures for Division I athletes; requiring Division I schools to provide medical insurance coverage for their athletes after they graduate or finish

conferences, including Robin Harris, the Executive Director of the Ivy League. On July 1, 2021, the Ivy League officially endorsed the NCAA's NIL policy, allowing Ivy League Athletes for the first time to earn money for their NIL rights. *Id.* ¶ 125. The Ivy League's NIL policy is a recognition by Defendants that Ivy League Athletes should benefit from competition (like other Division I athletes), and also that such athletic benefits are not inconsistent with the academic purposes of Ivy League schools. *Id.* ¶ 126. Public reporting since the Complaint was filed indicates that in the short time since permissive NIL policies have been in place,[2] consumer demand for college sports has increased.[3]

Yet against the increased national recognition that college athletes are legally entitled to the fair market value of their athletic services and that schools and entities should compete for those services, *id.* ¶¶ 114-23, the University Defendants adhere to a horizontal agreement that severely restricts competition on price for Ivy League Athletes. *Id.* ¶ 124. The University Defendants set forth the Ivy League's prohibition against athletic scholarships in the Ivy League Manual, first published in 1954 and formally reaffirmed in writing periodically, in at least 1977, 1979, and 2017. *Id.* ¶¶ 131-35. The Ivy League is the only Division I athletic conference that enforces an agreement prohibiting member schools from offering any athletic scholarships. *Id.* ¶ 136. The Patriot League abandoned its prohibition against awarding athletic scholarships in 2012. *Id.* n.40. Plaintiffs do not allege (and Defendants do not cite any evidence) that this decision has hurt the Patriot League or its members in any respect.

---

providing their services; additional scholarship protections; and requiring Division I schools to offer degree completion funds for 10 years following athletes' separation from providing athletic services. *Id.* ¶ 122.

[2] Since the Complaint was filed, for example, Princeton has entered in an arrangement with one of the nation's NIL marketplaces, Opendorse, to facilitate NIL deals for its athletes. *See* https://goprincetontigers.com/news/2023/5/24/general-princeton-athletics-partners-with-opendorse-to-launch-official-nil-marketplace-app.

[3] *See, e.g.*, Dennis Dodd, *College football attendance rose in 2022 with latest year-over-year increase since 1982*, CBS SPORTS (Mar. 8, 2023), https://www.cbssports.com/college-football/news/college-football-attendance-rose-in-2022-with-largest-year-over-year-increase-since-1982/.

### F.  The Ivy League Agreement Causes Antitrust Injury

The Agreement has stymied competition that would lower the net COA for, and

compensation to, Plaintiffs and the proposed Class. *Id.* ¶ 16. As happened after the Patriot

League abandoned its restriction against athletic scholarships, these schools would compete to

provide athletic scholarships or otherwise compensate athletes for their services. *Id.* ¶ 4.

The work of Ivy League Athletes benefits their schools and the Ivy League brand. They

devote substantial time—at least 20 hours per week during their official sports seasons, the

purported maximum allowed under NCAA rules, and comparable amounts off-season—in

formal practices, athletic conditioning, film sessions, injury treatment, team meetings, and travel

to and participation in formal competitions. *Id.* ¶ 17. These athletes do all this work and compete

in the NCAA's highest athletically competitive Division, while also preparing for and attending

classes and completing homework assignments at among the most academically rigorous

institutions in the country. *Id.* Without these students meeting both their academic and athletic

commitments, the University Defendants would not have athletic accomplishments to market to

prospective students, alumni, and the world. *Id.*

## LEGAL STANDARD

On a motion to dismiss, courts must "accept factual allegations in the complaint as true

and draw all reasonable inferences" in the plaintiff's favor. *Peretti v. Authentic Brands Grp.*

*LLC*, 33 F.4th 131, 137 (2d Cir. 2022). Plaintiffs satisfy the relevant standard, which "simply

calls for enough fact to raise a reasonable *expectation* that discovery will reveal evidence of

illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added); *see*

*also Licari v. Semple*, 2018 WL 3974731, at *1 (D. Conn. Aug. 20, 2018) ("A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.") (quotations omitted). "[T]here

is no heightened pleading standard in antitrust cases." *Wacker v. JP Morgan Chase & Co.*, 678

F. App'x 27, 29 (2d Cir. 2017); *accord Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46,

52 (2d Cir. 2016). "Fact-specific questions cannot be resolved on the pleadings." *Wacker*, 678 F.

App'x at 30; *accord Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012).

## ARGUMENT

### A. The Ivy League Agreement Is a *Per Se* Violation of Sherman Act Section 1

#### 1. The Agreement Is a Classic *Per Se* Violation of the Sherman Act.

The Ivy League Agreement reflects a classic conspiracy among competitors to restrict

price competition. Federal courts have long condemned such agreements as *per se* illegal. The

Supreme Court holds that "restraints 'imposed by agreement between competitors,'" such as the

Agreement here, "qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

2283-84 (2018) (quotations omitted); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir.

2016). Defendants are horizontal competitors for the athletic services of AAHA students:

without the Agreement, they would compete vigorously against each other for such services of

AAHA students. Compl. ¶ 4. Defendants thus operate "at the same level of the market structure,"

*United States. v. Topco Assocs.*, 405 U.S. 596, 608 (1972); *see also, e.g.*, *United States v. Aiyer*,

470 F. Supp. 3d 383, 408 (S.D.N.Y. 2020), and may not agree upon prices they charge to buyers

or pay to sellers.[4] This case can be viewed both ways: Plaintiffs allege that athletes are both

selling their services to the University Defendants at artificially depressed prices, Compl. ¶ 195,

---

[4] As this Court has recognized: "Horizontal price-fixing schemes are considered *per se* violations of the Sherman Act." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 165 (D. Conn. 2009). Indeed, horizontal price fixing is "perhaps the paradigm of an unreasonable restraint of trade." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 344 (1990) (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 100 (1984)); *see also United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) ("The paradigmatic example of a *per se* illegal restraint on trade under the Sherman Act is a horizontal conspiracy to fix prices with competitors."). That is true whether the suppliers are fixing prices to buyers, or whether buyers of services are fixing prices to sellers. *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 480-85 (W.D. Pa. 2019); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122; *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013).

and buying educational services from them at artificially inflated prices, *id.* ¶ 193.[5]

The industries involved here, education and collegiate sports, have no distinct characteristics precluding application of the *per se* rule. "[S]o far as price-fixing agreements are concerned, [the Sherman Act] establishes one uniform rule applicable to all industries alike." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 349 (1982) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940)); *see also United States v. Usher*, 2018 WL 2424555, at *4 (S.D.N.Y. May 4, 2018) (rejecting argument against applying the *per se* rule in a particular industry because "U.S. courts have experience assessing price fixing").[6]

### 2. Relevant Precedent Does Not Support Applying the Rule of Reason.

Defendants rely on substantively and procedurally inapposite case law to argue that the *per se* standard (or "quick look")[7] does not apply as a matter of law. Mot. at 12-14.

*First*, with the few exceptions addressed below, the sports-related cases that Defendants cite involve non-price/non-wage restraints that were determined "essential if the product is to be available at all." *NCAA v. Bd. of Regents*, 468 U.S. 85, 101 (1984).[8] Defendants do not argue,

---

[5] In a *per se* case like this one, there is no need for a precise definition of the relevant market. *Am. Express Co.*, 138 S. Ct. at 2285, n.7; *Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *5, n.56 (S.D.N.Y. Mar. 30, 2022) ("definition of a relevant market typically is unnecessary in a case alleging a per se antitrust violation such as horizontal price fixing"); *see also In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 364 (D.N.J. 2001) ("[R]equiring market definition ... in all cases would undermine the presumption of anticompetitive effect in the context of *per se* antitrust violations.") (citing *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000)).

[6] Defendants' non-profit status does not immunize them from *per se* liability for horizontal price restraints. *See Alston*, 141 S. Ct. at 2158-59; *Maricopa*, 457 U.S. at 349-52; *Goldfarb v. Va. State Bar*, 421 U.S. 773, 786-87 (1975). Judge Posner has explained that the "main efficiency rationale" for applying the antitrust laws to [for-profit] firms" applies "equally" to nonprofit firms. Thomas J. Philipson & Richard Posner, *Antitrust in the Not-for-Profit Sector*, 52 J. L. & ECON. 1, 2 (Feb. 2009). Citing collusion among universities in particular, the authors conclude: "Therefore, promoting competition is socially valuable *regardless of the particular objectives of producers, and* the fact that antitrust law does not distinguish between the two sectors is efficient." *Id.* at 28 (emphasis added).

