## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TAMENANG CHOH and GRACE KIRK, individually and on behalf of all others similarly situated,<br><br>                   Plaintiffs,<br><br>    v.<br><br>BROWN UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, HARVARD UNIVERSITY, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, PRINCETON UNIVERSITY, YALE UNIVERSITY, and THE IVY LEAGUE COUNCIL OF PRESIDENTS,<br><br>                   Defendants. | Case No. 3:23-cv-00305-AWT<br><br>July 27, 2023 |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................. ii

I.  PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A *PER SE* ANTITRUST VIOLATION ................. 1

    A.  Unambiguous Precedent Requires Rule-Of-Reason Analysis In This Case ............ 2

    B.  The Ivy League Agreement Has Facially Plausible Procompetitive Benefits ........... 5

II. PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE RULE OF REASON ................... 6

    A.  Plaintiffs' Alleged Markets Are Legally Deficient On Their Face .......................... 7

    B.  Plaintiffs Do Not Defend Their Impermissibly Vague Alternative Markets ......... 10

    C.  Plaintiffs Cannot Defend Their Implausible "All-Sports" Market ...................... 10

    D.  Plaintiffs Have Not Plausibly Alleged *Market-Wide* Anticompetitive Effects .......................... 11

III. PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE ANTITRUST INJURY-IN-FACT ...................... 12

IV. THE STATUTE OF LIMITATIONS BARS PLAINTIFF CHOH'S CLAIM .................................... 13

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Allen v. Dairy Farmers of America, Inc.*, 748 F. Supp. 2d 323 (D. Vt. 2010) .............................13

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010).......................................................................3

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008)........................................7, 9

*Belfiore v. New York Times Co.*, 826 F.2d 177 (2d Cir. 1987)........................................................8

*Brady v. NFL,* 779 F. Supp. 2d 992 (D. Minn. 2011).....................................................................4

*Brooklyn Downtown Hotel LLC v. New York Hotel & Motel Trades Council, AFL-CIO*,
    2017 WL 1192179 (S.D.N.Y. Mar. 29, 2017) ....................................................................11

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................................................9

*California Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ...................................................................5

*Chapman v. New York State Division for Youth*, 546 F.3d 230 (2d Cir. 2008)........................7, 8

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*,
    129 F.3d 240 (2d Cir. 1997)................................................................................................11

*Foundation for Interior Design Education Research v. Savannah College of Art &
    Design*, 73 F. Supp. 2d 829 (W.D. Mich. 1999)..................................................................9

*Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348 (S.D.N.Y. 1982).....................8

*Giordano v. Saks Inc.*, 2023 WL 1451534 (E.D.N.Y. Feb. 1, 2023) .............................................3

*Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275 (10th
    Cir. 2004) ...........................................................................................................................11

*Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000)....................................8

*Hanger v. Berkley Group, Inc.*, 2015 WL 3439255 (W.D. Va. May 28, 2015) ............................3

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)................................................................9

*In re German Automobile Manufacturers Antitrust Litigation*, 612 F. Supp. 3d 967
    (N.D. Cal. 2020)..............................................................................................................8, 9

*In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ....................10

*In re Travel Agent Commission Antitrust Litigation,* 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) .................................................................................13

*Jacobs v. Tempur-Pedic International, Inc.*, 626 F.3d 1327 (11th Cir. 2010) ..............................8

*JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273 (M.D. Fla. 2003)....................9

*Kenmore Mercy Hospital v. Daines*, 2011 WL 4368564 (W.D.N.Y. Sept. 19, 2011)....................13

*Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016)..................................................... 11

*McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2161786 (S.D.N.Y. July 27, 2007)....................8

*McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1998)...................................................3

*NCAA v. Alston,* 141 S.Ct. 2141 (2021)................................................................2, 3, 7

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984) ............................2, 3

*nFinanSe, Inc. v. Interactive Communications International, Inc.*, 2012 WL 13009231 (N.D. Ga. July 24, 2012) ............................................................2

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32 (2d Cir. 2018)...........................................................................2

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985).............................................................................2

*Rock v. NCAA*, 928 F. Supp. 2d 1010 (S.D. Ind. 2013) ............................................3, 4

*SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2620041 (2d Cir. Mar. 24, 2023) ...........................................................13

*United States v. Brown*, 5 F.3d 658 (3d Cir. 1993).........................................................4

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270 (S.D.N.Y. 2007) .................................................................12

*Wood v. NBA*, 809 F.2d 954 (2d Cir. 1987).................................................................4

## OTHER AUTHORITIES

NCAA, Division I Manual (effective Aug. 1, 2022), https://www.ncaapublications.com/productdownloads/D123.pdf....................................12

Plaintiffs' opposition reinforces that they have not stated a viable antitrust claim. *First*, the rule of reason is the presumptive mode of antitrust analysis; *per se* condemnation is reserved for only a select few uniformly anticompetitive agreements. Agreements, like the one alleged here, that plausibly facilitate legitimate joint ventures like sports leagues are not among that narrow set of naked restraints. *Infra* § I.A. That is especially true where, as here, it is apparent from the face of the complaint that the challenged agreement credibly facilitates student choice and is therefore procompetitive. *Infra* § I.B. Those potential benefits cannot be ignored.

*Second*, under the rule of reason framework, Plaintiffs' concession that other academically and athletically rigorous schools compete with the Ivy League dooms their claims as a matter of law. Antitrust plaintiffs must allege plausible relevant markets supported by facts, but the "markets" these plaintiffs describe—made up of just eight among more than 350 Division I schools—are contradicted by their own allegations and common sense. *Infra* § II.A. Plaintiffs do not defend their broader but amorphous alternative markets that expressly recognize this reality. *Infra* § II.B. The alleged markets also fail because the complaint, without explanation, lumps together dozens of different sports with facially different competitive landscapes. *Infra* § II.C. Plaintiffs' attempt to shirk their burden to allege a plausible market by alleging direct anticompetitive effects fails because they must allege *market-wide* effects, and they focus solely on purported effects in the facially implausible Ivy-League-only markets. *Infra* § II.D.

*Finally*, Plaintiffs rely on speculation rather than factual allegations to claim an injury that confers antitrust standing. *Infra* § III. And Plaintiff Choh's claim is time-barred because it accrued with his 2017 matriculation and has nothing to do with need-based aid. *Infra* § IV.

## I.     PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A *PER SE* ANTITRUST VIOLATION

The Ivy League Agreement cannot be evaluated under the *per se* rule. Contrary to Plaintiffs' suggestion (at 18-19), discovery is not necessary to know that "[r]egulation of league

sports is a textbook example of when the rule of reason applies." *North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018). Nor is discovery necessary to know that the Ivy League Agreement has potential "redeeming virtue[s]" and so cannot be "conclusively presumed to be unreasonable." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). Decades of uniform precedent make that perfectly clear. The *per se* rule is inapplicable as a matter of law.

### A.   Unambiguous Precedent Requires Rule-Of-Reason Analysis In This Case

Plaintiffs (at 14-16) fail to distinguish *NCAA v. Alston*, the most recent in a long line of cases holding that the rule of reason applies to agreements that are plausibly within the scope of a joint venture to create and run a sports league. *See* 141 S.Ct. 2141, 2157 (2021). *Alston* expressly reaffirmed that in collegiate athletics, some "horizontal restraints on competition are essential if the product is to be available at all," which triggers the rule of reason. *Id.* (quoting *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 101-102 (1984)). Plaintiffs (at 13-14) attempt to brush *Alston*'s holding aside, arguing that the Ivy League could exist in some form even if its members offered athletic scholarships. But neither *Alston* nor *Board of Regents* held that *only* "restraints 'necessary to produce a game'" are evaluated under the rule of reason. 141 S.Ct. at 2157. To the contrary, *Alston* recognized that such rules are often *approved* with only "a quick look," and that plaintiffs challenging other collegiate sports-league agreements like the one at issue here must plead and prove their case under the full rule-of-reason rubric. *Id.*

Plaintiffs (at 18) likewise assert that the ancillary restraints doctrine reserves the rule of reason solely for restraints "necessary for any sports league to exist." In fact, that doctrine *requires* rule-of-reason analysis whenever "it would be unreasonable to conclude that the agreement was designed as a 'naked' restraint on trade—that is, as a restraint formed 'with no purpose except stifling competition.'" *nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*, 2012

