# EXHIBIT

# A

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 01**

| | |
|---|---|
| **TRUSTEES OF DARTMOUTH COLLEGE**[1] <br><br> **Employer** <br><br> **and** <br><br> **SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 560** <br><br> **Petitioner** | **Case 01-RC-325633** |

## DECISION AND DIRECTION OF ELECTION[2]

Dartmouth College (Dartmouth or the Employer) is a private, non-profit university with a campus located in Hanover, New Hampshire.

Service Employees International Union, Local 560 (the Petitioner or the Union) seeks to represent a bargaining unit comprised of the approximately fifteen students enrolled at Dartmouth who comprise the men's varsity basketball team.

The Union has been recognized by Dartmouth as the exclusive representative of certain employees employed by Dartmouth since 1966. The Union and Dartmouth have been parties to a series of collective-bargaining agreements covering various units of employees since that time. These collective-bargaining agreements dictate, among other things, employee wages and hours of work. Tentative agreements are negotiated by unit members and are ratified by the bargaining units as a whole. The current president of the Union, Christopher J. Peck, is a master painter employed by Dartmouth; the other members of the Union's executive board are also employed by Dartmouth and elected by and from the membership at large. President Peck and other union officers have adjusted employee grievances on behalf of members of the Union. Accordingly, I find that the Union is a labor organization within the meaning of Section 2(5) of the Act.[3]

---

[1] The Employer's name was amended by stipulation at the hearing.

[2] The petition in this case was filed under Section 9(c) of the Act. The parties were provided opportunity to present evidence on the issues raised by the petition at a hearing held before a hearing officer of the National Labor Relations Board (the Board) on October 5, 6, 10, and 11, 2023. I have the authority to hear and decide these matters on behalf of the Board under Section 3(b) of the Act. I find that the hearing officer's rulings are free from prejudicial error and are affirmed; that there is no contract bar or other bar to election in this matter; and that a question affecting commerce exists. Both parties filed briefs in this matter.

[3] The Employer argues that men's basketball players are not employees under Section 2(3), and that therefore the Union cannot be a labor organization for purposes of this case because Section 2(5) defines a "labor organization" as one "in which employees participate." This argument is not persuasive, and as a threshold matter, I find that the Petitioner is a labor organization regardless of the employee status of the basketball players at issue here.

Trustees of Dartmouth College
Case 01-RC-325633

Dartmouth takes the position the petitioned-for basketball players are not employees within the meaning of the Act and submits that the petition should be dismissed. In addition, Dartmouth takes the position that the Board should decline to assert jurisdiction over the basketball players so as not to create instability in labor relations.

As set forth below, I find that because Dartmouth has the right to control the work performed by the men's varsity basketball team, and because the players perform that work in exchange for compensation, the petitioned-for basketball players are employees within the meaning of the Act. Additionally, I find that asserting jurisdiction would not create instability in labor relations. Accordingly, I shall direct an election in the petitioned-for unit.

## **FACTS**

### *Employer's Structure and Business*

Dartmouth College was founded in 1769. Its mission is to "educate the most promising students and prepare them for a lifetime of learning and of responsible leadership through a faculty dedicated to teaching and the creation of knowledge." In total, about 6,500 students attend Dartmouth, including 4,400 undergraduate students and 2,100 graduate students. In 2021, Dartmouth accepted just over 6% of its applicants.

The academic calendar at Dartmouth is broken into summer, fall, winter, and spring terms. "Winterim" is an approximately six-week break between the fall and winter terms and lasts from mid-November until early January.

In addition to academic pursuits, Dartmouth students take part in a wide variety of extracurricular activities, including athletics. Dartmouth maintains an intercollegiate athletic program consisting of 35 varsity sports teams, including the men's basketball team at issue here.

Taurian Houston, Dartmouth's Executive Associate Athletics Director for Administration, provides administrative and strategic leadership for the 35 varsity sport programs. A team of ten sport administrators works directly with the head coaches in overseeing those programs. Program oversight includes, among other things, scheduling, personnel changes, and health and welfare issues. Director Houston reports to Director of Athletics and Recreation Mike Harrity. The Dartmouth College Athletic Department has its own business office, fundraising department, marketing department, and brand management department.

Director Houston testified that, due to his role supporting the men's basketball team, he is in contact with Head Coach David McLaughlin on a daily to weekly basis. In addition to Coach McLaughlin, the coaching staff includes three assistant coaches. The coaching staff is assisted by a paid student manager, an athletic trainer, and a strength and conditioning coach. A director of basketball operations supports the administrative logistics of the program. Douglas Van Citters is the faculty athletic representative; he serves as a liaison between the athletic department and the faculty when there is potential conflict between athletic and academic matters.

Trustees of Dartmouth College
Case 01-RC-325633

Dartmouth does not view its men's varsity basketball players as employees and does not provide them with monetary compensation in exchange for playing basketball. Players do not receive W-2 forms related to their participation in the basketball program, nor do they complete I-9 forms related to their participation in the basketball program.

*The Ivy League and the NCAA*

Dartmouth is a member of the Ivy League athletic conference along with Brown University, Columbia University, Cornell University, Harvard University, Princeton University, the University of Pennsylvania, and Yale University. The men's varsity basketball team plays each of the other Ivy League teams twice per season; all of these games are broadcast by ESPN pursuant to a 2018 contract between ESPN and the Ivy League. Each season, the team also plays approximately fifteen games against non-Ivy League competition; some of these games are broadcast by ESPN or other networks.

The Ivy League's varsity athletic teams compete in Division I of the National Collegiate Athletic Association (NCAA). The NCAA is a member-led organization responsible for regulating student athletics among about 1,100 schools. Division I is the highest level of college sports competition in the United States and includes about 363 schools.

Each spring, the NCAA stages a single-elimination tournament to determine the Division I men's college basketball national champion. Teams invited to the tournament include champions from 32 Division I conferences (including the Ivy League) as well as 36 additional teams. The tournament, known as March Madness, is enormously popular and widely followed. When one member of the Ivy League participates in March Madness—as Princeton University did in the most recent tournament—all eight Ivy League athletic departments receive revenue distribution.

Both the Ivy League and the NCAA have many regulations with which member schools must comply.

The Ivy League's Statement of Principles requires that member schools admit students who will compete on their varsity sports teams on the basis of academic promise and personal qualities as well as athletic ability; that financial aid for students must be awarded and renewed on the sole basis of economic need (that is, athletic scholarships are prohibited); and that athletic participation ought never interfere with normal academic progress. The Ivy League does not participate in the National Letter of Intent program.[4]

Dartmouth's Student-Athlete Handbook[5] summarizes some of the NCAA's most significant rules and regulations, such as:

---

[4] A National Letter of Intent indicates that a student has committed to attend and compete for an NCAA college or university in exchange for athletics-based financial aid. Top high school recruits often formalize their intention amidst great ceremony on a designated date referred to as a "signing day."

