# EXHIBIT 1

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | | |
|---|---|---|
| **TRUSTEES OF DARTMOUTH COLLEGE,** | : | |
| | : | |
| | : | |
| **Employer,** | : | |
| | : | |
| **and** | : | **Case No. 01-RC-325633** |
| | : | |
| **SERVICE EMPLOYEES INTERNATIONAL** | : | |
| **UNION, LOCAL 560,** | : | |
| | : | |
| | : | |
| **Petitioner.** | : | |

<u>**AMICUS CURIAE BRIEF OF THE IVY LEAGUE**</u>
<u>**IN SUPPORT OF THE TRUSTEES OF DARTMOUTH COLLEGE**</u>

COZEN O'CONNOR
Daniel V. Johns
djohns@cozen.com
Kelly T. Kindig
kkindig@cozen.com
Benjamin Shechtman
bshechtman@cozen.com
1650 Market Street
Suite 2800
Philadelphia, PA 19103
215-665-4722

Attorneys for The Ivy League

## <u>TABLE OF CONTENTS</u>

**Page**

I.   STATEMENT OF INTEREST OF THE AMICUS CURIAE AND INTRODUCTION ... 1

II.   FACTUAL BACKGROUND .......................................................................................... 3

    A.   History and Structure of the Ivy League ................................................................ 3

    B.   No Athletic Scholarships Are Permitted ................................................................ 4

    C.   The Ivy League's Focus Is Student Academic Achievement. ............................... 5

III.   ARGUMENT ............................................................................................................... 6

    A.   Student-Athletes Are Not Employees Within the Meaning of the Act ................. 6

        1.   The Regional Director's Decision in Trustees of Dartmouth
           College ................................................................................................... 6

        2.   The Regional Director's DDE Is Flawed and Contravenes Board
           Precedent Because the Basketball Players Do Not Meet the
           Common Law Employment Test. ........................................................... 8

           a)   Student-Athletes in the Ivy League Do Not Receive
              Compensation. ............................................................... 9

           b)   Student-Athletes in the Ivy League Are Not Providing Services to
              Their Universities ........................................................... 12

        3.   Ivy League Universities Do Not "Control" Student-Athletes ................. 13

        4.   The Board Should Not Exercise Jurisdiction ......................................... 15

    B.   A Finding That Student-Athletes Are Employees Threatens the Continued
        Existence of Sports in the Ivy League Conference. .............................................. 16

    C.   Given the Unique Characteristics of the Ivy League, a Finding That
        Dartmouth's Men's Basketball Players Are Employees Opens the Door to
        Numerous Other Employee Designations in Academia That Would Not
        Effectuate the Purpose of the Act. ...................................................................... 20

    D.   The Board's Decision in Northwestern University Provides the Correct
        Analysis for Ivy League Student-Athletes. .......................................................... 23

IV.   CONCLUSION ........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Palm Beach County*,
  No. 23-11065, 2024 U.S. App. LEXIS 5876 (11th Cir. Mar. 12, 2024) ...............................11

*Columbia University*,
  364 N.L.R.B. 1080 (2016) ...........................................................................................6

*NCAA v. Board of Regents of the University of Oklahoma*,
  468 U.S. 85 (1984)......................................................................................................16

*NLRB v. Denver Building Trades Council*,
  341 U.S. 675 (1951).....................................................................................................15

*NLRB v. Town & Country Electric Inc.*,
  516 U.S. 85 (1995).......................................................................................................8

*Northwestern University*,
  362 N.L.R.B. 1350 (2015) ....................................................................... *passim*

*In Re Seattle Opera Association*,
  331 N.L.R.B. 1072 (2000) ................................................................................11, 12, 13

*Valley Hosp. Med. Ctr., Inc. v. NLRB*,
  93 F.4th 1120 (9th Cir. 2024) .....................................................................................15

*WBAI Pacific Foundation*,
  328 N.L.R.B. 1273 (1999) ..................................................................8, 9, 11, 12, 13

**Statutes**

29 U.S.C. § 152(3) ...........................................................................................................8

Fair Labor Standards Act ...............................................................................................11

**Other Authorities**

29 C.F.R. § 102.67 ....................................................................................................1, 12

I.      STATEMENT OF INTEREST OF THE AMICUS CURIAE AND
        INTRODUCTION

The Ivy League (alternatively, the "League") is an intercollegiate athletic conference

comprised of eight member institutions:  Brown University, Columbia University, Cornell

University, Dartmouth College, Harvard University, the University of Pennsylvania, Princeton

University, and Yale University.  The Ivy League has a deep interest in the employment status of

the students who attend its member institutions, particularly those who participate in

intercollegiate athletics.[2]

The Board should grant the request of the Trustees of Dartmouth College ("Dartmouth")

for review of the Decision and Direction of Election ("DDE") of the Regional Director in Case

01-RC-325633, which found that the men's basketball players at Dartmouth are employees

within the meaning of the National Labor Relations Act ("the Act"), and reverse the DDE,

because that unprecedented finding raises a substantial question of both law and policy.  29

C.F.R. § 102.67.  The Regional Director's finding is directly at odds with the fundamental

principles to which all of the Ivy League's member institutions adhere.  The Ivy League is

unique among Division I intercollegiate athletic conferences, as it was founded upon the

principles that the pursuit of academic excellence is paramount and that competition in sports

must be kept in harmony with the essential educational purposes of each member institution.

The Ivy League and its members have operated under these founding principles for seventy

years.