[7] The "quick-look" standard is an "abbreviated" version of the rule of reason, when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[8] In discussing *Board of Regents*, the Court recently observed that *Board of Regents* did not declare "the NCAA's compensation restrictions procompetitive." *Alston*, 141 S. Ct. at 2158. *Board of Regents* concerned a restriction on college football television packages, not restrictions on athlete compensation.

and could not plausibly argue here, that conspiring to prohibit athletic scholarships is necessary for Ivy League sports to exist, and thus *Board of Regents* is inapplicable on this point. *American Needle v. NFL*, 560 U.S. 183 (2010), was a summary judgment decision involving a joint merchandise licensing agreement. *North American Soccer League v. U.S. Soccer Federation,* 883 F.3d 32 (2d Cir. 2018), concerned a motion for preliminary injunction brought by a league against a regional governing body for setting standards that prevented inter-league competition.[9]

*Second*, Defendants rely on Section 1 cases involving professional sports leagues, Mot. at 13, ignoring that those leagues' compensation limits pass legal muster only because the leagues' players have formed unions, which allows the leagues to take advantage of the labor exemptions to the Sherman Act.[10] Indeed, in one of the few litigated cases in this area, a price-fixing and group boycott case that professional football players brought against the NFL, the district court applied the *per se* standard, at the preliminary injunction stage. *Brady v. NFL,* 779 F. Supp. 2d 992, 1040 (D. Minn. 2011), *vacated on other grounds*, 644 F.3d 661 (8th Cir. 2011). Defendants cite no case holding that professional sports leagues can fix pay, impose salary caps, or otherwise agree to limit athlete compensation in the absence of a labor exemption.

*Third*, notwithstanding the application of the rule of reason in *Alston*, the issues here compel a different analytical framework. As an initial matter, *Alston* did not address the

---

[9] *MLB Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 333-34 (2d Cir. 2008), dealt with the licensing of intellectual property and revenue sharing (and was decided on summary judgment). *Smith v. NCAA*, 139 F.3d 180, 186-87 (3d Cir. 1998), *vacated on other grounds by* 525 U.S. 459 (1999), upheld an NCAA bylaw restricting graduate students enrolled at one institution from competing for a different institution. And *Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 63-64, 74 (3d Cir. 2010), dealt with exclusive supply contracts entered into by race car sanctioning authorities (and was decided on summary judgment).

[10] *See Wood v. NBA*, 809 F.2d 954, 963 (2d Cir. 1987); *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474-75 (6th Cir. 2005); *Clarett v. NFL*, 369 F.3d 124, 142-43 (2d Cir. 2004). The Clayton and Norris-LaGuardia Acts create statutory exemptions for labor unions from the antitrust laws so "long as a union acts in its self-interest and does not combine with non-labor groups." *United States v. Hutcheson*, 312 U.S. 219, 232 (1941). The Supreme Court has also recognized a non-statutory labor exemption in the context of professional sports for joint actions that are ancillary to collective bargaining. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996).

aggressive nature of the conspiracy here: prohibitions on covering athletes' costs of paying for their educations. *Alston* dealt only with scholarship prohibitions over and above COA. Thus, the Supreme Court's decision not to apply the *per se* rule to a conspiracy less restrictive than the one here does not support application of the rule of reason in this case.

Moreover, the NCAA's primary procompetitive justification in *Alston* was that its rules preventing Division I institutions from compensating collegiate athletes (above the COA) "could play some role in product differentiation with professional sports and thus help sustain *consumer demand* for college athletics." *Alston*, 141 S. Ct. at 2153 (emphasis added). But the Defendants here are silent on the alleged effect of the Agreement on consumer demand for Ivy League sports. Unlike *Alston*, the Defendants here do not even attempt to argue that their conspiracy increases demand for *viewing* Ivy League sports or even for attending Ivy League schools—they merely argue that it expands student choice in the abstract. Mot. at 15-16. But merely offering something to consumers, where there is no evidence *they actually prefer* it for that reason, is not a valid procompetitive justification. Defendants do not even assert what they would need to show, namely that more students choose the Ivies *because* the Ivies collude to prohibit scholarships, *i.e.*, that the Agreement is output enhancing. *See Bd. of Regents*, 468 U.S. at 114 (holding that procompetitive efficiencies would "increase output and reduce the price of" the products). The Second Circuit recognized this *Board of Regents* holding in *MLB Properties*. 542 F.3d at 327 ("As a general matter, [*Board of Regents*] found that the NCAA's procompetitive-efficiencies contention was not supported by the record because production was restricted, not enhanced by the plan.").[11]

---

[11] *See also O'Bannon*, 802 F.3d at 1073 ("if anything, loosening or abandoning the compensation rules might be the best way to 'widen' recruits' range of choices; athletes might well be more likely to attend college, and stay there longer . . . . We therefore reject the NCAA's claim that, by denying student-athletes compensation apart from scholarships, the NCAA increases the 'choices' available to them").

Just as fundamental, even if Defendants were to assert that exploitation of athletes increases viewership of Ivy League events (thus expanding output), *Alston* would no longer support that justification. Just two weeks after *Alston*, the NCAA and Ivy League endorsed the rights of collegiate athletes to receive payments for their NIL rights. Plaintiffs do not allege (and there is no evidence) that NIL payments have adversely affected consumer demand for collegiate sports. If these were the facts in *Alston*, the Court's analysis would have *stopped* with the district court's finding that the NCAA's compensation restriction had anticompetitive effects. *See Alston*, 141 S. Ct. at 2152. Given *Alston*'s admonition that if the "market realities change, so may the legal analysis," *id.* at 2158, the changed reality created by the post-*Alston* NIL revolution meant the Court would not have had a justification to consider.

*Fourth*, Defendants elide important distinctions between other sports-related cases and this case. Mot. at 13-14. *McCormack v. NCAA* concerned the NCAA's rules against "pay to play," which are not at issue here. 845 F.2d 1338, 1344 (5th Cir. 1998). *Rock v. NCAA* involved NCAA's Division III prohibition of athletic scholarships and concluded that the rule could be justified by "the revered tradition of amateurism in college sports." 928 F. Supp. 2d 1010, 1026 (S.D. Ind. March 1, 2013) (quotation omitted). *Rock* would come out differently after *Alston*, because the Supreme Court has now affirmed the district court's rejection of the "amateurism" defense upon which *Rock* relied:

> While the NCAA asks us to defer to its conception of amateurism, the district court found that the NCAA had not adopted any consistent definition. Instead, the court found, the NCAA's rules and restrictions on compensation have shifted markedly over time. The court found, too, that the NCAA adopted these restrictions without any reference to "considerations of consumer demand," and that some were "not necessary to preserve consumer demand."

141 S. Ct. at 2163 (citations omitted).[12]

*Fifth*, Defendants dismiss *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), because it does not involve sports. Mot. at 16. As in *Brown*, however, the Ivy League Agreement restricts, among other forms of compensation, scholarship-based *financial aid*, and thus artificially inflates the Class Members' net prices for *educational services*. Compl. ¶¶ 192-93. Defendants ignore these allegations, and for this reason alone, their motion fails. In any event, the facts here involve a more significant restraint than in *Brown*, which restricted the price of educational services, because the Ivy League Agreement also prohibits compensation for students' *services* provided to the Ivy League schools. In addition, in declining to apply the *per se* standard to the financial aid fixing among the Ivies and MIT, *Brown* accepted MIT's assertion that the agreement reflected a "pure altruistic motive" and lacked a "revenue maximizing purpose." 5 F.3d at 672. In this case, in contrast, Plaintiffs allege in detail that Defendants operate, both generally and in their athletic programs, without altruistic motives; and that they do in fact maximize revenues, defined to include both revenue from operations and donations. *See*, *e.g.*, Compl. ¶¶ 145-46, 148-84. Under *Brown*'s rationales, these facts warrant *per se* treatment.

### 3. The Ancillary Restraints Doctrine Does Not Apply.

Defendants argue that the rule of reason applies because the Ivy League Agreement is "at most an ancillary restraint to the procompetitive collaboration between the University Defendants." Mot. at 15. Defendants are wrong. Horizontal price-fixing agreements escape *per*

---

[12] In addition, in contrast to *Rock,* Defendants here have chosen to compete in Division I, in which no other schools have agreed to prohibit athletic scholarships. And, as discussed below, Plaintiffs have alleged that the Agreement has no legitimate procompetitive justifications, and that the Defendants' procompetitive justification here is implausible, unsupported, and wrong. The NCAA's adoption of a rule in 1991 apparently meant to exclude the Ivy League from its requirements that Division I schools offer athletic scholarships does not shelter Defendants' conduct, since the NCAA has no authority to grant antitrust exemptions (Section 20.10.3.2.7 of the NCAA Division I Manual, which provides that "Member institutions that did not award any athletically related financial aid in any sport as of January 11, 1991," shall be exempted from "minimum requirements" relating to the award of athletic scholarships, under Section 20.10.3.2 of the Manual).