WL 13009231, at *7 (N.D. Ga. July 24, 2012).  An agreement that plausibly "differentiates" a product from others in the market is not such a naked restraint, and the rule of reason therefore applies as a matter of law.  *Board of Regents*, 468 U.S. at 101; *see also Giordano v. Saks Inc.*, 2023 WL 1451534, at *14 (E.D.N.Y. Feb. 1, 2023) (finding the rule of reason applied pursuant to ancillary restraint doctrine and granting motion to dismiss); *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at *5 (W.D. Va. May 28, 2015) (same).

Plaintiffs thus cannot explain away the fact that *Alston* evaluated the agreements limiting compensation for student-athletes at issue in that case using the rule of reason.  141 S.Ct. at 2160-2166.  Plaintiffs (at 15) assert that the Ivy League Agreement is more "aggressive," but *Alston*'s only comment on "more restrictive" restraints was that "*individual conferences remain free*" to impose them.  141 S.Ct. at 2164 (emphasis added).  The rule challenged in *Alston* applied across the entire NCAA, preventing student-athletes nationwide from receiving that compensation.  The Ivy League Agreement governs just a single, eight-school conference.

Plaintiffs fail to persuasively distinguish the numerous other cases applying the rule of reason to sports league agreements.  Many of Plaintiffs' purported distinctions (at 13-14 & n.9) simply highlight that courts apply the rule of reason to restrictions far less likely to help a joint venture enhance consumer choice than the agreement here.  *E.g.*, *American Needle, Inc. v. NFL*, 560 U.S. 183, 204 (2010).  Plaintiffs' attempts to distinguish cases applying the rule of reason specifically to compensation limits fare no better.  Plaintiffs (at 16) ask the Court to ignore *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1998), because it evaluated "rules limiting compensation for football players to scholarships," *id.* at 1340, 1343-1344.  But Plaintiffs also challenge prohibitions on "payments to Class Members for their athletic services."  Compl. ¶ 257.  Plaintiffs (at 16-17) also claim that *Rock v. NCAA*, 928 F. Supp. 2d 1010 (S.D. Ind.

2013), would come out differently after *Alston*.  Even if a court might no longer automatically uphold compensation limits as a matter of law (an argument not advanced here), *see id.* at 1026, it would still follow *Alston*'s lead and apply the rule of reason.

Plaintiffs' other cases are inapt.  Plaintiffs (at 14 & n.10) fault Defendants for purportedly "ignoring" that athletes in professional sports leagues are unionized and so can "take advantage of the labor exemptions to the Sherman Act."  But Defendants cited no cases that turned on the labor exemptions, and they are irrelevant to whether the rule of reason applies as a matter of law here.  *See Wood v. NBA*, 809 F.2d 954, 959 (2d Cir. 1987) (degree of antitrust scrutiny "need not be decided" in the face of a Sherman Act exemption).  Plaintiffs (at 14) next rely on *Brady v. NFL*, which involved professional players' challenge to a lockout that effectively shut down the league.  779 F. Supp. 2d 992, 1004-1005 (D. Minn. 2011), *vacated*, 644 F.3d 661 (8th Cir. 2011).  *Brady* does not help Plaintiffs.  Entirely shutting down the NFL (suspending the joint venture's procompetitive activities) by definition cannot broaden consumer choice, taking *Brady* outside *Board of Regents* and its progeny.  In any event, the NFL in *Brady* relied solely on the labor exemption and conceded the *per se* rule would otherwise apply.  *Id.* at 1040.  Finally, Plaintiffs' discussion (at 17) of *United States v. Brown*, 5 F.3d 658 (3d Cir. 1993), makes no sense:  *Brown* also applied the rule of reason, *reversing* the district court's decision to the contrary.

Plaintiffs' only remaining contention (at 15)—that the Ivy League Agreement does not increase output—further highlights the need for analysis under the rule of reason.  Indeed, that is precisely the analysis conducted in the three cases Plaintiffs cite (at 15 & n.11).  This reliance on cases applying the rule of reason underscores Plaintiffs' inability to find even one condemning *per se* a rule that is within the scope of a joint venture's effort to maintain a sports league.  These rule-of-reason cases cannot support Plaintiffs' argument for application of the *per se* rule.