[5] I note that the term "student-athletes" has been examined recently as to whether it has been utilized to deprive certain individuals of workplace protections. For purposes of clarity, I will use the term when referencing

Trustees of Dartmouth College
Case 01-RC-325633

- Student-athletes may not receive extra benefits not available to other students.
- Student-athletes must maintain their amateur status. They lose their amateur status, and their eligibility to compete for Dartmouth, if they enter into an agreement with an agent; use athletic skills for pay; receive compensation from a professional sports team;[6] or receive free apparel or equipment from an individual or entity other than the Dartmouth College team for which the athlete plays.
- Student-athletes must not violate the Ivy League's or the NCAA's Name Image and Likeness (NIL) rules.[7]
- Student-athletes are not permitted to engage in any outside competition or any non-collegiate, amateur competition during the academic year, other than under certain exceptions.
- The use of tobacco products by student-athletes, coaches, officials and game personnel during practice and competition is prohibited.
- Student-athletes are permitted to receive compensation for employment only if the student-athlete is compensated only for work actually performed, the student-athlete is compensated at a rate commensurate with the going rate in that locality for similar services, and the student-athlete does not obtain the position because of athletic ability.
- Student-athletes may not wager on sports.
- Prior to the official, written notification of transfer, coaches of other NCAA institutions are precluded from communicating with Dartmouth student-athletes.

Student-athletes are also subject to the NCAA's Countable Athletically Related Activity (CARA) requirements. CARA includes any required activity with an athletics purpose involving student-athletes and at the direction of, or supervised by, one or more coaching staff members. CARA includes but is not limited to: practice and/or competition; strength, conditioning and fitness activities; on-court or on-field skill instruction; film review or chalk talk; meetings, lectures or discussions relating to the sport; any activity utilizing equipment related to the sport; and any game simulations or walk-throughs.

Some athletically related activities are categorized not as CARA but as Voluntary Athletically Related Activities (VARA). In order for any athletically related activity to be categorized as voluntary, the student-athlete must not be required to report back to a coach or other athletics department staff member any information related to the activity. Further, the activity must be initiated and requested solely by the student-athlete. However, it is permissible for an athletics department staff member to provide information to the student-athletes related to available opportunities for participating in voluntary activities. The student-athlete's attendance and participation in the activity (or lack thereof)

___

documents and regulations which themselves use the term, such as Dartmouth's "Student-Athlete Handbook," and the NCAA and Ivy League policies and requirements. The use of the term "student-athlete" as opposed to "player" here is not a legal conclusion.

[6] While the NCAA allows an athlete to maintain amateur status in one sport while playing a different sport professionally, the Ivy League does not.

[7] No current members of Dartmouth's men's basketball team participate in NIL activities.

Trustees of Dartmouth College
Case 01-RC-325633

may not be recorded for the purposes of reporting such information to coaching staff members or other student-athletes, and the student-athlete may not by subjected to penalty if he elects not to participate in the activity. In addition, neither the institution nor any athletics department staff member may provide recognition or incentives such as awards to a student-athlete based on his attendance or performance in the activity.[8]

In-season, student-athletes may participate in a maximum of four hours of CARA daily and a maximum of twenty hours of CARA weekly. All competition and any associated athletically related activities on the day of competition count as three hours regardless of the actual duration of these activities. All CARA is prohibited for the remainder of the calendar day following a competition except during multiday competitions.  Upon arrival to campus from every away contest (during the academic year or vacation period) there must be a continuous 10-hour period in which CARA is prohibited for the traveling student-athlete.

While a sport is in-season, all CARA is prohibited during a minimum of one calendar day per week; however, a travel day related to competition may be counted as a day off. Additionally, while in-season, weekly and daily hour limitations do not apply when classes are not in session. Immediately after the conclusion of a team's final contest, CARA is prohibited for fourteen consecutive days.

When a sport is not in-season, student-athletes may participate in a maximum of six hours of CARA each week. Of those six hours, a maximum of four hours of skill instruction may be conducted, and the remaining hours may be strength and conditioning workouts.[9] Teams must be provided two calendar days off each week.

The Ivy League also requires each student-athlete to accumulate a total of 49 rest period days each academic year, and does not allow student-athletes to participate in required summer athletic related activities.[10]

Dartmouth tracks compliance with these external regulations through a system called ARMS. Coaches must submit CARA logs to the athletic compliance office for review on a monthly basis.

Although players may not exceed the maximum number of hours of CARA permitted, at their discretion coaches may require fewer than the maximum hours of CARA. However, the players on the Dartmouth men's basketball team are scheduled for the maximum permitted amount of CARA.

---

[8] For example "captains' practices," which are led by the players and are not attended by coaches, are VARA. VARA is also sometimes referred to as "non-CARA."

[9] The NCAA permits eight hours of CARA during the week during a sport's off-season; the Ivy League's more restrictive limit is six hours.

[10] The NCAA permits eight hours of CARA during the week during the summer; the Ivy League does not.

Trustees of Dartmouth College
Case 01-RC-325633

### *Recruiting, Admitting, and Funding Basketball Players at Dartmouth*

All fifteen players currently on the Dartmouth men's basketball team were recruited by Dartmouth's coaching staff. Coach McLaughlin testified he was permitted to recruit four individuals this year and three individuals in each of the two preceding years.

Under NCAA rules, member schools may first contact prospective recruits on June 15th, at the conclusion of the recruits' sophomore year of high school. Coach McLaughlin testified that he and his staff identify students they believe would be a good fit for Dartmouth's men's basketball program through video, in-person visits, scouting services, and word of mouth. The evaluation period may last for a year or it may be much shorter. The timeline varies greatly from player to player. Coach McLaughlin and his staff speak not only to the players themselves but to their families, to their high school coaches, and to other people who are helping the players choose a college. Discussions about financial aid and scholarships are sometimes between the coaching staff and the player's parents more than between the coaching staff and the player himself.

During the initial stage of the recruiting process, the coaches explain that Dartmouth, as an Ivy League institution, does not offer the athletic scholarships that other colleges recruiting the players may offer. However, the coaches explain that all Dartmouth students receive financial aid based on the financial need of the student's family.[11] The coaches also emphasize that a basketball player who chooses to attend Dartmouth will receive benefits such as a valuable education and connections with a robust community of alumni.

Cade Haskins, a current member of the Dartmouth men's basketball team, testified that several schools contacted him about the possibility of playing basketball at the collegiate level. Haskins testified that Dartmouth's coaching staff reached out via phone call, text, and Zoom. One assistant coach traveled to Minnesota and watched Haskins work out in person.

Soon after reaching out to a recruit about his basketball skills, the coaching staff inquires about the prospective player's academic credentials and submits six semesters of transcripts to Dartmouth's Office of Admissions. The Office of Admissions tells the coaching staff whether the recruit meets Dartmouth's minimum academic standards. If the recruit does not meet the minimum academic standards for admission, the recruiting process comes to an end. If the recruit does meet minimum standards, the recruiting coaches cannot officially tell the recruit that he will be admitted. However, they may tell the student that he is a strong candidate and should continue the application process. Coach McLaughlin testified that he does not recall any recruit receiving a "likely letter" and then being rejected by the Office of Admissions.[12]

---

[11] For example, Dartmouth offers full tuition to all students from families with total income below $125,000. Dartmouth requires no parent contribution toward tuition/fees/housing/food for families with total income below $65,000.

[12] A "likely letter" signals strong interest from a college or university, but is not a formal acceptance letter. Haskins testified that he received a likely letter before he was formally admitted, and that he had already been aware that he would be accepted due to his conversations with the coaching staff.

Trustees of Dartmouth College
Case 01-RC-325633

In addition, Ivy League rules allow member institutions to provide recruited athletes with an estimate of their financial aid (known as an "early read") in January of their junior year in high school. Neither the coaching staff nor the Athletics Department can control the package the Office of Financial Aid chooses to provide to a recruit.

The recruited players must complete Dartmouth's standard application, although the coaching staff may provide direction during the application process. Haskins testified that he knew in September of his senior year of high school that he would likely be admitted to Dartmouth, and indeed, he was formally admitted that December. The Office of Admissions, not the Athletics Department, makes all admissions decisions.