Consistent with these principles, students who participate in intercollegiate sports at

member institutions are prohibited from receiving athletic scholarships, and instead may only

---

[2] While Dartmouth College is a member of the Ivy League, neither Dartmouth nor its counsel
participated in the preparation of this *amicus curiae* brief.

receive need-based scholarships on the same basis as any other student at the institution.

Moreover, students who participate in intercollegiate sports are evaluated under the same

rigorous academic admission standards applicable to all other applicants for admission.  Put

simply, participation in sports at an Ivy League institution is not the main focus of our athletes'

college experience.  Rather, as with all Ivy League students, their primary focus is academic.

      The Regional Director's finding jeopardizes these founding principles.  In addition to not

offering athletic scholarships, the Ivy League's member institutions also prohibit the provision of

compensation tied to a student's athletic ability or participation.  In this way, the Regional

Director's decision substantially departs from existing Board precedent that is directly on point

related to students who participate in intercollegiate sports without expectation of compensation.

In *Northwestern University*, 362 N.L.R.B. 1350, 1353-54 (2015), which involved the question of

whether the scholarship players on Northwestern University's football team were employees

within the meaning of the Act, the Board found that non-athletic scholarship football players (i.e.

"walk-on" athletes) are not employees within the meaning of the Act, because their participation

on the football team was based on their "love of the game" and "the strong camaraderie that

exists among the players," not because they received "compensation."  It is clear that the Board's

holding in *Northwestern University* regarding non-athletic scholarship football players is equally

applicable here.

      Finally, the Regional Director's decision has the potential to expand the Act's reach

beyond that which Congress contemplated when the Act was passed in 1935.  Indeed, under the

Regional Director's tortured analysis, student participation in any number of extracurricular

school activities could possibly be found to render them an employee of their college or

university (or even an employee of a high school, in the case of student-athletes at private high

schools).  For example, there is no appreciable difference between a student who participates in

intercollegiate athletics at an Ivy League institution and one who participates in the university

band or a musical theater club, despite the Regional Director's attempt to find one.  Ivy League

students are committed to excellence in the variety of academic and extracurricular pursuits in

which they participate as part of their dynamic campus communities.  Their dedication to these

pursuits – whether in basketball, glee club, or student government – is reflective of their

commitment to their personal development and holistic education.  Extending the Act in this way

serves none of the purposes that the Act was intended to serve upon its passage in 1935.

The Regional Director's decision finding that Dartmouth's basketball players are

employees entitled to unionize places at risk the unique academic principles to which the Ivy

League's member institutions adhere and has the potential to adversely impact the Ivy League

and the college experiences of its student-athletes, such as requiring student-athletes to "work"

like an employee at their sport in order to "earn compensation," to the detriment of their

academics, or possibly jeopardizing their ability to remain at their institution if they are not

adequately performing their "job duties."  For these reasons and those discussed below, the DDE

is not in accord with existing Board law and raises a substantial question of law and policy, and

the Board should grant Dartmouth's request for review of the DDE, and reverse the DDE.

## II.    FACTUAL BACKGROUND

### A.    History and Structure of the Ivy League.

The Ivy League is rooted in the longstanding, defining principle that intercollegiate

athletics competition should be "kept in harmony with the essential educational purposes of the

institution."  THE COUNCIL OF IVY LEAGUE PRESIDENTS, *Ivy Group Agreement*, *reprinted in* THE

IVY MANUAL 143 (5th ed. 2023).  The Ivy League provides the true test of academic and co-

curricular rigor – fostering an enduring culture that thrives on shared values and holds paramount

the academic and personal growth of students.  Consistently ranked as the top academic conference, the Ivy League sponsors 34 sports, with more than 8,000 student-athletes competing annually.  The League's member schools – Brown, Columbia, Cornell, Dartmouth, Harvard, Penn, Princeton and Yale – strive to inspire and transform student-athletes to take on the world's challenges and lead lives of great impact.

The Ivy League was founded by its member institutions in 1954 based on a group of shared values established by the member institutions that continue to guide the conference in the 21st century: academic primacy and representativeness; need-based financial aid; student-athlete health and well-being; broad based participation; and competitive excellence and balance.  The Ivy League's members have affirmed a number of important conditions focused on achieving these shared values.  These conditions require that the players generally be representative of the student body.  In the total student life of the campus, emphasis upon intercollegiate competition must be harmonized with the institution's educational purposes.  Further, athletic participation is designed to not interfere with or otherwise distort normal academic progress toward graduation.

The Ivy League Manual, which represents an agreement between member institutions, includes a set of rules that all member institutions are required to follow.  The members of the League agree to abide by all rules that are approved by the respective Committees as set forth in the Ivy League Manual.

### B.    No Athletic Scholarships Are Permitted.

As set forth in the Ivy League Manual, athletes must be admitted as students and must be awarded financial aid only on the basis of economic need.  No student-athlete is eligible to participate in intercollegiate athletics if the student-athlete has received financial support from any source except (i) from personal or family resources; (ii) in return for services (other than of an athletic character) rendered through employment at normal wages; (iii) from financial aid

awarded by or with the specific approval of the regular academic authority of the institution in which the player is a student; or (iv) from Government grants to war service veterans or regularly enrolled members of ROTC units.  Nor may a student-athlete's secondary education be subsidized by an institution or group of individuals not closely related to the student's family as consideration for the student attending that particular institution.

Financial aid for student-athletes must be awarded and renewed on the sole basis of economic need with no differentiation based on athletic ability or participation, provided that each member institution applies its own standard of economic need.  Student-athletes must be admitted and notified of admissions status only by an institution's admissions office, and must be awarded financial aid and notified of financial aid awards only by the office of financial aid.  The respective athletic departments of Ivy League members play no role in the determination or awarding of financial aid.