*se* treatment under the ancillary-restraint doctrine *only* where the challenged restraint is "reasonably necessary" for a business collaboration. *MLB Properties*, 542 F.3d at 338-39 (Sotomayor, J., concurring); *Polk Bros. v. Forest City Enters*., 776 F.2d 185 (7th Cir. 1985) (challenged restraint ancillary because it "made cooperation possible").

Some restraints are necessary for any sports league to exist, but that fact does not and cannot justify every restraint. *See Alston*, 141 S. Ct. at 2156 ("That *some* restraints are necessary to create or maintain a league sport does not mean *all* 'aspects of elaborate interleague cooperation are'").[13] Plaintiffs do not allege, and the Defendants do not plausibly assert, that the Agreement is reasonably necessary *for the Ivy League to exist*, or for it to achieve its claimed main purpose of having "a functioning league with a relatively level playing field." Mot. at 15. At minimum, Defendants would need *evidence* to show that their restrictions are reasonably necessary to the functioning of the Ivy League, especially when all other Division I conferences operate without colluding to prohibit athletic scholarships. Compl. ¶ 136.[14]

### 4.  The Court Need Not Resolve Now Which Mode of Analysis to Apply.

The Court need not decide which mode of analysis (*per se* or rule of reason) applies now. The Supreme Court has explained that "there is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before *the evidence* justifies a presumption of anticompetitive conduct." *Bd. of Regents*, 468 U.S. at 104

---

[13] *Giordano v. Saks, Inc.*, 2023 WL 1451534 (E.D.N.Y. Feb 1, 2023), Mot. at 15, is distinguishable in two ways. First, unlike the Ivy League Agreement, which fixes compensation at zero dollars, the challenged agreement in *Saks* did not directly pertain to worker *compensation*. *Id*. at *1. Second, the Agreement is multilateral: competitors each promising the other to fix compensation at zero, which is unlike the one-way "no hire" agreement restraining rival retailers from hiring Saks' workers but not *vice versa*. *Id*. Plaintiffs in *Saks* are also appealing that decision to the Second Circuit. No. 23-600 (2d Cir.).

[14] The Ivy League is not an "economically integrated" business combination formed between two competitors to sell a distinct product or service, as in *Texaco Inc. v. Dagher*, 547 U.S. 1, 3 (2006). While the League jointly negotiates a television broadcasting contract, University Defendants compete individually, not as a league, in athletic contests, many of which are against non-Ivy schools. Compl. ¶ 5. Likewise, the University Defendants individually deliver educational services, not as an integrated entity.

n.26 (emphasis added).[15]

Courts thus routinely decline to rule out a *per se* mode of analysis where discovery will help resolve whether such treatment applies. *See, e.g.*, *Borozny*, 2023 WL 348323, at *9 ("The CAC adequately alleges a potential claim for a *per se* violation of the Sherman Act. A final determination . . . 'is more appropriate on a motion for summary judgment.'" (quotations omitted)); *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 448 (N.D. Cal. 2017) ("[I]t is not necessary to determine whether the per se or rule of reason analysis applies at this stage.").[16] Courts have required evidence or fact-finding to consider whether the defendants in fact operate through a lawful joint venture, *see, e.g.*, *Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1303-05 (W.D. Wash. 2019); to consider what the evidence may show regarding marketplace conditions, *see, e.g.*, *Delta Dental*, 484 F. Supp. 3d at 635-36; and to consider evidence that "the restraint alleged was ancillary to some pro-competitive venture." *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1027 (C.D. Cal. 2011).[17] The Court should defer any rejection of the *per se* rule.

---

[15] The decision in *Brown* illustrates this principle. *See* 5 F.3d at 664 (a ten-day bench trial, informing whether to apply the *per se* rule, created the extensive factual record on appeal); *see also, e.g.*, *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 634-35 (N.D. Ill. 2020) ("Both *BMI* and *NCAA* were decided after lengthy trials, and the Court's decision not to apply the per se rule in these cases was based on highly fact-specific analyses that addressed unique features of the markets at issue and the product resulting from the defendants' collaboration.").

[16] *See also Robinson v. Jackson Hewitt, Inc.*, 2019 WL 5617512, at *7 (D.N.J. Oct. 31, 2019) ("The Court declines to determine the applicable standard of review at this stage of proceedings. To do so would be premature and more factual information is required."); *Fuentes v. Royal Dutch Shell PLC*, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019) (same) *In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, 2019 WL 5386484, at *8-9 (W.D. Ky. Oct. 21, 2019) (same); *Blanton v. Domino's Pizza Franchising LLC*, 2019 WL 2247731, at *4 (E.D. Mich. May 24, 2019) (same).

[17] Defendants' citations to the contrary, Mot. at 11-12, are inapposite. While *Aiyer*, 33 F.4th 97, discussed when the rule of reason or *per se* standard applies, it did so in the trial context, not a motion to dismiss. *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 431 (S.D.N.Y. 2015), *aff'd*, 622 F. Appx. 40 (2d Cir. 2015), dealt with a vertical restraint, not a horizontal price-fixing claim. In *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 2012 WL 3778348 at *5 (S.D. Cal. Aug. 30, 2012), there were no allegations of *any* specific collusive acts by the defendants. *Cal. Dental*, 526 U.S. 756, also did not involve horizontal price-fixing, but rather restrictions on deceptive advertising by dentists that the Supreme Court observed were not obviously comparable to classic horizontal agreements to limit output or price competition. *Id.* at 770-71.

**B.  The Ivy League Agreement Is Unlawful Under the Rule of Reason**

Under the rule of reason, courts analyze restraints under a three-part "burden-shifting framework" where (1) "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect," (2) if plaintiffs carry that burden, it then "shifts to the defendant to show a procompetitive rationale for the restraint," and (3) only if the defendant can make that showing does "the burden shift[] back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Am. Express*, 138 S. Ct. at 2284. Plaintiffs' allegations satisfy this standard.

**1.  The Ivy League Agreement Causes Substantial Anticompetitive Effects.**

Defendants assert that Plaintiffs do not meet their burden of pleading marketwide anticompetitive effects. Mot. at 29. Defendants are wrong for three reasons.

*First*, Plaintiffs adequately allege a horizontal price-fixing conspiracy, which is "inherently anticompetitive." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). Thus, Plaintiffs' allegations that Defendants' horizontal price-fixing agreement caused anticompetitive effects, including through suppressed compensation and artificially inflated prices (due to suppressed financial aid), Compl. ¶¶ 192-94, are plausible. Defendants' cited authorities do not concern horizontal price-fixing agreements and are therefore inapposite.[18]

*Second*, Plaintiffs directly allege the Agreement artificially suppresses compensation to thousands of students and artificially inflates net prices of education for those students. Compl. ¶¶ 1, 130-35, 138-39, 201, 212. That Ivy League Athletes are willing to attend Ivy League institutions despite receiving artificially depressed compensation and paying artificially inflated

---

[18] *See Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018) (alleged joint licensing "reduced output"); *Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, 2016 WL 5719790, at *3-5 (S.D.N.Y. Sept. 29, 2016) (exclusive dealing); *OmniMax Int'l, Inc. v. Anlin Indus., Inc.*, 2019 WL 2516121, at *5 (D. Colo. June 17, 2019) (employment non-compete)).

prices demonstrates anticompetitive effects. *See O'Bannon*, 802 F.3d at 1071 ("The athletes accept grants-in-aid, and no more, in exchange for their athletic performance, because the NCAA schools have agreed to value the athletes' NILs at zero," which is "an anticompetitive effect." (quotation omitted)); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 213-14 (2d Cir. 2001) (anticompetitive effects may take the form "[i]n the traditional oligopoly case" as "inflate[d] prices to supracompetitive levels," and "[i]n an oligopsony," "depress[ed] prices").