**B.      The Ivy League Agreement Has Facially Plausible Procompetitive Benefits**

Plaintiffs (at 21-34) argue that Defendants have not yet proven that the Ivy League Agreement has procompetitive justifications under the rule of reason.  That is true, but irrelevant. Defendants do not ask the Court to resolve now whether or to what extent the Agreement is in fact procompetitive.  What matters now is that it "might plausibly be thought to have a net procompetitive effect," and so as a matter of law cannot be *per se* condemned without considering those potential benefits.  *California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999).

As Defendants explained (at 13-14), on the face of the complaint, the Ivy League Agreement plausibly provides a framework for competitively balanced athletics among a small subset of Division I schools that offer prospective students a differentiated campus culture that stems from giving only need-based scholarships.  Plaintiffs cannot dispute that different recruitment and scholarship approaches may lead to different student bodies and campus cultures, among which applicants' preferences may vary.  One such choice-enhancing approach is the Ivy League's commitment, long expressed in the Ivy League Manual, that athletes will "be admitted as students and awarded financial aid only on the basis of the same academic standards and economic need as are applied to all other students."  Dkt. 153-3 at 152.

The Ivy League Agreement allows students at Ivy League schools to compete both in Division I athletics *and* in an athletic conference against other schools with similar admissions and financial aid principles.  The Agreement thus ensures that student-athletes at Division I schools committed to offering a campus culture that puts athletes and non-athletes on equal footing with respect to financial aid are not left to compete in an imbalanced athletic conference of universities with very different recruitment priorities.  By enabling that differentiated product, the Ivy League Agreement plausibly widens consumer choice, precluding *per se* condemnation as a matter of law.  Plaintiffs may wish to have both an Ivy League experience *and* athletic

scholarships, but they ignore the facially credible relationship between the two.

Plaintiffs' arguments against these justifications would come into play only under the rule of reason (and only if they had alleged a plausible market). They are also misguided. Plaintiffs (at 30-31) assert that Defendants rely on the amateurism justifications raised in *Alston*. But *Alston* applied the rule of reason, just as this Court should do, and certainly did not reject the facially credible benefits of the Ivy League Agreement that are described above and have nothing to do with amateurism. While Plaintiffs (at 30-31) accuse Defendants of manufacturing these benefits, they comport with common sense, are plainly credible from the face of the complaint and the Ivy League Manual and have not changed since 1954. *See* Compl. ¶¶ 131-34; Dkt. 153-3 at 149, 151-152. And contrary to Plaintiffs' argument (at 31), non-athletes at Ivy League schools—including actors, musicians, and others—could always benefit from their name, image, and likeness rights; now athletes can too. Finally, Plaintiffs' comparison (at 32) between varsity sports and work-study programs misses the mark. Work study is a form of need-based financial aid, while varsity athletics are among the many extracurricular activities that students may quit without affecting their financial aid package—a benefit of the Ivy League Agreement.

In short, *per se* treatment is inapplicable as a matter of law because the face of the complaint makes clear that the Ivy League Agreement is not among the narrow category of naked restraints universally agreed to have no plausible justification ever. The Agreement therefore cannot be condemned without inquiry into its actual effects—meaning without analysis under the rule of reason. That is precisely why every other court addressing compensation limits in collegiate sports has done so using the rule of reason. The same is required here.

## II.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE RULE OF REASON

Plaintiffs spill so much ink fighting application of the rule of reason because their "proposed relevant market … clearly does not encompass all interchangeable substitute products

even when all factual inferences are granted in plaintiff's favor," meaning the "market is legally insufficient and a motion to dismiss may be granted." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (cleaned up).

### A.     Plaintiffs' Alleged Markets Are Legally Deficient On Their Face

Plaintiffs concede the obvious point that some schools "are not part of the Ivy League" and yet "maintain stellar academic standards while competing for excellent athletes."  Compl. ¶ 11; *see also id.* ¶ 231 & n.81.  That concession accords with common sense and judicial experience.  Moreover, as Defendants explained (at 20-21), the Supreme Court in *Alston* recognized national markets for college football and men's and women's basketball in which the NCAA possesses market power, but by contrast emphasized that individual conferences remain free to impose the same or even more restrictive compensation limits.  *See* 141 S.Ct. at 2163-2165.  Discovery is not necessary to establish that Plaintiffs' contrived markets are legally deficient, and that Defendants lack market power in any properly defined market.