Four of the current fifteen men's basketball players receive no financial aid. The remaining eleven members of the team receive financial aid ranging from $31,070 to $85,013, the latter of which is the current full cost to attend Dartmouth for a year. Four of the players receive Federal Pell Grants. Like other students, the players may see their level of aid adjusted if there is a change to their families' financial situations.

Because the players do not receive athletic scholarships, they have the option of quitting the basketball team but remaining at Dartmouth without any change to their financial aid packages. Director of Financial Aid Dino Koff testified that a player's financial aid would not change even if he were kicked off the team, because the Office of Financial Aid would not be aware of this development unless the player were also expelled from Dartmouth.

Similarly, basketball players do not receive specialized housing on campus; they are assigned housing in the same manner as other students.

_Players' Commitment to Basketball and Studies_

Prior to the beginning of the academic year, basketball players follow a fitness program developed by Dartmouth. The program includes weight training, agility, and conditioning. Progress is recorded in an app and participation is monitored by the coaching staff. When several players did not participate during the summer, the coaching staff left messages criticizing the team's effort.

During the summer, before practices begin, players must sign a number of documents generated by Dartmouth including the Student-Athlete Handbook, a summary of NCAA regulations, an NIL waiver[13], and a certification of eligibility. Other documents relate to sports wagering,

---

[13] This waiver allows Dartmouth and the Ivy League to use a player's image for purposes of promotion. A player would not be removed from the team if he failed to sign the waiver, but Dartmouth does request that players sign the waiver.  Record testimony revealed that players could not be nominated, and players would not be eligible to receive awards within Dartmouth and/or the Ivy League if they failed to sign this waiver.  The record is unclear whether these awards are monetary awards.

Trustees of Dartmouth College
Case 01-RC-325633

amateurism, and drug use. Players must also consent to random drug testing. Many of these documents are required by the NCAA and/or the Ivy League rather than by Dartmouth as an individual school.

The players also take part in captains' practices. While captains' practices are technically not required and are not supervised by coaches (that is, they are not CARA), the players think of these practices as mandatory and expect coaches to be aware of their attendance.[14]

The current men's basketball season began on September 29, 2023; formal practices were permitted pursuant to Ivy League and NCAA regulations as of September 11. Because the men's basketball team shares the Leede Arena with the women's basketball team and the women's volleyball team, the coaching staff must work with other coaching staffs to coordinate practice windows. The players have no input into the practice schedule. Coach McLaughlin testified that during this process he tries to get a feel for when his players have class, but that the players may not have classes picked out when he makes the practice schedule. Accordingly, each season the coaching staff sends a message to the players asking them to try to avoid scheduling classes during the "potential practice window," although Coach McLaughlin testified that he would be flexible if a player had to take a class at that time. For example, the Fall 2023 message to the team read:

> When choosing classes, please do your best to AVOID the following class slots: 2, 2A, 3A, 3B, 6A, 6B[15]. Feel free to register for courses in the following time slots: 8S/8L, 9S/9L, 10, 10A, 11, 12. We will plan to practice in the 2-5pm slot every weekday in the fall. If you have any questions, please feel free to hit me up!

The Winter message read:

> Winter term course selection opens tomorrow at 8am. When choosing classes, please do your best to AVOID the following class slots: 2, 3A, 10A, 9S. Please do your best to take EITHER an 11 OR a 12, but NOT BOTH. We will plan to take the following practice slots during winter term:
>
> Mon 2-5pm
> Tue 9am-12pm
> Wed 2-5pm
> Thu 9am-12pm
> Fri 2-5pm

---

[14] There is no evidence in the record as to how these captains' practices are scheduled, or how often they are held.

[15] It appears these numbers correspond to course time slots.

Trustees of Dartmouth College
Case 01-RC-325633

Haskins testified that the players are sometimes required to participate in alumni events, such as events hosted by Friends of Dartmouth Basketball.[16] The coaching staff told the players to wear specific Dartmouth-brand apparel (which was provided to the players) and to be interviewed by an alumnus.  Alumni are also given access to the locker room, and players are encouraged to talk to the alumni under those circumstances. When the basketball team recently played Duke University, alumni were offered the opportunity to purchase tickets for $5,000 each. With that purchase came the opportunity to meet with players and attend their shootaround. Director Houston testified that players are not actually required to interact with alumni, but they are encouraged to do so because the players themselves will benefit from creating relationships with alumni.

The players have also been asked to promote the team and Dartmouth athletics on social media.

During the season, coaches schedule and direct practices. Players generally practice for two hours per day and spend another hour lifting weights, with one day off per week. Players also take part in non-CARA captains' practices and conditioning practices. Coach McLaughlin testified that he has directed players to stand in front of the team and explain why they were late for practice. He has also required the whole team to run because a single player has missed a practice, which he characterizes as "accountability" rather than "discipline." No evidence or testimony was presented with respect to players being removed from the team or disqualified from play for any reason.

When players travel to away games, the coaching staff requires players to travel, eat, and sleep as a group. The players also attend meetings, review film, interact with alumni, conduct media interviews, and sign autographs as directed. The coaching staff shapes the itinerary for departure time, travel time, hotel check-in, meals, and lights-out.  For example, the team's travel itinerary for a game against Princeton in January 2023 was as follows:

Friday, January 20, 2023

8:00 a.m. Bus arrives at Leede Arena
8:30 a.m. Bus departs for '53 Commons
8:40 a.m. Meal at 53 Commons
9:15 a.m. Bus departs for Chipotle
1:00 p.m. Bus arrives at Chipotle
1:15 p.m. Bus departs for Jadwin Gymnasium
4:30 p.m. Practice at Jadwin Gymnasium
6:15 p.m. Bus departs for Westin Princeton
6:30 p.m. Arrive at Westin Princeton
7:00 p.m. Dinner at hotel
11:00 p.m. Lights out

---

[16] Friends of Dartmouth Basketball is an organization dedicated to providing resources to the Dartmouth basketball teams in hopes of furthering the teams' success. It generates approximately $300,000 per year and has funded, among other things, upgrades to locker rooms and nutrition programs.

Trustees of Dartmouth College
Case 01-RC-325633

Saturday, January 21, 2023

9:40 a.m. Wake up
10:00 a.m. Pregame meal/film at hotel
12:10 p.m. Depart hotel for Jadwin Gymnasium
2:00 p.m. BEAT PRINCETON
3:45 p.m. Postgame meal delivered to bus
4:30 p.m. Depart Princeton
10:00 p.m. Arrive at Leede Arena

Players cannot deviate from this schedule if they wish to eat at a different time, stay at a different hotel, or take an unscheduled side trip. Director Houston testified that the schedule restrictions were put in place to ensure the safety of the players, and that the coach may occasionally give a player permission to get a haircut or visit his parents during a road trip.

Dartmouth's 2023-2024 Student-Athlete Handbook maintains that class attendance takes precedence over athletics, but also explains that professors may be accommodating if students approach them about conflicts between academics and athletics:

CLASS ABSENCE POLICY

The Dartmouth Faculty approves of student participation in athletic activities and wishes to encourage students to take advantage of opportunities at the College in both intramural and intercollegiate athletics. Student-athletes must keep in mind, however, that their primary objective here at Dartmouth is learning. They are students first and athletes second. Dartmouth coaches, as well as faculty accept this proposition. They also understand that each student must make his/her own decision of the importance of participation in sports and the demands it makes on his/her time.