Moreover, student-athletes should be generally representative of their class and admitted on the basis of academic promise and personal qualities as well as athletic ability.  Admissions policies must ensure that student-athletes have the requisite talents to participate successfully in the demanding academic programs of Ivy League institutions.

### C.     The Ivy League's Focus Is Student Academic Achievement.

The member institutions of the Ivy League share a tradition of academic excellence.  The Ivy League is committed foremost to the principle of academic primacy, based on the shared belief of member institutions that intercollegiate athletics ought to be maintained within a perspective that holds paramount the academic programs of the institution and the academic and personal growth of the student-athlete.  Student-athletes are held accountable to the same academic standards as other students.  The opportunities for student-athletes to pursue excellence in athletics are complemented by proactively protecting their academic and educational interests.

Athletic participation should not interfere with or otherwise impede normal academic progress toward their degree or post-baccalaureate plans for graduate education or employment.

The Ivy League's unique commitment to academics above athletics is demonstrated by the fact that it annually finishes as the top Division I athletic conference in national competitive rankings for its graduation success rate, and its student-athletes earn the country's best academic records in the National Collegiate Athletic Association ("NCAA") Academic Performance Ratings. Ivy League student-athletes learn and develop skills from their academic and athletics experiences to become national and community leaders across the spectrum of life in business, technology, education, philanthropy, law and government, non-profits, and medicine and research.

## III.    ARGUMENT

### A.    Student-Athletes Are Not Employees Within the Meaning of the Act.

#### 1.    The Regional Director's Decision in *Trustees of Dartmouth College*

On February 5, 2024, the Regional Director of Region 1 issued a DDE finding, for the first time, that student-athletes at a private university are employees within the meaning of the Act, and that it is appropriate for the Board to exercise jurisdiction over them. The Regional Director concluded that Section 2(3) of the Act defines "employee" broadly enough to include the Dartmouth students who participate on the men's basketball team. The Regional Director held that the basketball players meet the common law employment test outlined in *Columbia University*, which requires "generally that the employer have the right to control the employee's work, and that the work be performed in exchange for compensation." *See* DDE at 14; *Columbia Univ.*, 364 N.L.R.B. 1080 (2016). The Regional Director made three key findings: 1) the basketball players perform work that benefits the university; 2) the players perform work in

exchange for compensation; and 3) the university has the right to control the players' work.  The findings are detailed below.

First, the Regional Director found that the basketball players in the instant case are similar to the graduate student research assistants and teaching assistants in *Columbia University* and the football players in *Northwestern University*, because they engage in work that benefits Dartmouth.  The DDE cites facts regarding alumni engagement, financial donations, and publicity leading to student interest and applications, use of university-branded uniforms, and payment for the right to broadcast and distribute video of the basketball team as support for her determination that Dartmouth basketball players perform services that benefit Dartmouth.  The Regional Director's conclusion also relies on Dartmouth's athletic department's handling of "revenues and publicity generated" as further evidence the basketball players work for the university's benefit.  However, in direct contradiction, the Regional Director simultaneously held that the team's lack of profitability does not impact the students' employee status.  *See* DDE at 18-19.

Second, the Regional Director found that the basketball players perform work in exchange for compensation, despite the fact that they receive no actual compensation.  Rather, the Regional Director found that players are compensated because the players receive an "early read" of their financial aid prior to admission while they are high school students (issued by Dartmouth's financial aid office, over which the athletic department lacks control, and which applies not only to high school student-athletes, but also to non-athletes), equipment and apparel, tickets to games, lodging, meals, and other "individual support" and fringe benefits.  *See* DDE at 20.  Despite acknowledging that the basketball players only receive need-based financial aid, and

that some students do not receive any financial aid at all, the Regional Director concluded the students "both receive and anticipate economic compensation" from Dartmouth.  *See* DDE at 20.

Last, the Regional Director concluded that Dartmouth has the right to control the work performed by the men's basketball team because of Dartmouth's "dominance" over the players' team and class schedules.  *See* DDE at 21.  Much of what the Regional Director pointed to as control is simply dictated by the reality of participating in an organized activity.  For example, the Regional Director cited the fact that the coaching staff sets a schedule for traveling to other universities for competitions as a manner of controlling work, but the reality is that the team is scheduled to play another team at a particular time, and it takes a certain amount of time to travel there, so there must be a schedule to allow for enough travel time.  *See* DDE at 19.

> **2.      The Regional Director's DDE Is Flawed and Contravenes Board Precedent Because the Basketball Players Do Not Meet the Common Law Employment Test.**

On March 5, 2024, Dartmouth filed a Request for Review of the DDE.  In its Request for Review, Dartmouth again argues that its student-athletes participating in men's basketball are not employees within the meaning of the Act.  *See* Dartmouth Request for Review at 20-37.  The Ivy League highlights the following important points set forth by Dartmouth in its Request for Review:

Section 2(3) of the Act defines "employee" as including "any employee," who is not subject to the exceptions of the Act (i.e. supervisors, contractors, domestic workers, etc.).  29 U.S.C. § 152(3).  Because the statute itself does not define the term "employee," the Board has relied on caselaw to give the term meaning.  In *NLRB v. Town & Country Electric*, the Supreme Court interpreted "employee" to mean a worker who receives compensation in exchange for services.  *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 90 (1995).  The Board has followed this approach in subsequent cases.  In *WBAI Pacifica Foundation*, the Board clarified that the

Supreme Court's definition of "employee" is "bounded by the presence of some form of *economic relationship* between the employer and the individual held to have statutory employee status." *WBAI Pacific Foundation*, 328 N.L.R.B. 1273, 1274 (1999) (emphasis added). Further, "[t]he vision of a *fundamentally economic relationship* between employers and employees is *inescapable*." *Id*. at 1275 (emphasis added).