*Third*, Defendants cite inapposite cases where the challenged conduct was isolated and unlikely to harm anyone, let alone a large group of customers or sellers as alleged here. Mot. at 28-29.[19] As set forth below, Plaintiffs allege that Defendants—the *only* sellers in the AAHA Educational Services Market, and the *only* buyers in the AAHA Athletic Services Market—fixed athletic scholarship-based financial aid and compensation at $0, suppressing compensation below competitive levels and prices above competitive levels. Compl. ¶¶ 1, 130-35, 138-39, 201, 212.[20] Plaintiffs thus plausibly allege that the AAHA athletes are "worse off" than they would be in the but-for world, where market forces would compel Defendants to compensate athletes for their athletic services. Nothing more is required at this stage. *See, e.g.*, *Davitashvili*, 2022 WL 958051, at *13-14 (finding that plaintiffs sufficiently alleged direct anticompetitive effects on

---

[19] In *1-800 Contacts, Inc. v. FTC*, the Second Circuit found the FTC's market definition of search engines in a monopolization case was unclear, and that the FTC did not allege or produce evidence that the restriction on a few search terms was sufficient to harm competition because rivals could still use alternative search terms and thereby reach customers. *See* 1 F.4th 102, n.11 (2d Cir. 2021). Here, by contrast, Plaintiffs allege that the Agreement caused thousands of Ivy athletes to pay artificially inflated prices and receive artificially reduced compensation across an entire market. *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods, Inc.*, concerned vertical conduct, namely the termination of one distributor of Toshiba mobile phones as part of an agreement with another distributor, which the Second Circuit held would not harm competition at all. 129 F.3d 240, 245-46 (2d Cir. 1997). Here, Plaintiffs allege horizontal price fixing (fixing the price of education and wages for athletic services) that artificially inflates prices to thousands of students with no offsetting efficiency or price benefit—a clear anticompetitive effect.

[20] As pointed out below, a relevant market is defined as any hypothetical group of sellers whom, if organized into a cartel or single entity, could inflate prices to customers (students here) above competitive levels (or compensation below competitive levels). *Infra* at 23; *see also infra* nn. 21-22. Thus, the fact that by organizing into a cartel of just the eight of them, the Ivies were able to artificially inflate prices to a distinct group of customers (AAHA students) and depress compensation to a distinct group of service sellers (AAHA students), necessarily means that the effects were marketwide.

grounds that theory was "plausible").

### 2. Plaintiffs Plausibly Define the Relevant Markets and Allege Market Power.

Even if this were not a *per se* case, where, as alleged here, there is direct evidence of anticompetitive effects, there is no need for proof of market power or relevant market. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.") (cleaned up).[21] Nevertheless, Plaintiffs more than adequately allege that Defendants exercise sufficient market power to impose anticompetitive effects on thousands of students. Compl. ¶¶ 223-27.[22] Plaintiffs also plausibly allege that University Defendants have monopoly power in the properly defined AAHA Educational Services Market and monopsony power in the AAHA Athletic Services Market. Compl. ¶ 223. This is true whether the providers in these markets are limited to only the University Defendants, *id.* ¶¶ 203-06, 213-14, or alternatively include a few other selective universities. *Id.* ¶¶ 210-11, 218.

The federal antitrust enforcement agencies and the courts have defined relevant markets as the "smallest" group of providers in which a "hypothetical monopolist" could profitably impose "a small but significant and non-transitory increase in price." *Merger Guidelines* § 4.1.1 (2010); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 218 (S.D.N.Y. 2014); *AD/SAT, Div.*

---

[21] *See also In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 668 (D. Conn. 2016) ("[A]rticulating a relevant market definition is not an end in itself, but is in the service of answering the question of market power, which in turn 'is but a surrogate for detrimental effects.'") (quoting *Fed'n of Dentists*, 476 U.S. at 460-61).

[22] *See, e.g.*, *In re High-Tech*, 856 F. Supp. 2d at 1122 (allegation that "Defendants succeeded in lowering the compensation and mobility of their employees below what would have prevailed in a lawful and properly functioning market" was enough "to infer that Defendants had the market power to do so."); *see also Bd. of Regents*, 468 U.S. at 109 n.38 ("Market power is the ability to raise prices above those that would be charged in a competitive market.").

*of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228-29 (2d Cir. 1999) (market is defined by the smallest grouping of firms that "could profitably raise prices significantly above the competitive level"); Compl. ¶¶ 207, 215. Plaintiffs have alleged that the Agreement amongst *only the Defendants* meets this test because it allowed them to suppress athlete compensation and scholarships below competitive levels (in fact at $0), and thereby charge prices above competitive levels. Compl. ¶¶ 20, 194, 197.

The existence and persistence of the Ivy League Agreement—and the Ivies' ability to continue to attract AAHA students despite colluding to suppress their compensation—confirms the plausibility of these markets and Defendants' market power in them. It is well understood that an effective anticompetitive agreement, like the Agreement here, can define a market. "To some extent, of course, a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus, its very existence supports an inference that it would have an effect in a relevant market." *United States. v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986); *accord United States v. Teva Pharms.*, 2022 WL 7578988, at *3 (E.D. Pa. Oct. 13, 2022); *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *16 (D.N.J. Oct. 20, 2011).

Defendants challenge Plaintiffs' relevant market definitions on two grounds: (1) that Plaintiffs have "manufactured for this litigation" the AAHA educational and athletic services markets, and (2) that the markets cannot include more than one sport. Mot. at 18-27. As a threshold matter, these challenges are premature. Where Plaintiffs have alleged plausible markets, the precise contours of the markets are a subject for discovery: "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Wacker*, 678 F. Appx. at 30-31 (quoting *Todd*, 275 F.3d at

199-200).[23] "Determining reasonable interchangeability and defining the relevant market eventually 'require a fact-intensive inquiry that includes consideration of such practical indicia as the product's peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *TSI Prods., Inc. v. Armor All/STP Prods. Co.*, 2019 WL 4600310, at *12 (D. Conn. Sept. 23, 2019) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004)) (cleaned up). Indeed, Defendants cite *Cenedella v. Metropolitan Museum of Art*, Mot. at 18, in which the court cautions that "market definition is a fact-intensive inquiry not typically fit for dismissal at the pleadings stage." 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018); *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012) (finding market plausible and explaining that extent of substitutability between products at issue was among the "fruitful areas for discovery").

Turning to the merits, Plaintiffs' markets are not only plausibly alleged, but also arise out of Defendants' own Agreement, statements, actions, and materials. The Agreement, after all, includes only the Ivies, and can nevertheless sustain artificially suppressed compensation and artificially inflated prices to all Ivy League Athletes. Beyond that, Plaintiffs allege in detail how the University Defendants *themselves* define the Ivy League as a distinct market through the particular combination of the academic and athletic excellence of their collegiate athletes, and how industry participants view the Ivy League as singular. *See, e.g.*, Compl. ¶¶ 96-113. Plaintiffs agree with Defendants that, at the root, markets are defined by whether there is a significant degree of "cross-elasticity of demand" between the entities in the market, and a low level

---

[23] This District has repeatedly recognized and applied this precept in denying motions to dismiss. *See, e.g.*, *Legos A/S v. Zuru, Inc.*, 2020 WL 13145135, at *3 (D. Conn. Apr. 22, 2020) (Thompson, J.); *see also St. Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 2023 WL 1967133, at *19 (D. Conn. Feb. 13, 2023); *Borozny,* 2023 WL 348323, at *10-12; *Lima LS PLC v. PHL Variable Ins. Co.*, 2013 WL 3327038, at *4-6 (D. Conn. July 1, 2013); *Creative Copier Servs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 863-65 (D. Conn. 2004).

between entities in the market and those outside of it. Mot. at 21; *see also Todd*, 275 F.3d at 201-02. Here, Plaintiffs plausibly plead that, in the absence of the Agreement, the cross-elasticity of demand between Ivy and non-Ivy League schools would be low. Compl. ¶¶ 207, 216.[24]

Indeed, the fact that Defendants are the only institutions in Division I that do not offer athletic scholarships—and yet continue to convince thousands of athletes each year to attend their institutions at above-competitive level prices—is *prima facie* evidence that they constitute a relevant market, control over which they can impose supracompetitive prices. *See infra* n.25. Defendants effectively concede this point, arguing that student-athletes choose to attend Defendant institutions—even where prices would be lower and compensation would be higher at other schools. Mot. at 10. Similarly, after noting that "[m]arket power is the ability to raise prices above those that would be charged in a competitive market," the Supreme Court in *Board of Regents* highlighted the district court's finding that the payment of "a premium price per viewer to reach audiences watching college football because of their demographic characteristics is vivid evidence of the uniqueness of this product." 468 U.S. at 109, 111.[25]

---

[24] The relevant market cases Defendants cite, Mot. at 18, are inapposite. *City of New York v. Grp. Health Inc*, 649 F.3d 151 (2d Cir. 2011), related to a challenge to a merger where the lower court found that the market was defined by the preferences of only a single plaintiff, the City of New York, and "not according to the rule of reasonable interchangeability and cross-elasticity of demand." *Id.* at 156. In contrast, Plaintiffs here define their market by alleging facts relating to the uniqueness (and thus lack of interchangeability) of the Ivies versus non-Ivy League schools as well as with reference to the low cross elasticity of demand between Ivy and non-Ivy League schools, which is demonstrated by alleging, *inter alia*, that Defendants have been able to impose supracompetitive prices without losing sufficient numbers of students to make such differential pricing impossible. *See* Compl. ¶¶ 207, 208 215, 216. Next, *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974), is inapposite because the plaintiff alleged a vague market defined *at oral argument* as "general entertainment market in Buffalo," alleging no facts regarding cross elasticity or reasonable interchangeability. Plaintiffs here, in contrast, plead in the Complaint itself very specific markets that meet the requisite antitrust tests for defining relevant market markets. Compl. ¶¶ 207, 208, 25, 216. Finally, *Chapman v. N.Y. State Div. for Youth*¸ 546 F. 3d 230, 238 (2d Cir. 2008), held that the market at issue was defined too narrowly because the plaintiff had restricted the market to one group of purchasers of the service at issue without any rationale at all. In contrast, Plaintiffs here provide detailed allegations that the Ivy League is a distinct market for the athletic services of AAHA students. Compl. ¶¶ 212-17, and also a distinct supplier of educational services to AAHA students. *Id.* ¶¶ 201-09.