Nothing in Plaintiffs' opposition suggests otherwise.  Plaintiffs contend (at 24) that "Defendants *themselves* define the Ivy League as a distinct market," citing paragraphs 96 to 113 of the complaint.  Those allegations show no such thing.  Many amount to nothing more than statements that the Ivy League exists and joint ventures exist between its members.  *See* Compl. ¶¶ 96-100, 105-106.  That says nothing about reasonable substitutability or cross-elasticity of demand with schools outside the proposed market.  Plaintiffs also quote the Manual's requirement that Ivy League sports broadcasts promote the Ivy League, *id.* ¶¶ 103-104, the Ivy League website's favorable comparisons of the Ivy League to other athletic conferences, *id.* ¶¶ 108-109, and Harvard's, Yale's, and Penn's marketing of the educational benefits they offer student-athletes, *id.* ¶¶ 110-111.  This sort of "vigorous advertising is a sign of competition, not a lack thereof." *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1199 (N.D. Cal. 2008); *see*

*also, e.g., In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 980 (N.D. Cal. 2020) ("German automakers['] attempts to set themselves apart with advertising demonstrate that they were competing with non-German luxury brands"), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).  If the Ivy League did not compete with other conferences, it would of course not need to "emphasize the distinguishing characteristics of Ivy League athletics," Compl. ¶ 103, or market itself "as the top academic conference," *id.* ¶ 108.

Plaintiffs also cannot plausibly define a distinct market with reference to only academic and athletic success among the many features that inform enrollment decisions.  "[D]istinctions" that "do not demonstrate a lack of interchangeability" cannot plausibly define a market.  *McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2161786, at *2 (S.D.N.Y. July 27, 2007).  Rather, products' broader "unifying characteristics" are relevant to substitutability and cross-elasticity of demand.  *Chapman*, 546 F.3d at 238.  Courts have thus dismissed alleged markets for "restraint training services to private child care providers" as opposed to "restraint training services," *id.*; "visco-elastic foam mattresses" rather than "mattresses," *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337-1138 (11th Cir. 2010); and "international beauty pageants" that excluded "state and national" pageants, *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982).  The alleged markets are equally implausible given "the obvious" (conceded) fact that "many institutions of higher learning provid[e] superb educational opportunities," *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000), and compete in Division I.

Moreover, characteristics that exist on a gradient—like academic and athletic rigor—are particularly unlikely to define separate markets.  For example, the Second Circuit has held that a market limited to "general interest daily newspapers directed primarily to upscale readers" was "implausible as a theoretical matter."  *Belfiore v. New York Times Co.*, 826 F.2d 177, 180 (2d

Cir. 1987).  Other courts have rejected similar markets.  *See, e.g.*, *Hicks v. PGA Tour,* 897 F.3d 1109, 1122 (9th Cir. 2018) (affirming dismissal because "claims of increased effectiveness and price flexibility … fail to support the[] proposed markets"); *Foundation for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 73 F. Supp. 2d 829, 838 (W.D. Mich. 1999) (separate markets for accredited and unaccredited programs not plausible), *aff'd*, 244 F.3d 521 (6th Cir. 2001); *JES Props. v. USA Equestrian,* 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003) (same for market limited to "'A' rated hunter and jumper Recognized Horse Shows").  Plaintiffs' invented markets suffer from similar deficiencies and should likewise be dismissed.