With respect to practices or athletic meetings, it is understood by both the faculty and coaching staff that class attendance takes precedence over participation in athletics. In addition, per NCAA Rules, no class time shall be missed at any time (e.g., regular academic term, mini term, summer term) for practice activities except when a team is traveling to an away-from-home contest and the practice is in conjunction with the contest. Furthermore, full participation in classes which leads to the missing of practices may not, in itself, prejudice the coaches in the selection of team participants.

Although academic schedules may sometimes conflict with College sponsored athletic activities, there are no automatically excused absences for participation in such activities. Students who participate in athletics should check their calendars to see that events do not conflict with their academic schedules. If conflicts occur, each student is responsible for discussing the matter with his/her professors at the beginning of the appropriate term. Professors may be accommodating if approached well in advance of the critical date, but they are under no obligation to make special arrangements for make-up opportunities.

Trustees of Dartmouth College
Case 01-RC-325633

Haskins testified that in reality, academics are not always prioritized over athletics, and that he has generally—although not always— prioritized practice over class.

Roughly one week before the hearing in this matter, Coach McLaughlin allowed a player to miss practice when that practice conflicted with a physics lab. Another player left practice early to attend a language class, and another player was late to practice due to a math test. Director Houston testified that while he attends a majority of men's basketball practices, he did not recall ever seeing a starter miss practice. During the 2022-2023 season, a player missed multiple away games with Coach McLaughlin's approval because the player did not want to miss a class.[17]

Coach McLaughlin testified that he has never disciplined a player for missing an athletic activity to attend to an academic responsibility, nor has he ever refused to allow a player to play in a game for that reason. Haskins testified that, to the contrary, missing practice is likely to affect playing time and will likely result in an instruction to run laps or do other additional conditioning work.

Players miss classes when they travel for away games; for example, if the team is traveling on a Monday, any players with a Monday class will miss that class. Haskins testified that every member of the team recently missed a class for a game because the game took place during the time period during which the coaching staff had instructed the players to schedule their classes. Each player on the team chose to attend the game rather than his class.

<u>Revenues and Expenses of the Dartmouth Basketball Program</u>

As members of the basketball team representing Dartmouth, the players on the team receive valuable apparel and equipment.

Each year, each player receives six pairs of basketball shoes (valued at $1,200)[18]; lifting shoes; travel shoes; a backpack; a duffel bag; unlimited socks; three hoodies; a zip sweatshirt; a quarter-zip shirt; two pairs of athletic pants; compression undergarments; a long-sleeved shirt; approximately ten short sleeved shirts; a windbreaker; three pairs of shorts; and showering shoes. Every other year, the players also receive a Nike parka with Dartmouth's logo; a Nike hat with Dartmouth's logo; Nike Dartmouth polos; practice gear; and a large travel bag. The players estimate that in 2023, the equipment was valued at $44,242 or approximately $2,950 per player.

Each player also receives two tickets for each away game and four tickets for each home game. These tickets have an estimated value of $1,200 over the course of a 30-game season; however, the players may not sell the tickets. Dartmouth pays for all travel, lodging, and meals required for away games at a substantial cost per player per season. Further, Dartmouth provides room and board for

---

[17] It is unclear from the record evidence whether this player was a starter or not.

[18] The Petitioner notes that in calendar year 2022, Cade Haskins earned $909.06 working on campus at the dining hall and the alumni front desk. This is less than the value of the shoes he received as a member of the basketball team.

Trustees of Dartmouth College
Case 01-RC-325633

each player during the six-week "Winterim" break at a significant cost per player. Players may also receive valuable Winterim parking passes.

Dartmouth Peak Performance, a program for varsity athletes, provides academic support, career development, sports and counseling psychology, sports nutrition, leadership and mental performance, strength and conditioning, sports medicine, integrative health and wellness, and sports science and innovative tech. As discussed in more detail below, many of these supports are available to other Dartmouth students through other programs, but Dartmouth Peak Performance is a comprehensive program designed exclusively for varsity athletes who wish to create a "championship culture."

Haskins testified to the comprehensive nature of sports medicine offered to the men's basketball players by Dartmouth. Every team is assigned a trainer who is aware of an individual player's needs, injuries, and goals.[19] Players are also offered the use of cold tubs, stationary bicycles, ankle taping, ankle braces, mouth guards, water bottles, and medication. The basketball team makes use of innovative technologies such as heart rates trackers and jumping pads which determine whether the players' jumps are stronger on one leg.

When the basketball team is traveling and meals are not provided directly to players, the players receive per diem to purchase meals. Coach McLaughlin testified that more typically, the team eats together while traveling, including lunch or dinner at the team hotel and/or a post-practice meal. Haskins testified that team meals are "pretty nice," commonly including multiple options such as chicken or salmon with salads and side dishes like potatoes. Haskins further testified that the hotels chosen by the coaching staff are also of good quality; for example, the team stayed at the Omni in New Haven when visiting Yale University.

The players receive uniforms to wear while representing Dartmouth. Game jerseys and practice jerseys, unlike the other clothing distributed to the players, must be returned to the school and are not given to the players to keep. A cleaning service is responsible for washing the jerseys; players need not launder the jerseys themselves.

The men's basketball program receives funds from donors, ticket sales, opponents, and the NCAA. The men's basketball team's expenses include compensation for the coaching staff as well as costs associated with athlete recruitment, game administration, facility improvement, athlete equipment, and team transportation/lodging/meals.

Dartmouth asserts that the men's basketball team has operated at a loss for the past five years.[20] The Petitioner notes that Dartmouth alone chooses what salary to pay its coaches and how to price tickets. The Petitioner also notes that the Employer's accounting of the men's basketball team's

---

[19] Athletic trainers report not to the athletic department but to health services. There are also trainers assigned to non-varsity sports teams, such as club teams.

[20] Pursuant to a request by the Employer, the Acting Regional Director executed a Protective Order at the hearing, limiting the disclosure of certain confidential information.

Trustees of Dartmouth College
Case 01-RC-325633

profitability does not include revenues generated by the ESPN contract or by March Madness because Dartmouth considers those funds to have been generated by the athletic department as a whole rather than by basketball in particular.

<u>*Other Extracurricular Activities and Special Supports at Dartmouth*</u>

In addition to varsity athletics, Dartmouth students participate in student-run organizations known as club sports. Some of the activities offer skill instruction, while others include intercollegiate contests. Club sports range from basketball club and swim club to fencing club and ultimate frisbee club. Club sports often have no coaches and do not generate revenue. Participants do not have exclusive access to training facilities and do not receive expensive equipment, although they may receive a water bottle or a t-shirt.

Associate Dean for Student Support Services Anne Hudak is responsible for connecting students to resources they might need to support them as they make their way through Dartmouth. She oversees Student Accessibility Services, the Academic Skills Center, the Center for Professional Development, and the First Generation Office, which have a combined budget of about $2 million. Associate Dean Hudak testified that Dartmouth funds a number of extracurricular activities and support services aimed at particular groups of students.

For example, the First Generation Office has four employees who are dedicated to supporting students who are the first generation of their families to attend college. The First Year Student Enrichment Program is a four-week program in which about eighty incoming first generation low income students participate each year. Dartmouth pays for the students to travel to campus four weeks prior to orientation and also funds their room and board as they take courses designed to help them acclimate to the college experience. Dean Hudak described the program as a combination of cultural and academic experiences which costs Dartmouth over $50,000 and most likely over $100,000 each year. After the program ends, first generation students can come to the office throughout the year to study, meet with advisors, and enjoy snacks. The Prepare to Launch program provides extra help to first generation students seeking internships and career opportunities. The First Generation Office provides goods such as t-shirts and notebooks to its students.