> **a)** **Student-Athletes in the Ivy League Do Not Receive Compensation.**

The Board and other Regional Directors have held that there must be some form of compensation in exchange for services when determining whether students at institutions of higher education are also employees under the Act. In *Northwestern*, 362 N.L.R.B., 1350, 1357 (2015), the Regional Director of Region 13 found that the non-scholarship football players at Northwestern University, referred to as "walk-ons," were not employees within the meaning of the Act because they did not receive compensation for playing football. The walk-ons did not receive athletic scholarships, yet were required to abide by the same rules as the scholarship players on the team. *Id.* at 1353, 1357. Noticeably absent in *Northwestern* is any discussion that the walk-on players receive the same gear, free tickets, or other benefits as the scholarship players, rendering them employees who work in exchange for compensation. Instead, the sole focus was the receipt of athletic scholarships contingent on athletic performance as the required "compensation" to find employee status under the Act.

Student-athletes in the Ivy League categorically do not meet the common law test for employment because they do not receive compensation. There is no dispute that the Dartmouth men's basketball players receive no financial compensation or athletic scholarships in exchange for participating in the athletics program. The only form of financial assistance awarded to the students on the team is based solely on need—not their participation in athletics, level of skill,

9

games won, or hours played.  Their financial assistance does not depend on whether they play an entire season, quit the team after the first practice, or decline to play a single game.  The Regional Director also acknowledged the undisputed fact that four out of fifteen students on the team receive *no financial assistance at all*.  Essentially, these four students pay full tuition to attend Dartmouth and receive no remuneration to be part of the basketball team—the opposite of receiving compensation.  Those enrolled students choose to play despite their families' financial expenditures for tuition, room, and board.  This fact alone is sufficient evidence that the students on the basketball team do not meet the common law test for employment.

The Regional Director sidestepped this fact and instead found that the basketball players' receipt of an "early read" (which is a process that Ivy League institutions follow for many students they hope to attract, not just student-athletes, and is based on the student's demonstrated talents and potential in academics), equipment, apparel, tickets to games (all enrolled students attend games for free), lodging, meals, and other non-monetary benefit somehow constitutes compensation.  As discussed below, if the Regional Director's argument is accepted, there is no end to who may be considered an "employee" simply by virtue of receiving some level of non-monetary support from their college or university.  Under this flawed theory, if a school provides transportation and/or apparel to students who participate in club sports, play in a school band, or participate in any other of many college extracurricular activities, then it would be "compensating" such students at the risk of converting them into employees under the Act.  This result is simply not tenable and wholly inconsistent with the common law employment test.

Nor is there any Supreme Court or Board precedent supporting the argument that the provision of such non-monetary benefits to students is compensation.[3]  The Regional Director only cites *Seattle Opera Association*, where the Board concluded that auxiliary choristers were employees under the Act because they received a cash payment of $214 at the end of each production.  *In Re Seattle Opera Ass'n*, 331 N.L.R.B. 1072, 1072-73 (2000).  Indeed, the Board expressly stated that the fact that the "[a]uxiliary choristers receive monetary remuneration" was "[c]entral to our analysis . . . that there *is* an economic relationship with the Employer."  *Id.* at 1073 (emphasis in original).  This fact alone suffices to distinguish the auxiliary choristers from the basketball players, who receive no monetary compensation at all from Dartmouth.

The provision of such non-monetary benefits to the basketball players does not establish the requisite compensation to support a finding that they are employees within the meaning of the Act.  In *WBAI Pacifica Foundation*, the Board refused to find such benefits as compensation because "[t]he occasional reimbursement for travel, the contractual eligibility for a child care allowance, the payment of paid staff wages when substituting for paid staff, and finances for producing programs **are insufficient evidence of compensation, either monetary or in the form**

---

[3] The U.S. Court of Appeals for the Eleventh Circuit recently held that volunteer attendants at a public golf course were not employees under the Fair Labor Standards Act because they did not receive any compensation, and because they served with no expectation of receiving compensation.  *Adams v. Palm Beach Cty.*, No. 23-11065, 2024 U.S. App. LEXIS 5876, at *14-15 (11th Cir. Mar. 12, 2024).  In that case, the individuals at issue performed services on behalf of the public golf course, including "greeting customers; carrying and loading customers' golf clubs; cleaning balls, clubs, and carts; retrieving carts from and returning carts to cart barns; patrolling the range and policing the pace of play; raking sand traps and filling divots; collecting trash; and retrieving balls from the driving range."  *Id.* at *2-3.  The managers of the golf course determined what duties the attendants had to perform.  *Id.* at *3.  In exchange for their services, the golf course provided the attendants with discounted rounds of golf, and attendants were permitted to accept tips from golfers, and the attendants applied for the position knowing that it was an uncompensated volunteer position.  *Id.*  The Eleventh Circuit held that that was not compensation sufficient to establish an employment relationship.  *Id.* at *9-10.