[25] Defendants also cite, Mot. at 19, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), in which the court cited "many economic substitutes." *Id.* at 1121. Given Defendants' own arguments regarding the uniqueness of the Ivy League experience, Mot. at 1-2, 14-16, and Plaintiffs' specific allegations concerning cross-elasticity and the University Defendants' ability to maintain effective net price differentials between Ivies and non-Ivies for

Defendants' reliance on *Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir 2000), Mot. at 19-20, to contend that the alleged relevant market here is too narrow is misplaced. *Hack* concluded only that Yale *by itself* lacked market power in any market. *Id.* at 86-87. Here, in contrast, Plaintiffs allege agreement by all University Defendants making up an *entire league*, and that they collectively have market power, as demonstrated by their ability to charge effectively higher net prices to athletes than all other Division I colleges and universities. Compl. ¶¶ 201, 208; Mot. at 10. This effective price differential is no different than the one in *Geneva Pharmaceuticals*, where higher prices for the brand-name blood thinner Coumadin relative to its generic competitors were sufficient to define a market consisting only of that brand name drug even though the brand and generics were functionally identical. 386 F.3d at 496-97.[26]

As for the Defendants' argument that any relevant markets here must be sport-specific, Mot. at 23-27, it fails for multiple reasons. First, the substantial overlap in Division I sports among the University Defendants is more than sufficient to make the alleged markets plausible. That is, the interchangeability that matters is what AAHA students recruited in one sport consider to be substitutes *in that same sport*. With respect to the many and overlapping varsity sports in Division I, the University Defendants offer a distinct product (education provided by highly selective academic institutions *and* Division I athletics) for which AAHA students cannot find any (or very few) reasonable substitutes.[27] Defendants' identification of a few varsity sports

---

athletes, there is no basis for the Court to conclude here, as a matter of law, that non-Ivies are sufficient "economic substitutes" for Ivies. *See, e.g.*, Compl. ¶¶ 207-08, 215-16.

[26] Defendants' citation to *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. Appx. 23 (2d Cir. 2015), Mot. at 19, 21, does not help them because there the court reasoned, in considering whether the relevant market could consist of only Marriott-managed hotels, that "[i]f other, non-Marriott-managed hotels in New York City suddenly doubled the wages they paid to their employees, it is beyond doubt that Marriott hotels would have to increase their wages to retain any employees." *Id.* at 29. This analysis cannot control here because the University Defendants have *already* charged higher prices and suppressed compensation without losing enough AAHA students to other universities to cause them to undo the Agreement. Compl. ¶¶ 208-16.

[27] The law has long operated in this way. *See, e.g.*, *SmithKline Corp. v. Eli Lilly & Co*., 575 F.2d 1056, 1064 (3d Cir. 1978) (despite a certain degree of functional interchangeability among antibiotics, specific class of

that a few University Defendants do not offer hardly undermines Plaintiffs' market definitions as a matter of law. At the pleadings stage, the emphasis is not functional substitutability, but on cross-elasticity of demand, which Plaintiffs here allege is low for Ivy League versus non-Ivy League schools generally.[28]

Second, in analogous cases involving firms using anticompetitive schemes to suppress their workers' wages, courts commonly find markets to be plausible that include the sale of services from multiple types of workers in multiple different non-interchangeable occupations. *See Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016) (recognizing single market for mixed martial arts fighters' services even though they compete in distinct non-interchangeable weight classes); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. 2012) (rejecting a motion to dismiss alleged a horizontal conspiracy to restrain competition in labor market consisting of a wide variety of non-interchangeable occupations across multiple high-tech defendants, each with a different set of job types).

Third, the bundled sale of Ivy educational services combined with multiple Division I sports is a unique product that AAHA athletes seek to purchase, regardless of which of the Division I sports those athletes play. *See* Compl. ¶¶ 8, 82. Courts have long understood that

---

antibiotics was separate product market based on court's finding that there was a lack of price sensitivity and cross-elasticity of demand); *United States. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 & n.1 (8th Cir. 1988) (even though consumers would substitute high fructose corn syrup for sugar, they did not reside in same market because cross elasticity was low); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (even though products were interchangeable in the sense that they functioned in the same way, absence of cross elasticity of demand between them prevented products from residing in same market); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-60 (D.D.C. 2000) (explaining that "[f]inding two products to be functionally interchangeable, however, does not end the analysis" and recognizing that cross-elasticity of demand is the essential consideration); *FTC v. Staples*, 970 F. Supp. 1066, 1074-78 (D.D.C. 1997) (finding, due to lack of cross-elasticity that products reside in separate product markets despite functional interchangeability).

[28] Compl. ¶¶ 207, 216; *see, e.g.*, *Geneva Pharms.*, 386 F.3d at 497-98 (despite functional interchangeability, brand and generic drug were separate product markets because customers did not view them as reasonably interchangeable: customers of the branded drug did not switch to cheaper generic version, and customers of generic would not switch to more expensive branded version); *FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1239-43 (8th Cir. 2011) (affirming finding that two drugs treating the same medical condition were in separate markets due to absence of evidence cross-elasticity of demand between the two).

markets must be defined to reflect just those commercial realities. As the Supreme Court held in *United States. v. Grinnell Corp.*, 384 U.S. 563, 572 (1966), "We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." In *Grinnell*, the Court affirmed the district court's inclusion of the "entire accredited central station service business as a single market" even though it consisted of multiple different services: automatic burglar alarms, automatic fire alarms, sprinkler supervisory service, and watch signal service. 384 U.S. at 567, n.4;[29] *see also FTC v. Staples, Inc.* ("*Staples I*"), 970 F. Supp. 1066, 1075 (D.D.C. 1997) (upholding a broad market of "consumable office supplies," with at least 500 different products); *FTC v. Staples Inc.* ("*Staples II*"), 190 F. Supp. 3d 100, 117 (D.D.C. 2016) ("[a]lthough a pen is not a functional substitute for a paperclip, it is possible to cluster consumable office supplies into one market for analytical convenience").

A single market can encompass extremely large numbers of non-interchangeable products or services where a set of customers seek a provider or group of providers offering that combined product or service. *See Frame-Wilson v. Amazon.com, Inc.,* 591 F. Supp. 3d 975, 990 (W.D. Wash. 2022) (market defined to include internet retail sales of over 600 *million* distinct products appropriate); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930 (7th Cir. 2000) (single toys market consisting of "staggering" variety of over 11,000 toys); *Staples I*, 970 F. Supp. at 1078-79 (existence of customers dedicated to office supply superstores, with their "unique combination of size, selection, depth[,] and breadth of inventory," was an important factor in defining a distinct market). Because thousands of AAHA students seek the unique combination

---

[29] As in *Grinnell*, the commercial realities in collegiate sports also demonstrate the appropriateness of defining the markets here across sports. For example, the federal anti-discrimination legislation embodied in Title IX of the Higher Education Act treats all collegiate sports as a group, in requiring comparable spending between men's and women's *sports* (including as to athletic scholarships), not tailored to specific sports. *See* Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681, 1687.

of an Ivy League education and Division I athletics that the Ivies offer, it is appropriate to include the sale of that combined product as a single market.[30]

### 3.   The Ivy League Agreement Lacks Valid Procompetitive Justifications.

Plaintiffs allege the Ivy League Agreement has no procompetitive justifications, but is merely meant to benefit Defendants' bottom lines. Compl. ¶¶ 10-11, 192-93, 195, 228-32. Defendants nevertheless seek to justify the Agreement essentially by repackaging the NCAA's failed "amateurism" defense. They argue, for instance, that prohibiting athletic scholarships allows students to choose a unique "campus cultures and college experience" where purportedly: (1) "student-athletes and non-student-athletes are treated equally"; (2) "a measure of competitive balance within the athletic conference" is preserved; and (3) "financial assistance provided to student-athletes is not contingent on their continued participation in varsity sports." Mot. at 14.