Finally, Plaintiffs (at 23) say that the mere "existence and persistence of the Ivy League Agreement … tends to show that the parties to it are at least potential competitors."  But Plaintiffs' proposed markets fail because they *omit* scores of competitors.  As for the point (at 25) that student-athletes continue to attend Ivy League schools despite not receiving athletic scholarships, "a mere price differential alone does not necessarily signal a distinct market." *Apple*, 586 F. Supp. 2d at 1198.  Consumers often pay more for a differentiated product in a broader product market, so allegations of price differences on a spectrum do not nudge the alleged market from conceivable to plausible.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) (finding it "unrealistic to accept" the contention "that medium-priced shoes do not compete with low-priced shoes"); *German Auto.*, 612 F. Supp. 3d at 980 (rejecting alleged German luxury car market despite price premium for German cars).  And Plaintiffs do not even allege that the effective prices for student-athletes in the Ivy League are uniquely higher than at their peer schools.  Plaintiffs allege only that they "are *among* the most expensive undergraduate institutions in the country," Compl. ¶ 16 (emphasis added)—an allegation that ignores the generous need-based scholarships (including full tuition grants) that many student-athletes

receive, while conceding that other schools are equally or more expensive.

Plaintiffs' arguments thus do not render the alleged Ivy-League-only markets plausible. But it bears reiterating that these markets fail because Plaintiffs' *own allegations* concede the existence of numerous competitors that are not included.  The Court need go no further.

**B.     Plaintiffs Do Not Defend Their Impermissibly Vague Alternative Markets**

As Defendants established (at 21-23), Plaintiffs fatally fail to define the boundaries of their purported alternative markets, *see* Compl. ¶¶ 20, 218, or provide a basis for determining market power.  Plaintiffs do not argue otherwise, and so concede the point.

**C.     Plaintiffs Cannot Defend Their Implausible "All-Sports" Market**

As Defendants explained (at 23-27), Plaintiffs' proposed markets independently fail because they implausibly contain many different sports.  Plaintiffs have no persuasive rejoinder.

*First*, according to Plaintiffs (at 26), "the interchangeability that matters is what AAHA students recruited in one sport consider to be substitutes *in that same sport*." (emphasis added). Precisely.  Swimming and squash are not substitutes.  A price increase at Cornell would not lead a male lacrosse player to attend Columbia, which has no men's lacrosse team, but might lead him to Johns Hopkins, which competes in Division I lacrosse.  Columbia would be excluded from an appropriately defined men's lacrosse market, while Johns Hopkins (and others) would be included.  Defendants (at 25-27) provided numerous other examples that are plain from the face of the complaint.  As a matter of law, Plaintiffs cannot lump all these students and sports together in the same market without factual allegations plausibly justifying that decision.

*Second*, Plaintiffs (at 27) cite two out-of-circuit, district court decisions involving alleged labor markets that Plaintiffs believe included non-interchangeable jobs.  But that is not what the court in *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), found—it never once referenced any differences among the jobs included in the alleged market

in reaching its decision.  The court in *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016), likewise never mentioned weight classes, but rather held that the plaintiffs plausibly alleged an "Elite Professional MMA Fighters" market because the distinct "'Elite' designation [was] well understood in the industry," *id.* at 1165-1166.  Moreover, as Defendants explained (at 26-27), separate sport-by-sport markets are necessary here because, for many sports, teams in the Ivy League are not reasonable substitutes for each other and certain teams outside the Ivy League are obvious competitors for student-athlete applicants.  There was no such issue in *Le*: the defendant entirely "cornered the 'elite' market."  216 F. Supp. 3d at 1165.

*Third*, Plaintiffs argue (at 27-29) that all Ivy League sports are appropriately considered together in a single "cluster" market.  "A cluster market exists only when the 'cluster' is itself an object of consumer demand."  *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004).  It is therefore "inappropriate to treat the full line of services as a cluster" if consumers (1) do not "prefer to use" that full line of services or (2) "would respond to a price increase by a full line provider by shifting all or part of their business to partial line or single service providers."  *Brooklyn Downtown Hotel LLC v. New York Hotel & Motel Trades Council, AFL-CIO*, 2017 WL 1192179, at *6 (S.D.N.Y. Mar. 29, 2017).  Plaintiffs allege no facts to support such a market, nor could they.  No one attends Harvard to play 42 different varsity sports or Columbia to play 33.  And a price increase among Ivy League schools might well cause a rower to attend MIT, even though rowing is its only Division I sport.  The alleged all-sports markets thus obscure the meaningful differences in the competitive conditions for each sport that are plain from the face of the complaint.