Likewise, Dartmouth offers extra supports to student veterans who may be nontraditional students living with family off campus. Student veterans also have a dedicated space on campus for studying, storing belongings, and watching television.

An Academic Skills Center and tutoring programs offer academic support to any student who requires it, while Student Accessibility Services works with students who have disabilities. Haskins testified that Dartmouth Peak Performance offers more academic support than the general programs because each team is assigned a faculty member and the Dartmouth Peak Performance employees split their attention between fewer students than do employees of the Academic Skills Center.

The Center for Professional Development is available to all students on campus who are looking for internships or career opportunities, while Dartmouth Connect allows students to connect with alumni for networking purposes. Haskins testified that, while events open to the general student

Trustees of Dartmouth College
Case 01-RC-325633

population are also open to varsity athletes, someone proactively helped build resumes for the underclassmen on the basketball team without the team members attending the events open to the general student population.

All students have access to mental health counseling, medical attention, a nutritionist, and a leadership program.

## ANALYSIS AND CONCLUSIONS

In *Columbia University,* 364 NLRB 1080 (2016), the Board considered and rejected its prior holding in *Brown University* that "the graduate assistants *cannot* be statutory employees because they 'are primarily students and have a primarily educational, not economic, relationship with their university.'" *Id.* (quoting *Brown University*, 342 NLRB 483, 487 (2004)). The *Columbia* Board concluded that "it is appropriate to extend statutory coverage to students working for universities covered by the Act unless there are strong reasons not to do so." *Id.* at 1081.

In reaching this finding, the Board relied on the common-law definition of employment, which "generally requires that the employer have the right to control the employee's work, and that that work be performed in exchange for compensation." *Id.* at 1094. The Board explicitly held that "the fact that a research assistant's work might advance his own educational interests as well as the University's interests is not a barrier to finding statutory employee status." *Id.* at 1096.

The Board proceeded to contemplate the possibility that a student in receipt of a particular sort of funding might have the unfettered ability to pursue his own goals without regard to his benefactor's goals, although it found that this was not the case with the research assistants at issue in *Columbia*:

> It is theoretically possible that funders may wish to further a student's education by effectively giving the student unconditional scholarship aid, and allowing the student to pursue educational goals without regard to achieving any of the funder's own particular research goals. But where a university exerts the requisite control over the research assistant's work, and specific work is performed as a condition of receiving the financial award, a research assistant is properly treated as an employee under the Act…
>
> The funding here is thus not akin to scholarship aid merely passed through the University by a grantor without specific expectations of the recipients. Because Columbia directs the student research assistants' work and the performance of defined tasks is a condition of the grant aid, we conclude that the research assistants in this case are employees under the Act.
>
> *Ibid*. at 1096-1097, footnotes omitted.

The Board last evaluated the employee status of college athletes, as opposed to graduate student assistants, in *Northwestern University*, 362 NLRB 1350 (2015). In that case, the Regional Director determined that players on Northwestern University's football team who received grant-in-aid scholarships were employees within the meaning of Section 2(3) of the Act. Northwestern's football program generated revenues of approximately $235 million between 2003 and 2012 through

Trustees of Dartmouth College
Case 01-RC-325633

ticket sales, television contracts, merchandise sales and licensing agreements. However, the Regional Director noted that the football players also provided benefits to Northwestern by positively impacting its reputation, thereby increasing both alumni giving and applicants for enrollment. In exchange, the players received scholarships valued at as much as $76,000 per calendar year. The Regional Director found that the fact that Northwestern did not treat these scholarships as taxable income was not dispositive of whether the scholarships were compensation, citing *Seattle Opera v. NLRB*, 292 F.3d at 764, fn. 8. The Regional Director did not, however, find that non-scholarship football players (walk-ons) were employees, explaining that they did not at that time receive any compensation although they may have had aspirations of eventually earning scholarships.

When the case came before the Board, the Board explicitly did not decide whether the football players were employees. Instead, the Board determined that, even if the scholarship players were statutory employees, it would not effectuate the policies of the Act to assert jurisdiction. In deciding that it should decline to assert jurisdiction, the Board noted that previous cases involving professional sports involved leaguewide bargaining units, whereas the petitioned-for unit included only the Northwestern football players. The Board further observed that of the approximately 125 colleges and universities that participated in Football Bowl Subdivision (FBS) football, all but 17 were state-run institutions over which the Board could not assert jurisdiction. Further, Northwestern was the only private school which competed in the Big Ten Conference. The Board stated that in such a situation, asserting jurisdiction would not promote stability in labor relations due to the variety of state labor laws that would apply to football teams at state-run institutions.

Although the Board in *Northwestern University* declined to exercise jurisdiction over the players at that university, nothing in that decision precludes the finding that players at private colleges and universities are employees under the Act. The Board heavily emphasized that its decision applied only to football players at Northwestern University. The Board further emphasized that it did not reach the matter of whether team-by-team organizing is never appropriate and did not find that it would never assert jurisdiction over a single-team unit.

*The Employer's Argument*

The Employer argues that the players on the men's basketball team do not meet the common law test for employment because the players do not perform work in exchange for compensation. The Employer emphasizes that it provides no athletic scholarships. Rather, financial aid decisions are need-based and admissions are based on the players' academic prowess. A player who receives need-based financial aid will not lose that financial aid if he decides to quit the basketball team. A recruit who does not meet the Office of Admissions' academic standards will not be admitted to Dartmouth.

In support of this proposition, the Employer cites *WBAI Pacifica Foundation*, 328 NLRB 1273, 1274 (1999). The employer in that case was a not-for-profit corporation which operated a noncommercial FM radio station. Unpaid staff produced a majority of WBAI's programs. The unpaid staff received no wages or fringe benefits; instead, they often contributed money to the station. They testified that they worked because they wished to see the station thrive and took pride in doing a service to their community. The Board held that contractual provisions allowing unpaid staff to receive reimbursement for travel and a childcare allowance did not in and of themselves render staff

Trustees of Dartmouth College
Case 01-RC-325633

employees, particularly because no unpaid staff had ever utilized the child care benefit and the use of the travel reimbursement policy was sporadic. The Board also explained that the funding that unpaid staff received for their programs was not a form of remuneration for services rendered to the employer because the purpose of those funds was to pay for the expenses of producing the programs. In sum, the Board concluded that unpaid staff are not employees within the meaning of Section 2(3) of the Act because there is no economic aspect to their relationship with the employer, either actual or anticipated.

The Employer also asserts that it generates no profit from its men's basketball program. The Employer contrasts this financial loss with the economic benefits generated by the graduate students in *Columbia University*. In that case, the Board held that teaching assistants' work advanced Columbia's key business operation of educating undergraduate students and that the University received a share of the research assistants' grants as revenue. This, the Employer argues, further establishes that there is no economic relationship between the members of the men's basketball team and Dartmouth.

By contrast, the Employer notes, in *Northwestern University,* the football players at issue received athletic scholarships and the football program generated revenue.

In addition, the Employer emphasizes that it does not consider its men's basketball players to be employees and asserts that no indicia of employment exist. Players receive no W-2s, I-9s or paid time off. The Employer points to Haskins' testimony that he was recruited to play basketball as an indication that Haskins did not believe that he was recruited to perform services in exchange for compensation.