*of a benefit given in exchange for labor*." *Id*. at 1276.  There is even weaker evidence of

compensation in the instant case than there was in *WBAI Pacifica Foundation* because the

student-athletes at issue here are not given stipends or payments of any kind.  Accordingly, the

student-athletes on Dartmouth's men's basketball team cannot be said to be compensated

according to the Board's analysis under *Seattle Opera Association* and *WBAI Pacifica*

*Foundation*.  Because the DDE departs from existing Board precedent and raises a substantial

question of law and policy, review should be granted and the DDE should be reversed.  29

C.F.R. § 102.67.

         **b)**      **Student-Athletes in the Ivy League Are Not Providing Services to Their Universities.**

Student-athletes in the Ivy League do not meet the common law employment test and

are not employees under the meaning of the Act because they do not perform services for their

universities consistent with an employment relationship.  Universities exist primarily to teach

and to expand knowledge—not run athletic programs.  The Board analyzed a factually analogous

scenario in *WBAI Pacifica Foundation*, where the Board held that the unpaid staff of a nonprofit

radio station, who produced a majority of the programing, were not "employees" under the Act

because they did not provide employment services.  *WBAI Pacifica Foundation*, 328 NLRB at

1276.  The unpaid staff in that case "work[ed] out of an interest in seeing the station continue to

exist and thrive, out of concern for the content of the programs they produce, and for the

personal enrichment of doing a service to the community and receiving recognition from the

community." *Id.* at 1275.  The Board held the unpaid staff were not "employees" because they

did not "work for hire," there was no evidence of "anticipated compensation," and they did not

depend on the employer "for their livelihood or for the improvement of their economic

standards."

Similarly, the student-athletes at Ivy League institutions do not perform services necessary to establish an employment relationship.  They do not "work for hire," there is no evidence of anticipated compensation by them, and they do not depend on their teams for livelihood or for the improvement of their economic standards.  Moreover, they are eligible for the same aid based on their demonstrated financial need, irrespective of any "work" performed.  Instead, students seek admission to Ivy League universities to earn degrees from these prestigious institutions of higher learning.  The education itself is the goal.  The student-athletes who participate on teams do so because they enjoy competing in their sport, they want to see their teams succeed, they receive personal growth and development from participating in their sport, and they are able to make connections with others who share their love of a sport.  Participation in intercollegiate athletics also offers student-athletes an opportunity to showcase their talents while exhibiting sportsmanship, goal setting, communication, persistence, hard work, integrity, and leadership.  Thus, just as in *WBAI Pacifica Foundation*, and contrary to the Regional Director's DDE, the student-athletes at Ivy League universities are not employees under the Act, and the Board should grant Dartmouth's Request for Review, reverse the DDE, and correct the Regional Director's misapplication of Board law.

### 3.     Ivy League Universities Do Not "Control" Student-Athletes.

The Regional Director's decision avoided the Board's analysis under *Seattle Opera Association* and *WBAI Pacifica Foundation* by focusing instead on a distorted concept of "control" that Dartmouth and the coaching staff purportedly exert over the men's basketball players at issue there.  However, the level of "control" that the nonprofit radio station in *WBAI Pacifica Foundation* exerted over the unpaid staff was not a consideration in the analysis of whether they are employees under the common law test.  The staff at issue in that case produced a majority of the radio station's programming, suggesting that the radio station could and did

13

exert significant "control" over the content of the programming, the methods of production, and hours of "work."  Yet the Board instead applied the common law test, which analyzes whether an individual is performing services in exchange for compensation, not whether the purported employer "controls" those services.  This is not surprising, since "control" is a necessary element of many types of relationships that are not employment, such as a teacher and student, or a middle school basketball coach and student players, or, as discussed below, the relationship between a university club or organization and its members.

Further, the Regional Director's decision failed to take into account that the alleged "control" over a student-athlete's athletics participation ceded to the student's academics.  There was significant evidence that the coaches at issue in *Dartmouth College* did not exercise control consistent with an employment relationship, given that players were permitted to not perform athletic activities if an academic obligation took precedence.  For example, the record evidence demonstrated that student-athletes would prioritize academics over athletics, that the coach permitted students to miss practice if it conflicted with an academic obligation, and that the coach never disciplined any student who missed an athletic activity to attend to an academic obligation.  *See* DDE at 11.  If this were an employment relationship, there would be repercussions for an employee who failed to carry out their "job duties."  This only further serves to illustrate that athletics are an extracurricular activity – an enhancement to the education that students receive while attending an Ivy League institution.  That is the hallmark of the Ivy League athletics experience—academics take precedence over athletics.  The Regional Director's reliance on "control" and the mischaracterization of that alleged "control" thus contravenes existing Board law.

### 4.  The Board Should Not Exercise Jurisdiction.

The Regional Director has exercised jurisdiction in an unprecedented way without limits or regard for the Board's precedent in factually analogous cases.  The Board previously declined to exercise jurisdiction in *Northwestern University*, 362 NLRB 1350 (2015), because it found that exercising jurisdiction "would not promote stability in labor relations."  As the Board noted in *Northwestern*, "the Supreme Court has stated . . . even when the Board has the statutory authority to act . . . the Board sometimes properly declines to do so . . . [because] the policies of the Act would not be effectuated by its assertion of jurisdiction in that case."  *Id*. (quoting *NLRB v. Denver Building Trades Council*, 341 U.S. 675, 684 (1951)).  In that case, the Board observed that asserting jurisdiction was problematic because "labor issues directly involving only an individual team and its players would also affect the NCAA, the Big Ten, and other member institutions," thus "it would be difficult to imagine any degree of stability in labor relations."[4] *Id*. at 1353-54.  The Board's exercise of jurisdiction here would similarly promote instability in labor relations because it would invariably impact not only member institutions, but also other schools outside the conference that compete against the Ivy League.  Specifically, all Ivy League institutions routinely compete in intercollegiate athletics with public institutions and religious institutions, which are not subject to the jurisdiction of the Act, as well as other private institutions outside of the Ivy League, including in NCAA championships.  If Ivy League institutions are subject to collective bargaining obligations related to such matters as compensation and hours of practice and competition, this will distort competition against