These justifications are not only outside the Complaint, but *they directly contradict it*. *See*, *e.g.*, Compl. ¶¶ 228-35. Moreover, Defendants offer no evidence to support any of them. Thus, none can be considered at this stage. *See, e.g.*, *Davitashvili*, 2022 WL 958051, at *6 (asserted procompetitive assertions, "while certainly worth a fact-finder's consideration, do not persuade the Court to grant a motion to dismiss") (quoting *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 828 (S.D.N.Y. 2016)).[31]

---

[30] In the alternative, Plaintiffs seek leave to amend the Complaint. If deemed necessary, Plaintiffs could, for example, group all NCAA "headcount" sports together. The NCAA deems headcount sports to be those where all participating athletes receive full athletic scholarships, which post-*Alston* cover all education-related expenses. These sports include: men's and women's basketball, football, and women's tennis, gymnastics, and volleyball. These sports contrast with "equivalency sports," where the numbers of permitted scholarship "equivalents" can be divided in any manner member institutions choose. The head-count vs. equivalency distinction is discussed in *Fisk v. Bd. of Trs. of Cal. State Univ.*, 2023 WL 2919317, at *2 (S.D. Cal. Apr. 21, 2023).

[31] *See also Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014) (denying motion to dismiss antitrust case and stating, "Defendant will later have the opportunity to show the procompetitive effects of the agreements."); *Borozny*, 2023 WL 348323, at *8-9 ("While the parties spend many pages of their respective briefing arguing about whether the agreement in the instant case constitutes a naked or an ancillary restraint on trade, the Court need spend far less ink. The motion presently pending before the Court is one to dismiss the CAC."); *Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972, 978-80 (N.D. Cal. 2022) (denying motion to

### i.   The Creation of a "Culture" Based on Supposed "Equal Treatment" of Athletes and Non-Athletes Is Not a Valid Justification.

Defendants' wholly unsupported and implausible assertion that students somehow benefit from the ability to "choose" to attend Defendants' universities *because* those institutions collude not to offer athletic scholarships is meritless, or at the very least, cannot on the current record justify dismissal of this action.

*First*, Defendants' justification is legally invalid because it is based on the premise that the supposedly unique product Defendants seek to create is a "culture" of economic exploitation of athletes. Defendants are essentially using a defense rejected by the Supreme Court in *Alston*, namely, "relabel[ing] a restraint as a product feature and declar[ing] it immune from § 1 scrutiny." *Alston*, 141 S. Ct. at 2163. In other words, Defendants are asserting that *competition itself* is the root of their problem because competition creates the supposed "unequal treatment" that Defendants seek to eradicate. However, the "Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *Nat'l Soc'y of Prof'l Engineers v. United States.*, 435 U.S. 679, 695-96 (1978) ("The statutory policy precludes inquiry into the question whether competition is good or bad.").[32] As the Supreme Court reaffirmed in *Alston,* it "has regularly refused materially identical requests from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition." 141 S. Ct. at 2159.

*Second*, Defendants' unique campus culture argument is a contrived repackaging of the NCAA's discredited "amateurism" defense. The NCAA had for decades justified its members'

---

dismiss *per se* claim, where plaintiffs "plausibly alleged that the restriction on Align's ability to sell aligners directly to consumers was not reasonably necessary for the cooperative undertaking").

[32] *See also FTC v. Sup. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) (rejecting non-competitive quality of service and social justifications as irrelevant in rule-of-reason analysis, where the "social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful"); *Ind. Fed'n of Dentists*, 476 U.S. at 462-64 (same).

agreements to prohibit or limit athletic benefits on the ground that its "product" was defined by

not providing such benefits. The Supreme Court in *Alston* rejected this justification in part for the

reason stated just above: it is a direct challenge to competition itself, and thus invalid. But the

Court also looked upon the rationale with appropriate skepticism given the district court's

finding that "the NCAA had not even maintained a consistent definition of amateurism." *Alston*,

141 S. Ct. at 2146 (quotation omitted). This Court also should reject Defendants' justification

here for a similar reason. Like the NCAA's flexible amateurism defense, Defendants'

interpretation of the kinds of economic benefits that are in "harmony" with their claimed unique

"culture" has materially shifted over time. Indeed, immediately after *Alston,* the Ivies began

allowing Ivy League Athletes to benefit economically from their NIL rights, whose value

depends on participation in Ivy League sports—a benefit that non-athletes cannot similarly

exploit. How *these* financial benefits, which in combination with need-based aid can exceed the

COA, available only (or mainly) to athletes are in "harmony" with a culture of "equal treatment,"

but scholarships merely covering athletes' COA are not, is hard to fathom.

One reason the "culture" defense is so flexible is that Defendants appear to have made it

up for purposes of this lawsuit. If such a rationale existed, one would expect to find it in the Ivy

Manual, but it is not there. Defendants reference the Manual's statement that: "In the total life of

the campus, emphasis upon intercollegiate competition must be kept in harmony with the

essential educational purposes of the institution." Mot. at 14. But this amorphously stated goal is

fully consistent with offering academic scholarships like every other Division I institution. It

cannot and does not support Defendants' argument that the only way—or even one way—to

achieve the desired "culture" (or "harmony") is to exploit athletes by colluding to prohibit

offering them scholarships that would, at minimum, cover the COA at their schools. Defendants'

"equal treatment" argument fails to explain why or how offering athletic scholarships to cover the students' educations could possibly be contrary to the educational purposes of Ivy institutions, or how permitting athletes to benefit from NIL rights is consistent with achieving "harmony" but athletic scholarships is not.

*Third*, Defendants' definition of "equal treatment" is nonsensical. The Agreement affords *the opposite* of "equal treatment" for varsity athletes relative to other students. Treatment is fairly considered equal when differentially situated individuals or groups are afforded the same rights and privileges. Instead, the Ivy League singles out athletes for economic exploitation. Only athletes, under the Agreement, are blocked from receiving compensation for their work and the market value they bring to the schools. Ivy League Athletes—in contrast to other students who perform work-study jobs and get paid for their efforts—must not only meet their academic requirements, but also devote at least 20 unpaid hours per week throughout the year in training and in competitions from which Defendants derive value. Compl. ¶ 17. Only a warped definition of equal treatment would allow one group of students to benefit from their work, while refusing to allow another group the same rights and privileges—especially when the athletes provide Defendants services especially valued by the market and thus require a specifically targeted conspiracy to exploit.

*Fourth*, Defendants assert that the Ivy League Agreement's prohibitions "help expand consumer choice," without even arguing that students (or anyone) actually *value* that choice.[33]

---

[33] Defendants' "choice" argument—couched in terms of a "campus" culture for athletes and non-athletes alike—has not been recognized in past primary judicial decisions addressing collegiate sports. These decisions have defined choice only by whether the NCAA or any of its rules enhances choices of *fans* or the *athletes* themselves. As the Supreme Court stated in *Board of Regents*, striking down the NCAA's restrictions on television broadcasting, "the NCAA plays a vital role in enabling college football to preserve its character … In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes— and hence can be viewed as procompetitive." 468 U.S. at 5, 102. The Ninth Circuit's focus on choice in *O'Bannon* was even narrower, concentrating only on the effect of the restraints on *athletes,* failing "to see how the restraint at

Defendants do not claim that the Agreement increases output of anything—not educational services, nor Ivy League athletics. Because the "culture" defense does not even arguably increase efficiency, it is not a valid justification as a matter of law. *Bd. of Regents*, 468 U.S. at 114 ("If the NCAA's television plan produced procompetitive efficiencies, the plan would increase output and reduce the price of televised games."); *O'Bannon*, 802 F.3d at 1072-73 (rejecting justification because court could not "see how the restraint at issue in this particular case— *i.e.,* the NCAA's limits on student-athlete compensation—makes college sports more attractive to recruits").[34] In short, Defendants' "culture" justification is both premature and invalid.

### ii.   Defendants' "Competitive Balance" Justification is Meritless.

Defendants contend that their Agreement is necessary "to have a functioning league with a relatively level playing field." Mot. at 15. This assertion is flawed for several reasons.

*First*, Defendants nowhere explain why the Ivies need to conspire to ban scholarships to achieve balance when all other Division I conferences do not. There is no evidence that the advent of financial benefits to athletes over and above the COA—let alone up to the COA—has affected competitive balance in any other NCAA conference. College sports, especially at the Division I level, remain a big business. Compl. ¶¶ 90-94. Moreover, there is no evidence that the Patriot League and its member institutions have suffered since that League abandoned its previous policy of not allowing athletic scholarships. *Id*. ¶ 136 & n.40.