### D.    Plaintiffs Have Not Plausibly Alleged *Market-Wide* Anticompetitive Effects

Under the rule of reason, Plaintiffs must allege anticompetitive effects on "market-wide competition" or they "fail[] to allege a claim."  *Electronics Commc'ns Corp. v. Toshiba Am.*

*Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997).  Plaintiffs' opposition confirms they have not done so.  They first assert (at 20) that such allegations are not required because the Ivy League Agreement is inherently anticompetitive.  That argument merely repackages their incorrect contention that the Agreement is *per se* illegal.

Plaintiffs next posit (at 20-21) that student-athletes in the Ivy League would pay lower effective tuition but for the Agreement.  As Defendants demonstrated (at 28-30), however, courts regularly dismiss complaints that attempt to show direct anticompetitive effects by alleging harm to only a subset of market participants or nakedly allege "higher" prices.  Plaintiffs (at 21) attempt to distinguish those cases by reasserting that Defendants are "the only sellers in the AAHA Educational Services Market, and the only buyers in the AAHA Athletic Services Market."  As discussed, those narrowly alleged markets are implausible.  Alleging effects at just these eight schools provides no "plausible inference of *market-wide* harm to competition." *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007) (emphasis added).  Plaintiffs have thus failed to state a claim.

## III.   PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE ANTITRUST INJURY-IN-FACT

Plaintiffs allege no facts making it *plausible*, as opposed to just possible, that Brown would abandon its longstanding admissions and financial aid priorities but for the Ivy League Agreement, or that these two individuals would benefit if it did.  Plaintiffs contend (at 37) that they have established antitrust injury because, but for the Agreement, "Brown would have been required to provide Plaintiffs with full COA scholarships."  That is wrong.  Division I rules limit the *number* of scholarships that can be awarded in headcount sports.[1]  But Plaintiffs cite no rule that *requires* full scholarships for all basketball players.  Finally, that Plaintiffs received

---

[1] NCAA, Division I Manual at 205, 15.5.5, https://www.ncaapublications.com/productdownloads/D123.pdf.

scholarship offers elsewhere says nothing about whether they would have received full (or any) scholarships from Brown.

## IV.     THE STATUTE OF LIMITATIONS BARS PLAINTIFF CHOH'S CLAIM

Plaintiffs argue (at 39) that the continuing-violation doctrine might save Choh's untimely claim because Brown was not "unavoidably bound" to "decline, every year, to award athletic scholarships." But the "weight of authority" holds that "renewal of an existing agreement falls squarely within the 'reaffirmation' exception to the continuing violation doctrine." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 350 (D. Vt. 2010) (collecting cases); *see also In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *6 (N.D. Ohio Oct. 29, 2007) ("continuing the same commission policies that it had followed for years" not "an overt act"), *aff'd*, 583 F.3d 896 (6th Cir. 2009). Plaintiffs (at 39) rely on the mere fact that Defendants "continued the Agreement[] during Choh's tenure at Brown." That is insufficient.

The assertion (at 40) that Choh's *need-based* aid may have changed each year does not save his claim. It is the Ivy League Agreement that matters here and that did not change. *See Kenmore Mercy Hosp. v. Daines*, 2011 WL 4368564, at *3-4 (W.D.N.Y. Sept. 19, 2011) (resetting Medicaid reimbursement rates based on earlier, allegedly unlawful designation did not restart limitations period). The Ivy League Agreement was "memorialized long ago" and has been "enforced for decades, to the present," Compl. ¶ 130, including when Brown "recruited, accepted, and enrolled Choh," *id.* ¶ 23. On the face of the complaint, that Brown followed the Ivy League Agreement and did not award Choh an athletic scholarship during his tenure as an undergraduate student-athlete is "merely a 'manifestation' of Defendants' alleged prior agreement"—not a new overt act that triggers a new limitations period. *SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2620041, at *3 (2d Cir. Mar. 24, 2023). His claim should be dismissed.