Next, the Employer argues that its basketball players are akin to the walk-ons in *Northwestern University*. In that case, the Regional Director who determined that Northwestern scholarship football players were employees under Section 2(3) also determined that walk-ons were not employees because they did not receive compensation in exchange for their athletic services. The Regional Director noted that this was true even if the walk-ons hoped to earn an athletic scholarship through their play.

The Employer further posits that analogous case law under the Fair Labor Standards Act supports a finding of no employee status. Specifically, in *Berger v. NCAA*, 843 F.3d 285 (7th Cir. 2016), the 7th Circuit held that track and field athletes at the University of Pennsylvania were not employees under the FLSA because they had no real expectation of earning an income.

Finally, the Employer argues that the basketball players do not meet the common law test for employment because Dartmouth does not exercise sufficient control over them. The Employer points to testimony that basketball players have missed practices in favor of academic pursuits and not been penalized. On one occasion a player missed multiple away games because he did not want to miss a class. Dartmouth's Student-Athlete Handbook explicitly states that academics are prioritized over athletics, and Ivy League and NCAA regulations also dictate many of the coaching staff's actions.[21]

---

[21] No party argues that the NCAA and/or the Ivy League are joint employers of the basketball players.

Trustees of Dartmouth College
Case 01-RC-325633

Further, Dartmouth exercises a manner of "control" over all undergraduate students when it determines when they should go to class, how many classes they must complete, and how they must conduct themselves on campus.

The Employer also suggests, tangentially, that international students could be adversely affected by a decision to find that members of the basketball team are employees, citing to the Regional Director's Decision and Order in *Massachusetts Institute of Technology*, Case 01-RC-304042 (March 13, 2023).

_The Petitioner's Argument_

The Petitioner argues that that the players on the men's basketball team meet the common law test for employment because the players receive compensation in return for providing basketball-related services to Dartmouth and are subject to Dartmouth's control.

While the Petitioner concedes that the basketball players do not receive compensation in the form of a weekly paycheck or a scholarship, the Petitioner emphasizes that they do receive an early read upon recruitment, room and board for part of the year, equipment, apparel, tickets to approximately 30 games per season (four tickets for home games and two tickets for away games), footwear, access to nutrition and medical professionals, exclusive use of certain facilities, and academic support. The Petitioner notes that the early read may be more valuable than an athletic scholarship because the players are seeking an education. As a result, players like Haskins choose a special admission process to attend an Ivy League school and unconditional aid based on their financial situation over seeking an athletic scholarship at another university.

The Petitioner cites to *O'Bannon v. NCAA*, 802 F3d. 1049 (9th Cir. 2015). In that case, a group of current and former college football and basketball players brought an antitrust class action against the NCAA, alleging that the NCAA violated the Sherman Act by restraining trade in relation to players' names, images, and likenesses. The District Court ruled in the plaintiffs favor; the Ninth Circuit Court of Appeals affirmed, in part, and reversed, in part, the lower Court's ruling.[22] In *O'Bannon,* the Ninth Circuit explained that "the modern legal understanding of 'commerce' is broad" and, therefore, "encompasses the transaction in which an athletic recruit exchanges his labor and NIL rights for a scholarship at a Division I school because it is undeniable that both parties to that exchange anticipate economic gain from it."

Dartmouth participates in this market as an employer that scouts and recruits basketball players in competition with other Division I universities. Because members of the Ivy League may not offer athletic scholarships, Dartmouth instead offers a streamlined admissions process in the form of an early read, which is of great value where Dartmouth accepts roughly 6% of its applicants. A player who chooses Dartmouth's basketball program over a different Division I basketball program will not

---

[22] *O'Bannon v. NCAA* laid the groundwork for later cases such as *NCAA v. Alston*, 141 S. Ct. 2141 (2021) in which the Supreme Court ruled that NCAA's restrictions on "non-cash education-related benefits" violated antitrust law and required the NCAA to allow for certain types of academic benefits.

Trustees of Dartmouth College
Case 01-RC-325633

receive an athletic scholarship, but will receive as much financial aid as his family requires, up to and including the full cost of attending Dartmouth. Because this aid does not require the recruit to continue to play basketball, the Petitioner argues, it is a form of "fully guaranteed compensation," a benefit regularly sought through collective-bargaining by unions representing professional athletes.

The Petitioner emphasizes that Dartmouth exercises significant control over the players by designing and monitoring their summer workouts, requiring them to sign handbooks and other documents, dictating the time they spend practicing, directing those practices, and scheduling their road trips such that each meal and sleep period occurs at the coaching staff's discretion.

### *Conclusion*

### *The Players are Employees under Section 2(3) of the Act*

Section 2(3) of the Act defines "employee" broadly to include "any employee" subject to only a few enumerated exceptions that do not include players at academic institutions. Further, "the 'breadth of § 2(3)'s definition is striking . . . . [and] [t]he exclusions listed in the statute are limited and narrow, and do not, on their face, encompass the category 'students'."[23] The absence of an applicable exclusion "is itself strong evidence of statutory coverage."[24] So long as an individual meets the broad Section 2(3) definition of "employee," they are a statutory employee, regardless of whether their employer is an educational institution or they are also students while employed.[25]

Like the graduate student research assistants and teaching assistants in *Columbia University*, and like the football players in *Northwestern University*, the basketball players at issue here perform work which benefits Dartmouth. While there is some factual dispute as to how much revenue is generated by the men's basketball program, and whether that program is profitable, the profitability of any given business does not affect the employee status of the individuals who perform work for that business. The basketball program clearly generates alumni engagement—and financial donations—as well as publicity which leads to student interest and applications. The Employer concedes that the players are representing Dartmouth when they wear Dartmouth-branded clothing and uniforms. While students at Dartmouth take part in many extracurricular activities, major media outlets do not pay for the right to broadcast and distribute video of the vast majority of those activities. However, the Employer's Athletic Department has its own business office, fundraising department, marketing

---

[23] *Boston Medical Center Corp.*, 330 NLRB 152, 160 (1999) (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891-892 (1984) (undocumented persons "plainly come within the broad statutory definition of 'employee'").

[24] *Columbia University*, *supra* at 1083.

[25] *See, e.g., Columbia University*, *supra* at 1086 (holding that graduate student assistants are statutory employees as they "may be both a student *and* an employee; a university may be both the student's educator *and* employer") (emphasis in original); *Boston Medical Center Corp.*, *supra* at 160 (interns, residents and fellows are statutory employees "notwithstanding that a purpose of their being at a hospital may also be, in part, educational" as also being students "does not . . . change the evidence of their 'employee' status").

Trustees of Dartmouth College
Case 01-RC-325633

department, and brand management department to handle the revenues and publicity generated by Division I intercollegiate athletics.

Additionally, Dartmouth exercises significant control over the basketball players' work. The players are required to provide their basketball services to Dartmouth only. The Student-Athlete Handbook in many ways functions as an employee handbook, detailing the tasks athletes must complete and the regulations they may not break. While it is true that Dartmouth itself must follow restrictions placed on it by the NCAA and the Ivy League, Dartmouth has significant ability to make decisions within the framework of those restrictions. [26] While the coaching staff cannot ask the players to take part in CARA in excess of the Ivy League maximum, for example, it can allow the players to take part in less than the maximum. Dartmouth determines when the players will practice and play, as well as when they will review film, engage with alumni, or take part in other team-related activities. When the basketball team participates in away games, Dartmouth determines when and where the players will travel, eat, and sleep. Special permission is required for a player to even get a haircut during a trip. The Employer argues that this level of control is required for player safety and is no different from the regulations placed on the student body at large. However, the record reveals no evidence that other members of the student body (the vast majority of whom, like the basketball players at issue here, are presumably legal adults) are so strictly supervised when they leave the confines of Dartmouth's campus.