---

[4] Vacillation by the Board on this issue in such a short time also will lead to instability in labor relations.  *See Valley Hosp. Med. Ctr., Inc. v. NLRB*, 93 F.4th 1120 (9th Cir. 2024) (O'Scannlain, J. concurring) (noting the "troubling trend" of the Board to "seesaw[] back and forth between statutory interpretations depending on its political composition, leaving workers, employers, and unions in the lurch," questioning whether the Board's interpretations continue to deserve deference).

universities that are not, and will never be, subject to the same requirement.  The very same considerations that led the Board to decline jurisdiction in *Northwestern* point to the same result here:  asserting jurisdiction in this case would not lead to the "uniformity and stability" that the Board has traditionally sought to promote.  *Id*. at 1354.  Therefore, the Board should decline to assert jurisdiction over Dartmouth as it did in *Northwestern*.

      **B.**    **A Finding That Student-Athletes Are Employees Threatens the Continued Existence of Sports in the Ivy League Conference.**

Transforming the relationship between a student-athlete and their university into an employer-employee relationship has the potential to impact both students and universities in ways that could threaten the continued existence of intercollegiate sports in athletic conferences, like the Ivy League, which put academics at the forefront of the student's college experience.  As outlined above, the Ivy League was founded on the principle of the primacy of academics, not athletics, and the experience of student-athletes in the Ivy League reflect that.  Imposing an employment paradigm on the Ivy League runs counter to that principle.  This principle essentially is the embodiment of the ideal of amateurism that historically has formed the foundation for intercollegiate athletics, particularly in the Ivy League.  *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984) (recognizing the importance of amateurism in college athletics and its distinction from professional sports).  This concept of amateurism continues to serve as a key factor behind the ability of intercollegiate athletics to remain complementary to a student's education in the Ivy League.  Unlike professional athletes, Ivy League student-athletes compete for many reasons, including the love of the game (like the walk-on players in *Northwestern*), the opportunity to represent their college or university, the opportunity to meet others who share a love of sport, the connection they feel to alumni when pursuing future career opportunities, and the skills they learn for future success, such as

motivation, preparation, integrity, overcoming defeat, persistence, self-discipline, teamwork, and sportsmanship. Participation in athletics lends richness and diversity to a student's college experience, especially for student-athletes in the Ivy League, who, by and large, do not consider their athletic experiences to be launching pads for careers as professional athletes.[5]

Much of the rhetoric surrounding the amateurism model stems from a misconception that student-athletes are exploited for the benefit of the institution. In contrast, the Ivy League model enhances the experience of its student-athletes, including by placing academics before athletics. The Ivy League also is committed to empowering its member institutions to support their student-athletes and improve their athletic and academic experiences. Member institutions have taken steps to enhance the support and services available to their student-athletes incidental to their participation, providing access to world-class health care, athletic training and conditioning, dietary education, mental health support, and academic resources. These supports and services are not offered as "compensation," but rather these are measures put into place to ensure student-athletes can succeed and balance their academic responsibilities and issues attendant to varsity sports, such as ensuring that they are able to engage in their academic studies while participating in competitions and addressing injuries to ensure that they are able to continue to progress toward their degrees. As discussed above, the academic records and graduation rates of Ivy League student-athletes exceed that of other NCAA Division I conferences, demonstrating that they are not sacrificing their education for athletics (or any other extracurricular activity in which they choose to participate).

---

[5] Further demonstrating the unique nature of Ivy League athletics is the diversity of athletic programs, which includes cross country, fencing, field hockey, squash – not just football and basketball.

The imposition of an employment paradigm also would alter the experience of student-athletes in significant ways.  The student's focus on academics would be lost, as they would be held to particular standards as an employee who must carry out their job duties in order to "earn" their "compensation."  This concept runs contrary to the rules of the Ivy League and its member institutions that place limits on the amount of time that coaches can expect students to spend on athletics preparation, training, and competition, and that prioritize students' attendance in classes and progress toward degrees.  Blurring the academic lines also may result in uncertainty for student-athletes, who will be left to wonder if they may remain a student at their university should they decide they no longer wish to participate in sports or if an injury renders them unable to do so.  That is not the case at present, as a student's attendance at their university and financial aid award are not conditioned upon participation in athletics.  Further, any "compensation" paid to the student-athlete would need to be accounted for under tax laws, resulting in tax liability for the student-athlete and the institution.  Similarly, receipt of "compensation" could affect the student-athlete's eligibility for need-based financial aid.  International students who are subject to employment restrictions due to their visa status could be precluded from participating in intercollegiate athletics or from engaging in employment opportunities on or off campus.