*Second*, Defendants rest their competitive balance argument entirely on the Agreement's

---

issue in this particular case—*i.e.,* the NCAA's limits on student-athlete compensation—makes college sports more attractive to recruits, or widens recruits' spectrum of choices in the sense that *Board of Regents* suggested." *O'Bannon*, 802 F.3d at 1073. And in *Rock*, 928 F. Supp. 2d 1010, the "choice" defense was grounded in the supposed virtues of "amateurism," a rationale that, as shown above, the Supreme Court rejected in *Alston*. *See* 141 S. Ct. at 2163.

[34] *See also In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 873-74 (N.D. Ill. 2010) (denying defendants' motion for summary judgment, where "a factfinder resolving all disputes in Plaintiffs' favor could conclude that the alleged shutdown agreements did not support some higher goal, but rather served the naked and objectively intended purpose of reducing output to buoy declining market prices").

prohibition of scholarships for *athletes*. But each of the University Defendants competes with the other, without restriction, on payments to all their athletic department personnel, including their coaches, who have important impact on team success. Defendants are silent as to whether such competition impairs competitive balance.

*Third*, Defendants' assertion is contrary to the Complaint, which alleges that the Agreement has created a situation in the Ivy League where competitive balance is in short supply. Compl. ¶ 230 & Appx. D. Indeed, Defendants undermine their competitive balance claim by highlighting, Mot. at 26 & Exh. 2, the consistent success of the Princeton women's basketball team. Finally, since 2021, Defendants (and other Division I schools) have allowed their athletes to receive NIL compensation, Compl. ¶¶ 122-26, without any observed adverse effects on price or output. *See* Part A.2, *supra*.

### iii. Defendants Ignore Less Restrictive Alternatives to Prohibiting Scholarships and Refusing Compensation/Reimbursement.

Defendants' assertion that their Agreement ensures "that student-athletes can continue to obtain an Ivy League education should they opt to cease playing sports or suffer an injury," Mot. at 7, is not a procompetitive benefit for three reasons. First, if Defendants were truly concerned about this issue, they could unilaterally offer merit scholarships based on past athletic achievements that did not depend on continuing to play Ivy League sports. Second, the University Defendants claim to provide need-based aid to *any student* who merits it, so there is no basis for the claim that students would need to leave school if they could no longer play. Third, and simply put, Defendants' argument makes no sense. Under the Agreement, *no athlete* gets an athletic scholarship or otherwise receives compensation for their athletic work (other than NIL rights). Given that it is better to have had some athletic scholarship aid than none, it is hard to see how athletes would be worse off absent the Agreement.

### C. The "Conference Carve Out" in *Alston* Is Inapplicable

Defendants argue that they satisfy the rule of reason, as a matter of law, because *Alston* purportedly allowed individual Division I conferences to set their own rules regarding athletic benefits. Mot. at 3. This is wrong for three reasons. *First,* Defendants cite, Mot. at 9, *Alston's* reference to the district court's observation that "individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still." 141 S. Ct. at 2164. However, this statement does not support Defendants' argument. The district court was only referring to the restraints *it had explicitly enjoined*—none of which included the ban on athletic scholarships that the Ivies seek to justify. The Supreme Court made clear that to the extent it had a concern, it related only to ensuring that benefits provided *above the COA* "are legitimately related to education." *Alston*, 141 S. Ct. at 2165. The athletic scholarships the Ivies have banned include those up to the COA—and thus are presumptively related only to education. The *Alston* court thus cannot be read as having allowed athletic conferences to ban athletic scholarships.[35]

*Second,* as Defendants acknowledge, Mot. at 20, the district court's order did not constrain the ability of conferences to impose rules that limit athletic benefits to athletes above the COA on the assumption that conferences did not have market power. *See In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1088 (N.D. Cal. 2020). That assumption of the *Alston* district court is contrary to Plaintiffs' plausible allegations here that *the Ivy League has substantial market power*. Compl. ¶¶ 223-27; *see* Part B.2, *supra*. *Alston* thus leaves no room for

---

[35] The co-author of the leading antitrust law treatise, in commenting on *Alston*, observed that "the individual conferences within the NCAA also operate as agreements among the participating teams. It is unclear why if a restraint covering the entire NCAA is unlawful, a restraint covering only the Big Ten or Pac-12 conference would be permissible, *but the Court did not elaborate. . . .* Nevertheless, it bears observing that all of the challenges were from the NCAA, arguing that the decree [of the district court] limited the NCAA's control excessively. The Court clarified that its focus was 'only on the objections the NCAA' raised. *It 'express[ed]* no views' on other issues." Herbert Hovenkamp, *A Miser's Rule of Reason: Student Athlete Compensation and the Alston Antitrust Case*, UNIV. OF PA. CAREY LAW SCHOOL (2022), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=3536&context=faculty_scholarship (emphasis added).

finding that a ban on athletic scholarships serves a procompetitive end; and at the very least,

requires discovery to assess the supposed rationales and impact of the Ivy League Agreement.

*Third*, as Defendants also acknowledge, Mot. at 20, the conference carve-out in *Alston*

was a *less restrictive alternative*. Courts reach this third stage in the *American Express*

framework *only if* a defendant carries its burden of showing a legitimate procompetitive

justification—which Defendants have not done here. *See* Part B.3, *supra*.

### D.  Plaintiffs Suffered Antitrust Injury

Defendants assert that Plaintiffs fail to allege antitrust injury because they purportedly do

not allege that Brown would have awarded them athletic scholarships or otherwise compensated

them absent the Agreement. Mot. at 4, 31. Defendants are wrong for three reasons.

*First*, the only question on a motion to dismiss is whether it is *plausible* that Plaintiffs

would have received more support or benefits from their schools, and thus effectively paid less to

attend them, absent the Agreement. *See, e.g.*, *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 890

(N.D. Ill. 2022) (finding plausible the premise that but for the conspiracy not to provide

competitive aid packages, "the defendants would have competed for students by providing more

competitive aid packages"). A plaintiff need only allege that she has suffered harm that a

favorable decision would likely redress. *In re High-Tech*, 856 F. Supp. 2d at 1123 n.11. That "it

may be hard" to reconstruct "a competitive market" is not "a get-out-of-court-free card" for

monopolists and cartelists. *Apple v. Pepper*, 139 S. Ct. 1514, 1524 (2019). Plaintiffs in fact

allege that, absent the Agreement, the University Defendants would compete for them and other

Class Members, Compl. ¶ 191, and that, as a result, the Agreement "has caused and is causing

Plaintiffs and the other Class members to pay artificially inflated net prices for attending"

Defendants' schools. *Id*. ¶ 194.[36] That is sufficient.

*Second*, Defendants argue both that the Agreement not to award athletic scholarships is *necessary* to create their "campus culture," Mot. at 14, but also that without the Agreement, they apparently would not offer those scholarships (or other forms of compensation) to Plaintiffs anyway. The purported necessity of organizing a cartel not to provide scholarships implies that without it, the University Defendants would, in fact, provide such scholarships.

*Third,* Plaintiffs' allegations that they would have received more compensation and paid lower prices absent the Agreement is well-founded. Plaintiffs plausibly allege, as shown, that absent the Ivy League Agreement, Defendants would compete with each other to attract Division I athletes, including by awarding athletic scholarships. Compl. ¶¶ 23-24, 192-94. The logical candidates for such scholarships are those high school athletes whom other competitive Division I colleges recruited and to whom athletic scholarships were offered, and those varsity athletes that competed successfully in their sport and without sufficient financial aid. Plaintiffs fall into both categories. Compl. ¶¶ 3, 23-24.[37]

*Fourth*, Plaintiffs each play basketball, a "headcount" sport for which the NCAA rules provide Division I schools must award full COA scholarships. *See supra*, n.30; Compl. ¶¶23-24. Absent the Agreement, and the corresponding carve-out of the NCAA scholarship rules for the Ivy League, Brown would have been required to provide Plaintiffs with full COA scholarships.

### E.  Plaintiff Choh's Claim Is Not Time-Barred

Defendants argue that Plaintiff Choh's claim is untimely because he enrolled at Brown in

---

[36] *See also id*. ¶ 195 (the Agreement "has prevented and/or is preventing Plaintiffs and other Class Members from earning compensation or reimbursement for education-related expenses from the University Defendants for the athletic services they have provided to the universities. But for the Ivy League Agreement, Plaintiffs and the other Class Members would have been compensated for those services.").