Dated:   July 27, 2023                    Respectfully submitted,

                                          */s/ Seth P. Waxman*
                                          Seth P. Waxman (phv03095)
                                          WILMER CUTLER PICKERING HALE AND DORR LLP
                                          2100 Pennsylvania Avenue NW
                                          Washington DC 20037
                                          Tel.: (202) 663-6000
                                          Fax: (202) 663-6363
                                          seth.waxman@wilmerhale.com

                                          Alan Schoenfeld (phv207237)
                                          David Gringer (phv207236)
                                          WILMER CUTLER PICKERING HALE AND DORR LLP
                                          7 World Trade Center
                                          250 Greenwich Street
                                          New York, NY 10007
                                          Tel.: (212) 230-8800
                                          Fax: (212) 230-8888
                                          alan.schoenfeld@wilmerhale.com
                                          david.gringer@wilmerhale.com

                                          *Attorneys for Defendant The Trustees of the
                                          University of Pennsylvania*

                                          Deirdre M. Daly (ct23128)
                                          David R. Allen (ct30827)
                                          FINN DIXON & HERLING LLP
                                          Six Landmark Square
                                          Stamford, CT 06901
                                          Tel.: (203) 325-5000
                                          Fax: (203) 325-5001
                                          ddaly@fdh.com
                                          dallen@fdh.com

                                          *Attorneys for Defendants*

                                          Noah J. Kaufman (phv207186)
                                          MORGAN, LEWIS & BOCKIUS LLP
                                          One Federal Street
                                          Boston, MA 02110
                                          Tel.: (617) 341-7590
                                          noah.kaufman@morganlewis.com

Jon R. Roellke (phv207185)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel.: (202) 739-5754
jon.roellke@morganlewis.com

*Attorneys for Defendant Brown University*

Karen Hoffman Lent (phv207216)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
Room 40-216
New York, NY  10001-8602
Tel:  212-735-3276
Fax:  917-735-3276
karen.lent@skadden.com

Amy Van Gelder (phv207221)
John Kocoras (phv207222)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, IL  60606-1720
Tel:  312-407-0903
amy.vangelder@skadden.com
john.kocoras@skadden.com

*Attorneys for Defendant The Trustees of Columbia
University in the City of New York*

Norm Armstrong (phv207230)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006
Tel.: (202) 737-0500
narmstrong@kslaw.com

Zachary T. Fardon (phv207217)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel.: (312) 995-6333
zfardon@kslaw.com

*Attorneys for Defendant Cornell University*

15

Ishan K. Bhabha (phv207234)
Douglas E. Litvack (phv10727)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001-4412
Tel.: (202) 637-6327
ibhabha@jenner.com
dlitvack@jenner.com

Terri L. Mascherin (phv207218)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
tmascherin@jenner.com

*Attorneys for Defendant Trustees of Dartmouth College*

Renata Hesse (phv207214)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
Tel.: (202) 956-7500
Fax: (202) 293-6330
hesser@sullcrom.com

Diane L. McGimsey (phv207215)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
Tel.: (310) 712-6600
Fax: (310) 712-8800
mcgimseyd@sullcrom.com

*Attorneys for Harvard University*

Juan A. Arteaga (phv05032)
Rosa Morales (phv207245)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel.: (212) 803-4000
Fax: (212) 223-4134
jarteaga@crowell.com
rmorales@crowell.com

16

Jordan Ludwig (phv11097)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel.: (213) 443-5524
Fax: (213) 622-2690
jludwig@crowell.com

*Attorneys for Defendant Princeton University*

Charles A. Loughlin (phv207263)
Benjamin F. Holt (phv01665)
Christopher M. Fitzpatrick (phv207257)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel.: (202) 637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
chris.fitzpatrick@hoganlovells.com

*Attorneys for Defendant Yale University*

Derek Ludwin (phv207232)
Meaghan Ryan (phv207233)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Tel: (202) 662-5429
Fax: (202) 778-5429
dludwin@cov.com
mryan@cov.com

*Attorneys for Defendant Council of Ivy Group
Presidents*

## CERTIFICATE OF SERVICE

I, Seth P. Waxman, hereby certify that, on July 27, 2023, I caused a copy of this Reply in Support of Defendants' Motion to Dismiss to be served on all registered counsel electronically via the Court's ECF system.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by U.S. mail, postage prepaid, to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

*/s/ Seth P. Waxman*
Seth P. Waxman (phv03095)