Further, the Dartmouth men's basketball team performs work in exchange for compensation. It is true that they do not receive the athletic scholarships enjoyed by the football players at issue in *Northwestern University*. They do, however, receive the benefits of "early read" for admission prior to graduating high school. They also receive equipment and apparel—including basketball shoes valued in excess of $1000 per player per year— as well as tickets to games, lodging, meals, and the benefits of Dartmouth's Peak Performance program. While the Employer asserts that players are admitted to Dartmouth on the strength of their academic records, the record reveals that Dartmouth first makes contact with the players as high school students because of their basketball abilities. The coaching staff is allotted a certain number of highly coveted admission spots for players they scout based upon their basketball skills, and encourages players to matriculate at Dartmouth rather than at a school which might offer them an athletic scholarship because of the lifelong benefits that accrue to an alumnus of an Ivy League institution.

The Employer argues that valuable clothing and equipment are provided so that students may play basketball, rather than because they play basketball. If basketball shoes constituted payment, the Employer posits, the stars of the team would receive more shoes than those players who remain on the bench throughout the season. However, the Employer cites no case, and I can find none, which stands for the proposition that employee status is tied to the size of one individual's salary in relation to that of his colleagues. The players' compensation is of a non-traditional form because NCAA regulations

---

[26] In many other industries, employers must operate within external regulations, including federal laws. Further, the Board has often found that a single location of a widely franchised business—such as a store or a restaurant—constitutes an appropriate unit for bargaining even if that single store or restaurant is subject to national corporate policies.

Trustees of Dartmouth College
Case 01-RC-325633

have historically prohibited a traditional form of compensation. Nonetheless, the players are compensated in exchange for performing specific tasks, including practicing and attending games. A player completes his assignment when he participates in a game regardless of how many points he happens to score. The Employer further notes that it provides various kinds of support to all its students. However, no evidence in the record suggests that other students receive the extent of individual support and special consideration received by those individuals who participate in high-profile Division I collegiate athletics.

Although several members of the team do not receive compensation in the form of a scholarship—and those players who do receive scholarships nominally receive need-based financial aid rather than athletic scholarships— they nonetheless both receive and anticipate economic compensation from the Employer, they are critical to the success of the team, and they are subject to the Employer's control. See *Seattle Opera Association,* 331 NLRB 1072 (2000), in which the Board concluded that auxiliary choristers are employees within the meaning of the Act, contrary to the Regional Director's decision that that they had an insufficient economic relationship with the Opera. In that case, the Board noted that auxiliary choristers signed a letter of intent and signed in at each rehearsal, agreeing to attend rehearsals and performances on time, at times designated by the Opera; were given explicit instructions on decorum and conduct and are expected to comply with conditions set forth in a handbook; and were subject to normal expectations of performing the music and staging.

Further, the Board provides that employee status will be found where there is a rudimentary economic relationship, actual or anticipated, between employee and employer.[27] To make this determination, the Board employs a broad test that considers payments other than traditional wages. These payments need not be large or otherwise significant in amount.  In *Seattle Opera,* the Board found that a payment of $214 to auxiliary choristers at the end of each production sufficed to establish employee status, explaining that "[i]mportantly, to find individuals not to be employees because they are compensated at less than minimum wage, or because their compensation is less than a living wage, contravenes the stated principles of the Act."  Economic compensation "receive[d]" thus includes payments intended as reimbursement for work-related expenses, if it is not a direct expense reimbursement.

Compensation can also include various fringe benefit payments. The players receive numerous fringe benefits, including academic support, career development, sports and counseling psychology, sports nutrition, leadership and mental performance training, strength and conditioning training, sports medicine, and integrative health and wellness. Similar to the free tickets that the auxiliary choristers received in *Seattle Opera* for the performances that they participate in,[28] players are eligible to receive up to four free tickets to each regular season home game and two free tickets for each away game. Because the Board will not consider the size of the compensation when making the determination of whether compensation is "received," it is immaterial that these payments and benefits may be less than the value of full scholarships.

---

[27] *WBAI Pacifica Found.*, 328 NLRB 1273 (1999), *enforced*, 292 F.3d 757 (D.C. Cir. 2002).

[28] *Seattle Opera supra* at 1072.

Trustees of Dartmouth College
Case 01-RC-325633

Because Dartmouth has the right to control the work performed by the Dartmouth men's basketball team, and the players perform that work in exchange for compensation, I find that the petitioned-for basketball players are employees within the meaning of the Act.

The Employer's argument that under this definition of employee, any student who participates in any extracurricular activity and receives need based financial aid could be deemed an employee under the Act is inapposite. The record does not suggest that other extracurricular activities dominate students' schedules to the extent that students are encouraged to take classes at particular times and then miss those dutifully scheduled classes due to the activity's travel requirements. The record also does not suggest that the hypothetical student journalists, actors, and musicians described by the Employer in its brief are recruited and admitted through a special process because of their investigatory and artistic skills. Nor does the record indicate that these students' journalistic and artistic endeavors require Dartmouth to employ multiple specialized individuals to monitor funds and brand management.

Further, the Employer's citation to the Regional Director's Decision and Order in *Massachusetts Institute of Technology* is misplaced. In that case, the petitioning union submitted that all research conducted by graduate fellows in connection with their studies constituted work performed on behalf of MIT due to MIT's stated mission of "advancing knowledge." In response to this argument, MIT argued that if all research is work, international students would be in violation of immigration regulations. The Decision and Order, which is currently pending review by the Board, relied on a finding that the work performed by the fellows was indistinguishable from academic work; the direction was indistinguishable from academic direction; and compensation received by the fellows was not tied to completing tasks as assigned. The Decision and Order applied only to the particular graduate fellows at issue in that matter and did hold not that no international students can be members of a labor organization without compromising their immigration status.[29]

The Petitioner in this matter does not rely on an argument that all basketball-related activities inherently constitute service to Dartmouth; rather, it argues, rightly, that some basketball-related activities constitute service to Dartmouth and are subject to Dartmouth's control, and that the basketball players receive compensation in response.

To the extent that this decision is inconsistent with *Berger v. NCAA* or the Regional Director's Decision and Direction of Election in *Northwestern University*, I am not bound by those decisions, neither of which constitute Board precedent.

---

[29] Indeed, many of the research assistants and teaching assistants who are members of MIT's existing graduate student union are international students. Some of the graduate fellows at issue in *Massachusetts Institute of Technology* were themselves members of that union because they were employed as research assistants in addition to being graduate fellows.

Trustees of Dartmouth College
Case 01-RC-325633

*The Petitioned-for Unit is Appropriate*

When the Board declined to assert jurisdiction in *Northwestern University,* it explained that Northwestern was the only private school which competed in the Big Ten Conference and a variety of state labor laws would apply to football teams at state-run institutions. The Board remarked that, in general, cases involving professional sports involve leaguewide bargaining units but stopped short of reaching the matter of whether team-by-team organizing is ever appropriate.

The same conclusion is not warranted here. The Ivy League, unlike the Big Ten Conference, consists only of private universities. Accordingly, the Board's concerns about potentially conflicting state labor laws do not apply.  In *N. Am. Soccer League,* 236 NLRB 1317 (1978), the Board held that that while the record supported a finding that the league-wide unit was an appropriate unit, single-club units are also appropriate units; stressing "single-location units where a degree of day-to-day autonomy or control is exercised are usually presumptively appropriate no matter what industry is involved…"[30]

Accordingly, I find that the following employees of the Employer constitute a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(b) of the Act:

> All basketball players on the men's varsity basketball team employed at the Employer's Hanover, New Hampshire location, but excluding managers, guards, and professional employees and supervisors as defined in the Act.