The employment paradigm also poses challenges to the Ivy League's member institutions that would flow through to its students.  The Regional Director wholly sidestepped the issue of whether the Dartmouth athletics program generates more revenue than its expenses, yet that is a critical reality of the athletic programs of all of the Ivy League institutions.[6]  The Ivy League's

---

[6] The Regional Director appeared to simultaneously claim that the "profitability" of a collegiate athletic program supports the conclusion that its student-athletes are employees within the meaning of the Act while ignoring the fact that the Dartmouth men's basketball team has operated at a loss.  The Board should reject the Regional Director's reasoning and conclusions, as they are inconsistent not only internally, but also with the common law employment test,

member institutions do not generate profit from their athletic departments.  Rather, the expenses of the athletic programs far exceed any revenue that is generated or expected to be generated. Adding the expenses attendant with an employment relationship and collective bargaining to that equation (e.g. building out administrative structures to handle the employment aspects of the relationship and potentially managing dozens of bargaining units), coupled with the fact that Ivy League institutions place academics ahead of athletics, could result in difficulty for an institution to maintain all of its varsity athletic programs.  This would be to the detriment of not only the institution, but also to the student-athletes who desire to participate in intercollegiate athletics if some or all sports are no longer offered at a varsity level.

Finally, an employment model is not the panacea that proponents envision.  A labor union is not legally authorized to bargain over the academic relationship between a student-athlete and their institution.  Many concerns cited by proponents of the employment model would not be solved by collective bargaining.  For example, unions have no authority to bargain over the degree requirements for a student-athlete, or the scope of their financial aid.  Nor may unions bargain over the admissions requirements that universities maintain related to the minimum academic standards necessary to be admitted, or what classes a student-athlete must take to obtain a degree or to satisfy the requirements of a particular major.  These are fundamental to academic freedom and institutions' right to make academic decisions.

Because the employment model clearly would operate to the detriment of student-athletes, college sports, and the Ivy League's member institutions, it is inconsistent with the

---

which does not take "profitability" into account when determining whether an individual is an employee under the Act.  In fact, if profitability were found to be a consideration, it would not effectuate the purposes of the Act to find that Ivy League student-athletes are employees, given the lack of profitability among Ivy League athletic programs.

purposes of the Act.  Accordingly, the Board should grant Dartmouth's Request for Review and find that student-athletes at Dartmouth are excluded from coverage under the Act.

    **C.**    **Given the Unique Characteristics of the Ivy League, a Finding That Dartmouth's Men's Basketball Players Are Employees Opens the Door to Numerous Other Employee Designations in Academia That Would Not Effectuate the Purpose of the Act.**

The Regional Director's decision that student-athletes at Dartmouth are employees within the meaning of the Act also threatens to diminish the entire Ivy League experience and spill into other academic settings in unprecedented, unwarranted, and potentially damaging ways.  As it relates to the Ivy League, the Regional Director's inconsistent and unsupported reasoning about the status of student-athletes as employees could possibly open the door to the creation of an employment relationship between a university and its students in nearly every facet of their extracurricular experiences.[7]  While the Regional Director seemed to find that other collegiate extracurricular activities would not be swept in as a result of her decision, the novel analysis that she applied to the Dartmouth student-athletes could result in extracurricular activities being found to create an employment relationship under a future novel analysis.  Specifically, the Regional Director distinguished the basketball program by citing a lack of evidence on the record that "other extracurricular activities dominate students' schedules" in the same way as athletics, and noting that there are no "hypothetical student journalists, actors, and musicians" who are recruited and admitted through a "special process" because of their skills. But this is wholly untrue, as students are accepted to Ivy League schools based on many criteria including, but not limited to, their academic record, their leadership abilities, their participation in extracurricular

---

[7] To be clear, the Ivy League firmly believes that all students who participate in all extracurricular activities, whether athletic or not, are not employees of their member institution under any law.

activities or jobs, and their likelihood for success in college. A deeper examination of collegiate extracurriculars exposes the fallacy of the Regional Director's reasoning.

The factors that the Regional Director cited to support her conclusion that the Dartmouth men's basketball players are employees apply to students involved in virtually *all* extracurricular activities on a college campus. First, many extracurricular clubs and student organizations throughout the Ivy League's member institutions generate alumni engagement, financial donations, and publicity for their universities. For example, musical groups (jazz bands, *a cappella* groups, glee clubs) play an integral role at many collegiate events and are the subject of their own events and competitions that draw spectators and supporters. Students participate in numerous clubs and organizations that can take much of their time, such as a robotics club that designs and builds robots to participate in technology and engineering competitions taking place around the country, or a musical theater group that plans and stages large productions, which are common across the Ivy League's member schools. These clubs require practice, meetings, training, and competition. Students on the moot court team may need to juggle class attendance against the travel needed to attend a tournament at a competitor institution, not because their time is controlled by their university as their employer, but because they are committed to an activity that allows them to develop not only legal expertise but also the time management skill that will serve them after graduation. Also, many of these groups have rigorous selection procedures (e.g. auditions, try-outs, applications, and interviews), receive support from their institution, and have faculty and staff advisors directing their performances and "work." Such groups also elicit financial donations from alumni and supporters through affinity funds, which are common in universities as a means for alumni and donors to contribute to campus life that remains meaningful to them and their institution. While these clubs and student organizations generate

alumni engagement, financial donations, corporate and industry sponsorships, and publicity for their universities, the activities of their student members do not make them employees under the Act.