[37] A full athletic scholarship would have provided Plaintiffs more than their need-based financial aid; accordingly, the assertion, Mot. at 31, that Plaintiffs' "need-based awards would have been reduced" is irrelevant.

the fall of 2017, more than four years before the Complaint was filed. Mot. at 32-33. This argument fails to address controlling law, misreads the Complaint, and declines to acknowledge what Defendants report to be their own practices. "A statute-of-limitations claim is an affirmative defense, which is not normally considered on a motion to dismiss for failure to state a claim." *Rahman v. Gen. Elec. Corp.*, 2022 WL 13916448, at *4 (D. Conn. Oct. 24, 2022) (quotations omitted); *see also Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, 2012 WL 162361, at *3 (D. Conn. Jan. 19, 2012) ("The statute of limitations is an affirmative defense, and therefore generally not appropriate for a motion to dismiss.").[38] An "exception to this general principle" applies "when the defense appears on the face of the complaint," sufficient to "create an ironclad defense." *Rahman*, 2022 WL 13916448, at *4 (quotations omitted). The exception does not apply here for three main reasons.

 *First*, a reasonable inference to draw from Plaintiffs' allegations is that the continuing violation doctrine applies:

> A cause of action under the antitrust laws accrues when a defendant commits an act that injures a plaintiff's business, *but the clock can restart in cases if the conspiracy continues through additional overt acts.* Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy . . . each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times. An overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff.

*SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2620041, at *2 (2d Cir. Mar. 24, 2023) (cleaned up) (emphasis added). Plaintiff Choh's claims meet this test because the

---

[38] This precept reflects that "statute of limitations analysis is generally riddled with questions of fact which *the Defendants* must establish in order to bar Plaintiffs' claims." *Bartold v. Wells Fargo Bank, N.A.*, 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015) (emphasis in original) (quotations omitted); *accord Walker v. Accenture PLC*, 511 F. Supp. 3d 169, 191-92 (D. Conn. 2020). Accordingly, the defense "most often . . . requires a factual inquiry beyond the face of the complaint." *OBG Tech. Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 503 (D. Conn. 2007).

University Defendants decline, every year, to award athletic scholarships or compensation for athletic services for the year; and every year in which Defendants continued the Agreement, during Choh's tenure at Brown, inflicted new and accumulating injury on him. Compl. ¶ 23.

Plaintiffs do not allege that the Agreement applies for any term of years (nor does the Agreement say that). Indeed, the fact that Defendants have regularly revised their "Ivy League Manual"—each time without specifying any period of years for which it will apply—underscores that no particular instantiation of the Agreement is permanent or final.[39] *Nothing* in Plaintiffs' allegations indicates—let alone says on their face—that in the fall of 2017, Brown made decisions regarding Plaintiff Choh that unavoidably bound the school for each of the next four years, or that the economic impact on him from year to year was somehow not accumulating. In sum, "it is apparent that there are no facts that can be ascertained from the face of the Complaint that definitively render the lawsuit untimely." *Navarro v. Allied World Surplus Lines Ins. Co.*, 544 F. Supp. 3d 229, 241 (D. Conn. 2021).[40]

*Second*, Defendants' suggestion that Plaintiff Choh has failed to show his claim is timely, Mot. at 32-33, turns the law on its head. Plaintiffs could allege in further detail that each Ivy League school decides each year whether and to what extent it will award athletic scholarships or compensate varsity athletes. Contrary to Defendants' assertion, however, whether Plaintiffs *could have* alleged this level of detail in their Complaint is irrelevant because a motion to dismiss

---

[39] These facts are relevant, for example, under the standard in a case that Defendants cite. In *Creative Copier Servs. v. Xerox Corp.*, 2005 WL 2175138 (D. Conn. Sep. 2, 2005), the court focused on whether each time the Defendant engaged in a "refusal to deal" constituted a "new and independent act." *Id*. at *1-2. The court held that "whether a particular refusal is an independent act or simply a reaffirmation of a prior refusal will typically turn on whether the initial refusal to deal is irrevocable, immutable, permanent and final." *Id.* at *2 (quotations omitted). Plaintiffs do not allege that the original Agreement, or any subsequent version of it, has been final.

[40] *See, e.g., Walker*, 511 F. Supp. 3d at 192 (explaining that whether plaintiff's allegations of "a continuing pattern of discrimination triggering the continuing violation doctrine or, instead, are discrete events is a question better addressed on a summary judgment motion after discovery"); *accord Theophilous v. Bridgeport Mental Health Ctr.*, 2020 WL 4449949, at *9 (D. Conn. Aug. 2, 2020).

"may not be granted simply because a complaint failed to include allegations affirmatively establishing its timeliness." *Bartold*, 2015 WL 7458504, at *4 (quotation omitted).[41]

*Third*, Defendants' arguments underscore why the courts wait to resolve statute-of-limitations defenses with a factual record. The Court can take judicial notice that Brown's tuition prices change from year to year, and that a student must reapply for financial aid every year.[42] The net price of tuition that Brown charged Plaintiff Choh for each year of his attendance was not "merely a reaffirmation of a previous act," any more than the tuition that Brown set for each of those years was a "reaffirmation" of the prior year's tuition—it was a new and distinct price, easily shown to be based on certain factors that vary from year to year.[43]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

---

[41]*Accord Navarro*, 544 F. Supp. 3d at 240; *see also, e.g.*, *Clearspan Fabric Structures Int'l, Inc. v. Wildwood Dev. Corp.*, 2021 WL 430050, at *5 (D. Conn. Feb. 8, 2021) (denying statute-of-limitations defense on motion to dismiss where plaintiff's allegations "are not specific" as to timing of certain alleged breaches of contract).

[42] *See, e.g.*, https://www.brown.edu/news/2021-02-08/tuition (Brown increases its tuition and fees 2.85% for the 2021-2022 academic year); https://www.brown.edu/news/2020-02-10/tuition (Brown increases its tuition and fees 3.75% for the 2020-2021 academic year); https://www.brown.edu/news/2019-02-10/budget#:~:text= Undergraduate%20tuition%20will%20be%20%2457%2C112,student%20charges%20will%20total%20%247 3%2C736 (Brown increases its tuition and fees 5.1% for the 2019-2020 academic year); https://finaid.brown.edu/ basics/financial-need-eligibility#:~:text=Brown%20does%20not%20package%20loans,for%20financial%20 aid%20each%20year ("Students must reapply for financial aid each year.").

[43] Just as fundamental, the Supreme Court decided *Alston* in 2021—during Plaintiff Choh's tenure at Brown. The reasonable conclusion, one that Defendants could not sensibly dispute as a matter of law, is that this decision prompted the Ivy League schools further to analyze the propriety of the Agreement—which they then decided to reaffirm. These few facts alone underscore why the application of the continuing violation doctrine in this case "is a question better addressed on a summary judgment motion after discovery." *Walker*, 511 F. Supp. 3d at 191-92; *Theophilous*, 2020 WL 4449949, at *9.

Dated: June 29, 2023

By:   */s/ John L. Cesaroni*

Stephen M. Kindseth (ct14640)  
James M. Moriarty (ct21876)  
John L. Cesaroni (ct29309)  
ZEISLER & ZEISLER, P.C.  
10 Middle Street, 15th Floor  
Bridgeport, CT 06605  
Tel. 203-368-4234  
Fax. 203-368-5485  
skindseth@zeislaw.com  
jmoriarty@zeislaw.com  
jcesaroni@zeislaw.com  

Eric L. Cramer  
Patrick F. Madden  
Alan K. Cotler  
Najah Jacobs  
BERGER MONTAGUE PC  
1818 Market Street, Suite 3600  
Philadelphia, PA 19103  
Phone: (215) 875-3000  
ecramer@bm.net  
pmadden@bm.net  
alancotler@gmail.com  
njacobs@bm.net  

Robert E. Litan  
Dan Walker  
Hope Brinn  
BERGER MONTAGUE PC  
2001 Pennsylvania Avenue, NW, Suite 300  
Washington, DC 20006  
Phone: (202) 559-9745  
rlitan@bm.net  
dwalker@bm.net  
hbrinn@bm.net  

Velvel (Devin) Freedman  
Edward Normand  
Joseph Delich  
Stephen Lagos  
FREEDMAN NORMAND  
FRIEDLAND LLP  
90 Park Avenue  
Suite 1910  
New York, N.Y. 10016  
Phone: 646-970-7513  
vfreedman@fnf.law  
tnormand@fnf.law  
jdrelich@fnf.law  
slagos@fnf.law

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2023, I caused to be electronically transmitted a true and correct copy of the foregoing document to the Clerk of Court for filing using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ *John L. Cesaroni*