### DIRECTION OF ELECTION

The National Labor Relations Board will conduct a secret ballot election among the employees in the unit found appropriate above.  Employees will vote whether or not they wish to be represented for purposes of collective bargaining by Service Employees International Union, Local 560.

**A.      Election Details**

The parties agree to conduct the election by manual ballot at the Employer's Office of Human Resources Training Room, 7 Lebanon Street, Suite 203, Hanover, New Hampshire, between 11:30 a.m. and 1:00 p.m.

 Prior to the issuance of the Notice of Election, the parties will be requested to file their written positions as to their preferred date for the election, and the applicability of any additional voting eligibility formula.

**B.      Voting Eligibility**

Eligible to vote are those employed in the unit who were employed during the 2023-2024 basketball season, including employees who did not work during that period because they were ill, on

---

[30] *Supra* at 1321.

Trustees of Dartmouth College
Case 01-RC-325633

vacation, or temporarily laid off.  In a mail ballot election, employees are eligible to vote if they are in the unit on both the payroll period ending date and on the date they mail in their ballots to the Board's designated office.

Employees engaged in an economic strike, who have retained their status as strikers and who have not been permanently replaced, are also eligible to vote.  In addition, in an economic strike that commenced less than 12 months before the election date, employees engaged in such strike who have retained their status as strikers but who have been permanently replaced, as well as their replacements, are eligible to vote.  Unit employees in the military services of the United States may vote if they appear in person at the polls.

Ineligible to vote are (1) employees who have quit or been discharged for cause since the designated payroll period, and, in a mail ballot election, before they mail in their ballots to the Board's designated office; (2) striking employees who have been discharged for cause since the strike began and who have not been rehired or reinstated before the election date; and (3) employees who are engaged in an economic strike that began more than 12 months before the election date and who have been permanently replaced.

## C.     Voter List

As required by Section 102.67(l) of the Board's Rules and Regulations, the Employer must provide the Regional Director and parties named in this decision a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cell telephone numbers) of all eligible voters.

To be timely filed and served, the list must be *received* by the regional director and the parties by **Wednesday, February 7, 2024.**  The list must be accompanied by a certificate of service showing service on all parties.  **The region will no longer serve the voter list.**

Unless the Employer certifies that it does not possess the capacity to produce the list in the required form, the list must be provided in a table in a Microsoft Word file (.doc or docx) or a file that is compatible with Microsoft Word (.doc or docx).  The first column of the list must begin with each employee's last name and the list must be alphabetized (overall or by department) by last name.  Because the list will be used during the election, the font size of the list must be the equivalent of Times New Roman 10 or larger.  That font does not need to be used but the font must be that size or larger.  A sample, optional form for the list is provided on the NLRB website at www.nlrb.gov/what-we-do/conduct-elections/representation-case-rules-effective-april-14-2015.

When feasible, the list shall be filed electronically with the Region and served electronically on the other parties named in this decision.  The list may be electronically filed with the Region by using the E-filing system on the Agency's website at www.nlrb.gov.  Once the website is accessed, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.

Failure to comply with the above requirements will be grounds for setting aside the election whenever proper and timely objections are filed.  However, the Employer may not object to the

Trustees of Dartmouth College
Case 01-RC-325633

failure to file or serve the list within the specified time or in the proper format if it is responsible for the failure.

No party shall use the voter list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters.

### D.    Posting of Notices of Election

Pursuant to Section 102.67(k) of the Board's Rules, the Employer must post copies of the forthcoming Notice of Election in conspicuous places, including all places where notices to employees in the unit found appropriate are customarily posted.  The Notice must be posted so all pages of the Notice are simultaneously visible.   In addition, if the Employer customarily communicates electronically with some or all of the employees in the unit found appropriate, the Employer must also distribute the Notice of Election electronically to those employees.  The Employer must post copies of the Notice at least 3 full working days prior to 12:01 a.m. of the day of the election and copies must remain posted until the end of the election. For purposes of posting, working day means an entire 24-hour period excluding Saturdays, Sundays, and holidays. However, a party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

Failure to follow the posting requirements set forth above will be grounds for setting aside the election if proper and timely objections are filed.  However, a party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

### RIGHT TO REQUEST REVIEW

Pursuant to Section 102.67 of the Board's Rules and Regulations, a request for review may be filed with the Board at any time following the issuance of this Decision until 10 business days after a final disposition of the proceeding by the Regional Director.  Accordingly, a party is not precluded from filing a request for review of this decision after the election on the grounds that it did not file a request for review of this Decision prior to the election.  The request for review must conform to the requirements of Section 102.67 of the Board's Rules and Regulations.

A request for review must be E-Filed through the Agency's website and may not be filed by facsimile.  To E-File the request for review, go to www.nlrb.gov, select E-File Documents, enter the NLRB Case Number, and follow the detailed instructions.  If not E-Filed, the request for review should be addressed to the Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570-0001, and must be accompanied by a statement explaining the circumstances concerning not having access to the Agency's E-Filing system or why filing electronically would impose an undue burden.  A party filing a request for review must serve a copy of the request on the other parties and file a copy with the Regional Director.  A certificate of service must be filed with the Board together with the request for review.

Neither the filing of a request for review nor the Board's granting a request for review will stay the election in this matter unless specifically ordered by the Board.

Any party may, within 5 business days after the last day on which the request for review must be filed, file with the Board a statement in opposition to the request for review. An opposition must be filed with the Board in Washington, DC and a copy filed with the Regional Director and copies served on all the other parties The opposition must comply with the formatting requirements set forth in §102.67(i)(1). Requests for an extension of time within which to file the opposition shall be filed pursuant to §102.2(c) with the Board in Washington, DC, and a certificate of service shall accompany the requests. The Board may grant or deny the request for review without awaiting a statement in opposition.

Dated:  February 5, 2024

_____
Laura A. Sacks, Regional Director
National Labor Relations Board
Region 01

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 01**

| | |
|---|---|
| **TRUSTEES OF DARTMOUTH COLLEGE** | |
| **Employer** | |
| **and** | **Case 01-RC-325633** |
| **SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 560** | |
| **Petitioner** | |

**AFFIDAVIT OF SERVICE OF: <u>DECISION AND DIRECTOR OF ELECTION</u>**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on February 5, 2024**,** I served the above-entitled document(s) by **electronic mail** upon the following persons, addressed to them at the following addresses:

Cheryl M. Guerin, Exec. Dir. of HR
Trustees of Dartmouth College
6001 Parkhurst Hall, Suite 11A
Hanover, NH 03755
Email: cheryl.m.guerin@dartmouth.edu

Joseph P. McConnell, Attorney at Law
Ryan Jaziri, Esq.
Morgan Brown & Joy, LLP
200 State Street, Suite 11A
Boston, MA 02109
Email: jmcconnell@morganbrown.com
Email: rjaziri@morganbrown.com

John Stanley Krupski, Esq.
Service Employees International
  Union, Local 560
109 North State Street, Suite 2
Concord, NH 03301
Email: jake@milnerkrupski.com

| | |
|---|---|
| February 5, 2024 | Elizabeth C. Person, Designated Agent of NLRB |
| Date | Name |
| | *Elizabeth C. Person* |
| | Signature |