Second, the Regional Director cited the fact that the Dartmouth basketball players wear "Dartmouth-branded clothing and uniforms" to support her finding that they are employees under the Act. Yet many extracurricular clubs and teams also receive institutional support, including school-branded uniforms or other gear, an activities budget, or a travel and per diem stipend. By the logic advanced by the Regional Director, students who participate in such clubs and teams receive compensation in a "non-traditional form" and should be considered employees if their institution supplies them with uniforms, signs, instruments, and other equipment needed to participate in their extracurricular activities, or for example free tickets to musical and theatrical performances. This logic is flawed and further underscores the problems inherent in the Regional Director's analysis. Once this "non-traditional compensation" argument is accepted, any student who receives an iota of support from their institution can be said to receive compensation.[8] The Regional Director's decision thus opens the door for any number of extracurricular groups on campuses around the country to be deemed employees under Section

---

[8] The Regional Director also distinguished other extracurricular activities on the basis that "major media outlets do not pay for the right to broadcast and distribute video of the vast majority of those activities." *See* DDE at 18. As an initial matter, this is not a criterion that is relevant to an analysis of the common law employment test under existing Board law. Moreover, not all Ivy League varsity sports are televised by "major media outlets." Finally, the Regional Director appears to acknowledge that at least some other extracurricular activities may be televised, which would render this criterion meaningless as it is impossible to decipher whether and to what extent "major media outlet coverage" converts a particular activity to employment status. This further highlights the fallacy of the Regional Director's reasoning underlying the DDE.

2(3), demonstrating why such inconsistent results are precisely why the Act should not be applied to the Ivy League's student-athletes.

Even beyond just the Ivy League, the Regional Director's decision is so broad that it would likely sweep in hundreds of thousands of Division III student-athletes, who would then be considered "employees" under the Act.[9]  Although Division III does not permit athletic scholarships, approximately 80% of Division III students receive some form of academic grants or need-based scholarships.[10]  Similarly, high school students at private schools could be swept in by the Regional Director's decision.  Competitive private schools across the country engage in recruitment practices, give students admissions consideration, provide students with gear and equipment, and offer scholarships.  These high school programs often operate similarly to a college athletics program, so the interpretation of "employee" advanced by the Regional Director would sweep in these students, making high schools their employers, threatening those students' continuing ability to participate in interscholastic sports and possibly jeopardizing the existence of the sports programs at those institutions.  These outlandish results would constitute a natural extension of the framework established by the Regional Director.

### D. The Board's Decision in *Northwestern University* Provides the Correct Analysis for Ivy League Student-Athletes.

As noted above, the correct analysis for intercollegiate athletics in the Ivy League is one that the Board already has considered and applied in the *Northwestern* decision, which excluded walk-on players who have the same characteristics as student-athletes in the Ivy League.  In

---

[9] Division III, which includes 430 active schools with 200,000 student-athletes, was established in 1973 and is the largest NCAA division.  *Our Division III Story*, NCAA, https://www.ncaa.org/sports/2021/2/16/our-division-iii-story.aspx (last visited Apr. 22, 2024); *Our Division III Members*, NCAA, https://www.ncaa.org/sports/2021/5/11/our-division-iii-members.aspx (last visited Apr. 22, 2024).

[10] *Our Division III Story*, NCAA, https://www.ncaa.org/sports/2021/2/16/our-division-iii-story.aspx (last visited Apr. 22, 2024).

*Northwestern*, the Board and the Regional Director recognized that there is at least one category of student-athlete that indisputably is not an employee under the Act—the non-scholarship football players who did not receive compensation for the athletic services that they performed. *Northwestern Univ.*, 362 NLRB at 1355, 1364.  The non-scholarship football players at Northwestern practiced and played alongside the scholarship players and were subject to the same schedules and rules.  *Id.* at 1364.  Unlike the scholarship players, they did not sign a "tender," a document that specifies the scholarship award is subject to the player's compliance with the school's policies and NCAA and Big Ten conference regulations.  *Id.*  As the Regional Director found, the non-scholarship football players at Northwestern had "nothing tying them to the football team except their 'love of the game' and the strong camaraderie that exists among the players."  *Id.*  The fact that these student-athletes "may also have aspirations of earning" some financial gain in the future, "does not change the fact that they do not receive any compensation at that point in their collegiate football careers."  *Id.*

Student-athletes in the Ivy League are no different from the non-scholarship players in *Northwestern*.  First, they do not receive any type of compensation, and instead only receive need-based financial aid on the same terms as any other student at their institution.  Second, Ivy League students do not sign a "tender," and are not compelled in any way to remain in their respective athletic program.  The Ivy League is the only Division I conference that does not participate in the National Letter of Intent program, in which high school student-athletes sign an agreement to attend and play for their chosen school in exchange for an athletics scholarship. Most notably, Ivy League student-athletes can quit anytime and for any reason without any repercussions.  If they cease participating in sports for any reason, they remain an enrolled student of their institution with the same need-based aid.  Third, Ivy League student-athletes

have "nothing tying them" to the team except for their "love of the game" and the "strong camaraderie" among team members.  The fact that these student-athletes "may also have aspirations of earning" some financial gain in the future, "does not change the fact that they do not receive any compensation at that point in their collegiate football careers."  *Id.*  In sum, the close similarities between Ivy League student-athletes and the walk-on players in *Northwestern* cannot be overlooked.  The Regional Director should have followed *Northwestern* and held the same for the Dartmouth student-athletes.  The Board should grant review of the Dartmouth decision to correct a serious misapplication of the law that potentially could adversely affect the future of sports not only in the Ivy League, but in other athletic conferences as well.

## IV.    CONCLUSION

For the foregoing reasons, the Ivy League respectfully requests that the Board grant Dartmouth's request for review of the Regional Director's decision, reverse the DDE, and dismiss the petition to represent Dartmouth's men's basketball team.

Respectfully submitted,

COZEN O'CONNOR

Date: April 23, 2024

/s/ Daniel V. Johns
Daniel V. Johns (djohns@cozen.com)
Kelly T. Kindig (kkindig@cozen.com)
Benjamin Shechtman (bshechtman@cozen.com)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
215-665-4722

Attorneys for the Ivy League