**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------ x
                               :
TAMENANG CHOH and GRACE KIRK,  :
individually and on behalf of  :
others similarly situated,     :
                               :
                               :  Civil No. 3:23-cv-00305(AWT)
          Plaintiffs,          :
                               :
v.                             :
                               :
BROWN UNIVERSITY, THE TRUSTEES :
OF COLUMBIA UNIVERSITY IN THE  :
CITY OF NEW YORK, CORNELL      :
UNIVERSITY, TRUSTEES OF        :
DARTMOUTH COLLEGE, HARVARD     :
UNIVERSITY, THE TRUSTEES OF THE:
UNIVERSITY OF PENNSYLVANIA,    :
PRINCETON UNIVERSITY, YALE     :
UNIVERSITY, and THE IVY LEAGUE :
COUNCIL OF PRESIDENTS,         :
                               :
          Defendants.          :
------------------------------ x
```

## RULING ON MOTION TO DISMISS

The plaintiffs, Tamenang Choh and Grace Kirk, individually and on behalf of all others similarly situated, bring this proposed class action, claiming a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Class Action Complaint (ECF No. 1) (the "Complaint") names as defendants Brown University ("Brown"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Harvard University ("Harvard"), The Trustees of the University of Pennsylvania

("Penn"), Princeton University ("Princeton"), Yale University ("Yale") (collectively, the "University Defendants"), and The Ivy League Council of Presidents (the "Council," and with the University Defendants, the "Ivy League").

The defendants have moved to dismiss the Complaint. For the reasons set forth below, their motion to dismiss is being granted.

## I.   FACTUAL ALLEGATIONS

This action arises out of an agreement among the defendants (the "Ivy League Agreement") "not to provide athletic scholarships to their Division I athletes ("Ivy League Athletes") and not to pay Ivy League Athletes any compensation (or reimbursement of education-related expenses) . . . ." Compl. ¶ 1. "The original Ivy League Agreement, from 1954, states in relevant part: 'The members of the Group reaffirm their prohibition of athletic scholarships. Athletes shall be admitted as students and shall be awarded financial aid only on the basis of economic need.'" Id. ¶ 131 (quoting Ivy Manual (2017-2018), at 39 (quoting the 1954 Ivy League Agreement)). The plaintiffs

> bring suit on behalf of a proposed Class of all Ivy League Athletes recruited to play a sport by one or more University Defendants, and who, within the period of March 7, 2019, to the date the conduct challenged as illegal in this Complaint ceases (the "Class Period"), attended one of the University's undergraduate programs while playing a sport for that school.

Id. ¶ 2.

"Plaintiff Tamenang Choh, a resident of Lowell, Massachusetts, attended Brown University from September 2017 until May 2022, when he graduated." Id. ¶ 23. "Choh was recruited to play basketball by multiple Division I colleges and received a full athletic scholarship from at least three of them." Id. "Brown recruited, accepted, and enrolled Choh, providing him need-based financial aid, which did not cover the full cost of his tuition, room, and board, and incidental expenses." Id.

"Plaintiff Grace Kirk, a resident of Duluth, Minnesota, is attending Brown." Id. ¶ 24. "Kirk was recruited to play women's basketball by multiple Division I colleges and was offered a full athletic scholarship from one of them." Id. "Brown recruited, accepted, and enrolled Kirk, providing her need-based financial aid, which did not cover the full cost of her tuition, room, and board, and incidental expenses." Id.

"The University Defendants are institutions of higher education that have belonged to the Ivy League athletic conference since its formation in 1954." Id. ¶ 25. "The Ivy League Council of Presidents (also known as the Council of Ivy Group Presidents) is the body that effectuates and enforces the Ivy League Agreement on behalf of the University Defendants." Id. ¶ 26.

"The Council, through its executive director and administrative staff, coordinates the athletic activities of the Ivy League schools, including the negotiation of television rights for Ivy League athletic competitions . . . ." Id. ¶ 77. "The Council also organizes meetings of the Ivy League schools, which representatives of the University Defendants attend." Id. ¶ 80. "The Council also negotiates on behalf of the University Defendants for revenues generated by Ivy League athletic competitions and distributes the proceeds due to the University Defendants." Id. ¶ 81. "The 'Ivy League' is an athletic conference." Id. ¶ 96. "The Ivy League competes on a national level in all Division I sports . . . ." Id. ¶ 97. "The Ivy League's mission has long included recruiting students with the highest academic qualifications with nationally ranked athletic skills." Id.

"The Ivy League maintains an extensive body of rules and regulations that govern its intercollegiate sports activities." Id. ¶ 98. "Under the latest edition of the 'Ivy Manual' (2017-18), these rules and regulations govern, for example, the eligibility of Ivy League students for intercollegiate sports competitions, multiple aspects of competitions themselves and when they are held, and dates for the 'seasons' for individual sports." Id.

"The Ivy League operates through multiple standing committees, principally the Council, but also the Policy Committee, the Committee on Administration, the Committee on Admissions, and the Committee on Financial Aid." Id. ¶ 99.

> The Ivy League's Executive Director is responsible for implementing the rules set forth in the Ivy League Manual and the relevant national rules pertaining to intercollegiate athletics, and for imposing "penalties as may be appropriate and the implementation of such procedures for exceptions to Ivy rules as may be established by the Committee with authority in such areas."

Id. ¶ 100 (quoting Ivy Manual at 18). "The name 'Ivy League' has brand value, which each of the Defendants use in marketing efforts, including efforts to attract students and faculty and to sell tickets and media rights to athletic competitions." Id. ¶ 101. "The Ivy League rules require prominent display of the 'Ivy League' logo—evidencing the value of the 'Ivy League' brand—at events and in promotional materials." Id. "The Ivy League has rules that promote its unique brand on television broadcasts." Id. ¶ 103. "The rules state in that regard: 'League-wide programming should emphasize the distinguishing characteristics of Ivy League athletics and institutions: in particular, wide participation in a variety of sports, equal opportunity for women and equal emphasis upon women's athletics, and the comprehensive excellence of each of the eight Ivy League institutions.'" Id. (quoting Ivy Manual at 133). "In addition,

television exposure 'should involve outlets and times that have

the basis for securing a good audience and for portraying Ivy

League athletics as an activity worth watching in its own right,

not simply as another collegiate athletic broadcast.'" Id. ¶ 104

(quoting Ivy Manual at 134).

> The Ivy League promotes [and] markets itself through
> its website to students, athletes, and the nation as
> the only league that, top to bottom, "stands at the
> pinnacle of higher education and Division I athletics,
> rooted in the longstanding, defining principle that
> intercollegiate athletics competition should be kept
> in harmony with the essential educational purposes of
> the institution."

Id. ¶ 109 (quoting About the Ivy League, https://ivyleague.com/

sports/2017/8/13/HISTORY_0813173057.aspx).

> Defendants further proclaim, on the website, the
> uniqueness of the Ivy League conference, with a brand
> that is "[u]nrivaled in its legacy," and that "the Ivy
> League provides the true test of academic and co-
> curricular rigor – fostering an enduring culture that
> celebrates a storied-tradition, thrives on shared
> values and holds paramount the academic and personal
> growth of students."

Id.

The Ivy League is a member of the National Collegiate

Athletic Association (the "NCAA"). "The NCAA has three athletic

Divisions." Id. ¶ 1 n.1. "Division I contains approximately 350

colleges and universities and reflects the highest level of

athletic competition among the three Divisions." Id. "According

to the NCAA: Division I schools provide unmatched academic and

athletic opportunities and support. This support includes full

scholarships, cost-of-attendance stipends, degree completion programs and academic revenue distribution from the NCAA for schools that meet certain criteria. . . ." Id. (alteration in original) (quoting Our Division I Story, http://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx). "Division II schools generally offer only partial athletic scholarships [citing Division II Partial-Scholarship Model, https://www.ncaa.org/sports/2014/9/25/divisionii-partial-scholarship-model.aspx], while those in Division III cannot offer athletic scholarships [citing Our Division III Story, https://www.ncaa.org/sports/2021/2/16/our-division-iiistory.aspx]." Mem. of Law in Supp. of Defs.' Mot. to Dismiss (ECF No. 153-1) ("Defs.' Mem.") at 12.[1]

The plaintiffs claim that "[t]he misconduct at issue occurs in two related markets." Compl. ¶ 7. The first is "the market for educational services for athletically and academically high-achieving ("AAHA") students who seek to graduate from college and play Division [I] sports in the National Collegiate Athletic Association . . . ." Id. The plaintiffs define this market as the AAHA Educational Services Market. The second is "the market for the athletic services of the AAHA students who seek to play

---

[1] The page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

for the University Defendants." Id. The plaintiffs define this
as the AAHA Athletic Services Market.

"In the AAHA Educational Services Market, the University
Defendants compete with each other, albeit in ways restricted by
the Ivy League Agreement, to attract AAHA students' purchase of
educational services." Id. ¶ 142. "In the AAHA Athletic Services
Market, the University Defendants compete with each other,
albeit in ways restricted by the Ivy League Agreement, to
attract AAHA students to provide their athletic services to the
University Defendants." Id.

## II. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the
court must accept as true all factual allegations in the
complaint and must draw inferences in a light most favorable to
the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).
Although a complaint "does not need detailed factual
allegations, a plaintiff's obligation to provide the 'grounds'
of his 'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Bell Atlantic Corp. v. Twombly,
550 U.S. 544, 555 (2007) (alteration in original) (citing
Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to
dismiss, courts "are not bound to accept as true a legal
conclusion couched as a factual allegation")). "Nor does a

complaint suffice if it tenders naked assertion[s] devoid of
further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (alteration in original) (quoting Twombly, 550 U.S.
at 557). "Factual allegations must be enough to raise a right to
relief above the speculative level on the assumption that all
the allegations in the complaint are true (even if doubtful in
fact)." Twombly, 550 U.S. at 555 (internal citations and
quotations omitted). However, the plaintiff must plead "only
enough facts to state a claim to relief that is plausible on its
face." Id. at 547. "A claim has facial plausibility when the
[claimant] pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678. "The function of a
motion to dismiss is 'merely to assess the legal feasibility of
the complaint, not to assay the weight of the evidence which
might be offered in support thereof.'" Mytych v. May Dep't Store
Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder
Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d
774, 779 (2d Cir. 1984)). "The issue [on a motion to dismiss] is
not whether the plaintiff will prevail, but whether the
plaintiff is entitled to offer evidence to support his claims."
United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D.
Conn. 1990) (citing Scheuer, 416 U.S. at 236).

In its review of a motion to dismiss for failure to state a

claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## III. DISCUSSION

The Complaint does not allege a per se antitrust violation, nor does it allege a restraint that violates the rule of reason. The Complaint fails to allege a restraint that violates the rule of reason because it does not allege any properly defined market, and consequently, it also fails to allege market-wide anticompetitive effects. In light of this fact, the court does not reach the defendants' additional argument as to why the plaintiffs have failed to state a claim under the rule of reason and does not reach their argument with respect to failure to allege an antitrust injury-in-fact. The court reaches the

defendant's argument that the statute of limitations bars plaintiff Choh's claim and concludes that it does.

## A. **The Complaint Does Not Allege a Per Se Violation**

"Only unreasonable restraints on competition violate § 1 of the Sherman Act." N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 41 (2d Cir. 2018). "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" Id. (alteration in original) (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 458 (1986)). The court agrees with the defendants that "[w]ell-established precedent requires that Plaintiffs' claim be assessed under the rule of reason." Defs.' Mem. at 19.

"Regulation of league sports is a textbook example of when the rule of reason applies." N. Am. Soccer League, 883 F.3d at 41 (citing NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 101, 104 (1984)).

In NCAA v. Alston, 594 U.S. 69 (2021), the Supreme Court applied the rule of reason to NCAA-wide rules limiting compensation for student-athletes. As part of its analysis, the Court gave an overview of the evolution of rules relating to such compensation. That overview included the following:

In 1948, the NCAA . . . adopted the "Sanity

Code." The code reiterated the NCAA's opposition to "promised pay in any form." . . .

. . . In 1956, the NCAA expanded the scope of allowable payments to include room, board, books, fees, and "cash for incidental expenses such as laundry." . . . In 1974, the NCAA began permitting paid professionals in one sport to compete on an amateur basis in another. . . . In 2014, the NCAA "announced it would allow athletic conferences to authorize their member schools to increase scholarships up to the full cost of attendance." . . .

In recent years, changes have continued. The NCAA has created the "Student Assistance Fund" and the "Academic Enhancement Fund" to "assist student-athletes in meeting financial needs," "improve their welfare or academic support," or "recognize academic achievement." These funds have supplied money to student-athletes for "postgraduate scholarships" and "school supplies," as well as "benefits that are not related to education," such as "loss-of-value insurance premiums," "travel expenses," "clothing," and "magazine subscriptions." . . .

The NCAA has also allowed payments "'incidental to athletics participation,'" including awards for "participation or achievement in athletics" (like "qualifying for a bowl game") and certain "payments from outside entities" (such as for "performance in the Olympics"). The NCAA permits its member schools to award up to (but no more than) two annual "Senior Scholar Awards" of $10,000 for students to attend graduate school after their athletic eligibility expires. Finally, the NCAA allows schools to fund travel for student-athletes' family members to attend "certain events."

Id. at 77-79 (internal citations omitted).

It was against this backdrop that the Court stated: "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'" Id. at 81 (citations omitted).

Upholding the scope of the permanent injunction issued by the district court, the Court stated: "The [district] court enjoined only restraints on education-related benefits—such as those limiting scholarships for graduate school, payments for tutoring, and the like." Id. at 103. The Court added: "And the [district] court emphasized that its injunction applies only to the NCAA and multiconference agreements; individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still." Id.; see also id. at 104-05 ("Accordingly, the NCAA may seek whatever limits on paid internships it thinks appropriate. And, again, the court stressed that individual conferences may restrict internships however they wish.").

The Supreme Court had previously applied the rule of reason to the NCAA in Board of Regents. In 1984, during an era prior to the NCAA's recent expansions of the scope of allowable payments to athletes, the Court explained the nature of the NCAA as follows:

> [Some] activities can only be carried out jointly. Perhaps the leading example is league sports. . . . What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed,

-13-

all must be agreed upon, and all restrain the manner
in which institutions compete. Moreover, the NCAA
seeks to market a particular brand of football—college
football. The identification of this "product" with an
academic tradition differentiates college football
from and makes it more popular than professional
sports to which it might otherwise be comparable, such
as, for example, minor league baseball. In order to
preserve the character and quality of the "product,"
athletes must not be paid, must be required to attend
class, and the like. And the integrity of the
"product" cannot be preserved except by mutual
agreement; if an institution adopted such restrictions
unilaterally, its effectiveness as a competitor on the
playing field might soon be destroyed. Thus, the NCAA
plays a vital role in enabling college football to
preserve its character, and as a result enables a
product to be marketed which might otherwise be
unavailable. In performing this role, its actions
widen consumer choice—not only the choices available
to sports fans but also those available to athletes—
and hence can be viewed as procompetitive.

Bd. of Regents, 468 U.S. at 101–02 (quotation marks and internal

citations omitted); see also McCormack v. NCAA, 845 F.2d 1338

(5th Cir. 1998) (applying rule of reason to NCAA rules limiting

compensation for collegiate football players to scholarships

with limited financial benefits); Rock v. NCAA, 928 F. Supp. 2d

1010 (S.D. Ind.2013) (applying rule of reason to NCAA bylaws

prohibiting multi-year athletics-based scholarships and capping

the total amount of athletics-based scholarships member

institutions could grant to student-athletes in a given sport);

O'Bannon v. NCAA, 802 F.3d 1049, 1069 (9th Cir. 2015) (applying

rule of reason to NCAA rules prohibiting student-athletes from

receiving compensation for their names, images, and likenesses).

A review of the factual allegations in the Complaint and
the contents of the Ivy Manual, which is quoted in the Complaint
and attached as an appendix to the defendants' memorandum of
law, shows that assessing the plaintiffs' claim under the rule
of reason is consistent with this well-established precedent.
The Complaint alleges that "[t]he 'Ivy League' is an athletic
conference," Compl. ¶ 96, and "[t]he University Defendants are
institutions of higher education that have belonged to the Ivy
League athletic conference since its formation in 1954," id.
¶ 25. The Complaint also alleges that the Ivy League promotes
itself "as the only league that, top to bottom, 'stands at the
pinnacle of higher education and Division I athletics, rooted in
the longstanding, defining principle that intercollegiate
athletics competition should be kept in harmony with the
essential educational purposes of the institution,'" and
"provides the true test of academic and co-curricular rigor –
fostering an enduring culture that celebrates a storied-
tradition, thrives on shared values and holds paramount the
academic and personal growth of students." Id. ¶ 109. The
Complaint alleges that the defendants affirmed in 2017 that
"[a]ll the Ivy League institutions follow the common policy that
any financial aid for student-athletes will be awarded and
renewed on the sole basis of economic need with no
differentiation in amount or in kind (e.g. packaging) based on

-15-

athletic ability or participation." Compl. ¶ 134 (quoting 1977
Ivy Manual at 149).

The Ivy League Agreement, which is Appendix A to the Ivy
Manual, begins with the following statement: "In November, 1945,
the undersigned institutions entered into an agreement regarding
football, with the purpose of maintaining the values of the game
in the service of higher education." Ivy Manual at 151. Section
3A of the Ivy League Agreement states:

> The Group affirm their conviction that under proper
> conditions intercollegiate competition in organized
> athletics offers desirable development and recreation
> for players and a healthy focus of collegiate loyalty.
> These conditions require that the players shall be
> truly representative of the student body and not
> composed of a group of specially recruited athletes.
> They further require that undue strain upon players
> and coaches be eliminated and that they be permitted
> to enjoy the game as participants in a form of
> recreational competition rather than as professional
> performers in public spectacles. In the total life of
> the campus, emphasis upon intercollegiate competition
> must be kept in harmony with the essential educational
> purposes of the institution.

Id. Section 3B states: "The Group conclude that these conditions
and requirements can best be fulfilled by denying to the fullest
possible extent external pressures for competitive extremes."
Id.

The Ivy Manual also states:

> The principle of need as the basis for financial aid
> for student-athletes is a cornerstone of Ivy belief.
> The Ivy Group has consistently adopted positions with
> the objective of requiring need as the basis for all
> such aid, while arguing against any related

limitations on the number of scholarships awarded to athletes or any special admissions restrictions for athletes i.e., letters-of-intent.

Id. at 5. The Ivy Manual was last revised in August 2017. See id. at 3.

These factual allegations and provisions in the Ivy Manual support the defendants' position that "[t]he challenged rule helps broaden consumer choice by offering a campus culture and college experience where student-athletes and non-student-athletes are treated equally and financial assistance provided to student-athletes is not conditioned on their continued participation in varsity sports, while preserving a measure of competitive balance within the athletic conference and still allowing student-athletes the opportunity to play competitive Division I sports." Defs.' Mem. at 21.

The plaintiffs contend that the Ivy League Agreement is per se illegal because "[t]he University Defendants are horizontal competitors in the commercial activities in the Relevant Service Markets. . . . [H]orizontal agreements on price restraints with respect to commercial activities [are] per se illegal under the Sherman Act." Compl. ¶ 141. However, as the defendants point out, "[h]orizontal price fixing and output limitation [that] are ordinarily condemned as a matter of law under an 'illegal per se' approach" were at issue in Board of Regents yet the Court concluded "that it would be inappropriate to apply a per se rule

-17-

. . . ." <u>Board of Regents</u>, 468 U.S. at 100.

The plaintiffs also contend that "the Ivy League Agreement satisfies the criteria for application of the <u>per se</u> standard under <u>United States v. Brown University [in Providence in the State of Rhode Island]</u>, 5 F.3d [658], [6]72 (3d Cir. 1992) (declining to apply the <u>per se</u> standard to the 'Ivy Overlap' agreement because of defendant MIT's alleged pure altruistic motive and alleged absence of a revenue-maximizing purpose)." Compl. ¶ 145. The Complaint alleges that "[t]he Ivy League Agreement meets the <u>Brown</u> standard because the University Defendants' athletic operations are commercial enterprises and are not purely altruistic." <u>Id.</u> ¶ 146. In <u>Brown</u>, the Antitrust Division of the United States Department of Justice claimed that Massachusetts Institute of Technology ("MIT") had "violated section one et seq. of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq., by agreeing with the Ivy League schools to distribute financial aid exclusively on the basis of need and to collectively determine the amount of financial assistance commonly admitted students would be awarded." 5 F.3d at 661. "The district court found that the Ivy Overlap Group members, which are horizontal competitors, agreed upon the price which aid applicants and their families would have to pay to attend a member institution to which that student had been accepted." <u>Id.</u> at 670 (internal quotation marks and citation omitted). "Based

on this finding, the [Antitrust] Division argue[d] that MIT's conduct was per se unlawful price fixing." Id. The court of appeals agreed "with the district court that [the agreement] must be judged under the rule of reason." Id. at 672. In reaching this decision, the court reasoned that the "alleged pure altruistic motive and alleged absence of a revenue maximizing purpose contribute to our uncertainty with regard to [the agreement's] anti-competitiveness, and thus prompts us to give careful scrutiny to the nature of [the agreement], and to refrain from declaring [the agreement] per se unreasonable." Id. The plaintiffs maintain that:

> In this case, in contrast, Plaintiffs allege in detail that Defendants operate, both generally and in their athletic programs, without altruistic motives; and that they do in fact maximize revenues, defined to include both revenue from operations and donations. See, e.g., Compl. ¶¶ 145-46, 148-84. Under Brown's rationales, these facts warrant per se treatment.

Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (ECF No. 160) ("Pls.' Opp'n") at 28.

However, the rationale in Brown does not support a conclusion that where plaintiffs allege that defendants do not have purely altruistic motives and have a revenue maximizing purpose, i.e. the defendant is operating a commercial enterprise, the conduct of the defendants should not be judged under the rule of reason. As the defendants note, correctly:

> [T]he NCAA has repeatedly been called "commercial,"

> yet the Supreme Court and lower courts consistently
> apply the rule of reason to evaluate its rules. <u>See,</u>
> <u>e.g.</u>, <u>Alston</u>, [594 U.S. at 76] (noting long history of
> "commercialism" and "profitab[ility]" in college
> sports); <u>O'Bannon</u>, 802 F.3d at 1065 (similar); <u>Board</u>
> <u>of Regents</u>, 468 U.S. at 100-101 n.22 (similar).

Defs.' Mem. at 24 (second alteration in original). Moreover, the

above-quoted language from the Ivy Manual directly contradicts

the plaintiffs' contention that the Ivy League operates without

altruistic motives.

Therefore, the court concludes that the plaintiffs have not

plausibly alleged a <u>per se</u> antitrust violation.

## B. <u>The Rule of Reason</u>

"To determine whether a restraint violates the rule of

reason . . . a three-step, burden-shifting framework applies."

<u>Ohio v. Am. Express Co.</u>, 585 U.S. 529, 541 (2018). "Under this

framework, the plaintiff has the initial burden to prove that

the challenged restraint has a substantial anticompetitive

effect that harms consumers in the relevant market." <u>Id.</u> The

rule of reason analysis "generally requires a court to 'conduct

a fact-specific assessment of market power and market structure'

to assess a challenged restraint's 'actual effect on

competition.'" <u>Alston</u>, 594 U.S. at 70 (quoting <u>Am. Express Co.</u>,

585 U.S. at 541). "Always, '[t]he goal is to distinguish between

restraints with anticompetitive effect that are harmful to the

consumer and restraints stimulating competition that are in the

consumer's best interest.'" Id. (alteration in original) (quoting Am. Express Co., 585 U.S. at 541).

Plaintiffs can meet their initial burden "directly or indirectly." Am. Express Co., 585 U.S. at 542. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." Id. (alteration in original) (internal citations and quotation marks omitted).

"[A] plaintiff initially must show that the challenged action had an actual adverse effect on competition as a whole in the relevant market . . . ." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998) (internal citation and quotation marks omitted). "The Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-reducing' effect." Id. (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342-44 (1990)).

"To state a claim under . . . [§ 1] of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired." City of New York v. Grp.

Health Inc., 649 F.3d 151, 155 (2d Cir. 2011). "The relevant

market must be defined 'as all products "reasonably

interchangeable by consumers for the same purposes," because the

ability of consumers to switch to a substitute restrains a

firm's ability to raise prices above the competitive level.'"

Id. (quoting Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386

F.3d 485, 496 (2d Cir. 2004) (quoting United States v. E. I. du

Pont de Nemours & Co., 351 U.S. 377, 395 (1956))).

> Though market definition is a deeply fact-intensive
> inquiry [and] courts [therefore] hesitate to grant
> motions to dismiss for failure to plead a relevant
> product market, [w]here the plaintiff fails to define
> its proposed relevant market with reference to the
> rule of reasonable interchangeability and cross-
> elasticity of demand, or alleges a proposed relevant
> market that clearly does not encompass all
> interchangeable substitute products even when all
> factual inferences are granted in plaintiff's favor,
> the relevant market is legally insufficient and a
> motion to dismiss may be granted.

Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 238 (2d Cir.

2008) (alterations in original) (internal citation and quotation

marks omitted). "Interchangeability implies that one product is

roughly equivalent to another for the use to which it is put

. . . ." Id. (alteration in original) (quoting Queen City Pizza

v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)).

"Cross-elasticity of demand [means] consumers would respond to a

slight increase in the price of one product by switching to

another product." Todd v. Exxon Corp., 275 F.3d 191, 201-02 (2d

Cir. 2001) (quoting AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999)).

### 1. Failure to Allege Any Properly Defined Market

#### a. The Alleged Primary Markets

As discussed above, a plaintiff must initially show that the challenged action had an actual adverse impact "on competition as a whole in the relevant market," Tops Markets, 142 F.3d at 96, and "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," City of New York, 649 F.3d at 155 (quoting Chapman, 546 F.3d at 238). Here the plaintiff defines the relevant markets as the AAHA Educational Services Market and the AAHA Athletic Services Market. The sellers or buyers, respectively, in these markets are limited to the University Defendants. The Complaint alleges that "AAHA students highly and uniquely value both the high-level Division I athletics programs and the rigorous academic programs that the University Defendants offer." Compl. ¶ 202. It also alleges that "AAHA students are a distinct and unique group of college applicants and, later, students. . . . AAHA students are exceptionally high-achieving in both academics and athletics." Id. ¶ 213.

In addition though, the Complaint alleges that "[o]ther academically selective universities—such as Stanford University, Duke University, the University of Notre Dame, and Rice

University—award athletic scholarships and compensate/reimburse
their athletes . . . . These schools are not part of the Ivy
League, but they demonstrate they can maintain stellar academic
standards while competing for excellent athletes . . . ." Id.
¶ 11. The Complaint further alleges that "[a] handful of other
academically selective institutions offer athletic scholarships
along with need-based aid for all other students, without
sacrificing their academic standing." Id. ¶ 231. With respect to
Stanford University, the Complaint alleges: "Through the 2018-19
academic year, for example, Stanford University had won the
IMF/Learfield Director's Cup for the overall most successful
intercollegiate athletic department in the nation for 25
consecutive years. Simultaneously, Stanford ranks among the most
academically prestigious universities in the country." Id.
(footnote omitted).

Thus the Complaint alleges facts which show that schools
other than the University Defendants compete to offer
educational services to AAHA students, and that the University
Defendants are not the only schools to which AAHA students sell
their athletic services.[2] But Stanford, Notre Dame, Duke and Rice
are not included for purposes of the definition of the relevant

---

[2] The defendants assert that "scores of other schools . . . offer 'high-level
Division I athletics programs' and 'rigorous academic programs,'" identifying
specifically UVA, Michigan, Berkeley, UNC Chapel Hill, Georgetown, and
Vanderbilt. Defs.' Mem. at 27. These schools are not named in the Complaint.

market with respect to either the AAHA Educational Services Market or the AAHA Athletic Services Market. Consequently, the Complaint does not satisfy, with respect to the alleged primary markets, the requirements for defining a plausible relevant market, i.e., defining the proposed relevant markets with reference to the rule of reasonable interchangeability and cross-elasticity of demand, and the alleged primary relevant markets are legally insufficient.

### b. The Alternative Alleged Markets

With respect to the AAHA Educational Services Market, the Complaint alleges that "[i]n the alternative, the AAHA Educational Services Market comprises both the Defendant Universities and a few other schools, including Stanford, Notre Dame, Duke, and Rice." Compl. ¶ 210 (emphasis added). With respect to the AAHA Athletic Services Market, the Complaint alleges that "[i]n the alternative, the AAHA Athletic Services Market comprises AAHA students who sell their athletic services to the University Defendants and a small number of other academically selective universities (those in the alternative AAHA Educational Services Market)." Id. ¶ 218. Thus the Complaint alleges that the sellers or buyers, respectively, in each of these alternative markets are the University Defendants plus a small number of other schools, some of which are identified and some of which are not identified.

The court agrees with the defendants that "these proposed market definitions fail for the simple reason that Plaintiffs do not actually propose the contours of a relevant market." Defs.' Mem. at 29. "The Supreme Court requires plaintiffs to identify the relevant product and geographic markets so the district court can assess 'what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market.' . . . Without an explanation of the [competitors] involved, and their products and services, the court cannot determine the boundaries of the relevant product market . . . ." Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 437 (6th Cir. 2008) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962)); see also Laboratoires Majorelle SAS v. Apricus Bioscis., Inc., No. 17 Civ. 6625 (AT), 2018 WL 11222863, at *5 (S.D.N.Y. Sept. 21, 2018) (a well-pled antitrust claim must "allow the Court to perform an 'analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products'" (citation omitted)); Vital Pharms., Inc. v. Berlin Packaging LLC, 632 F. Supp. 3d 780, 786 (N.D. Ill. 2022) (antitrust plaintiff did not "allege a cognizable market in which [defendant] ha[d] market power" when the plaintiff "never clearly identifie[d] the product market); Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings, C.A. No. 18-600-

MN, 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019) (a failure to "identify which . . . services are a part of the relevant product market" is a failure "to adequately define the relevant product market").

The court also agrees with the defendants that "the absence of any meaningful market definition makes it impossible to evaluate whether Plaintiffs have plausibly alleged that Defendants have the market power necessary to withhold athletic scholarships and other athletics-based aid without losing athletically and academically high-achieving student-athletes to other excellent schools in these alternative markets." Defs.' Mem. at 29-30. As in Cupp v. Alberto-Culver USA, Inc., the court requires a "a more specific definition and accounting of the [schools] in the relevant market[s]" to "determine the boundaries of the market[s]." 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004).

**2. Failure to Allege Market-Wide Anticompetitive Effects**

As discussed above, the plaintiffs have failed to define a legally sufficient relevant market with respect to the AAHA Educational Services Market because they do not include other colleges and universities that compete with the University Defendants to offer educational services to AAHA students, and with respect to the AAHA Athletic Services Market, because they do not include other colleges and universities to which AAHA

-27-

students sell their athletic services. As a consequence, the facts alleged by the plaintiffs are legally insufficient to show an adverse effect on competition as a whole in a relevant market. At best, the plaintiffs' allegations of anticompetitive effects relate to just some market participants, not effects in the market as a whole. See 1-800 Contacts, Inc. v. FTC, 1 F.4th 102, 118 n.11 (2d Cir. 2021) (per curiam) ("[S]howing that a price for certain [products] dropped is not direct evidence of the effect on the market as a whole."); Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 245 (2d Cir. 1997) ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted."); Pennsylvania v. NCAA, 948 F. Supp. 2d 416, 431 (M.D. Pa. 2013) (holding that, lacking any more precise market definition, a university did not adequately allege an "anticompetitive effect . . . in the nationwide market for" athletes and "the nationwide market for post-secondary education").

The plaintiffs contend that "where, as alleged here, there is direct evidence of anticompetitive effects, there is no need for proof of market power or relevant market." Pls.' Opp'n at 33. The plaintiffs quote FTC v. Indiana Federation of Dentists for the proposition that "[s]ince the purpose of the inquiries into market definition and market power is to determine whether

-28-

an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." 476 U.S. 447, 460-61 (1986) (internal quotation marks and citations omitted).

As an initial matter, this dicta in Indiana Federation of Dentists predates the explanation in American Express Co. of what a court is required to do in conducting a rule of reason analysis. Moreover, while the plaintiffs accurately quote from Indiana Federation of Dentists, the context in which the quoted language appears makes it clear that the Court is not purporting to articulate an alternative standard for pleading a claim that a restraint violates the rule of reason. The quoted language appears as part of a discussion by the Court of reasons it rejects the arguments advanced by the Indiana Federation of Dentists. The Court explained that "the Federation suggests that in the absence of specific findings by the Commission concerning the definition of the market in which the Federation allegedly restrained trade and the power of the Federation's members in that market, the conclusion that the Federation unreasonably restrained trade is erroneous as a matter of law." Id. at 460. In rejecting the Federation's argument the Court stated:

> [T]he Commission's failure to engage in detailed
> market analysis is not fatal to its finding of a
> violation of the Rule of Reason. The Commission found
> that in two localities in the State of Indiana (the
> Anderson and Lafayette areas), Federation dentists
> constituted heavy majorities of the practicing
> dentists and that as a result of the efforts of the
> Federation, insurers in those areas were, over a
> period of years, actually unable to obtain compliance
> with their requests for submission of x rays. Since
> the purpose of the inquiries into market definition
> and market power is to determine whether an
> arrangement has the potential for genuine adverse
> effects on competition, "proof of actual detrimental
> effects, such as a reduction of output," can obviate
> the need for an inquiry into market power, which is
> but a "surrogate for detrimental effects." 7 P.
> Areeda, Antitrust Law ¶ 1511, p. 429 (1986). In this
> case, we conclude that the finding of actual,
> sustained adverse effects on competition in those
> areas where IFD dentists predominated, viewed in light
> of the reality that markets for dental services tend
> to be relatively localized, is legally sufficient to
> support a finding that the challenged restraint was
> unreasonable even in the absence of elaborate market
> analysis.

Id. at 460-61 (footnote omitted).

In support of this contention the plaintiffs also quote

United States v. Sargent Electric Co. for the proposition that

"[t]o some extent, of course, a horizontal agreement tends to

define the relevant market, for it tends to show that the

parties to it are at least potential competitors. If they were

not, there would be no point to such an agreement. Thus its very

existence supports an inference that it would have an effect in

a relevant market." 785 F.2d 1123, 1127 (3d Cir. 1986). However

this language in Sargent makes it clear that defining a relevant

market is a predicate for drawing the inference the plaintiffs argue should be drawn here, and the plaintiffs have failed to define a legally sufficient relevant market.

The plaintiffs also argue that they "allege in detail how the University Defendants themselves define the Ivy League as a distinct market through the particular combination of the academic and athletic excellence of their collegiate athletes, and how industry participants view the Ivy League as singular. See, e.g., Compl. ¶¶ 96-113." Pls.' Opp'n at 35. The court agrees with the defendants that "[t]hose allegations show no such thing." Defs.' Reply in Supp. of Mot. to Dismiss (ECF No. 164) ("Defs.' Reply") at 11. These allegations merely show that the University Defendants define themselves as, and are viewed by industry participants as, an athletic conference, with a "unique brand." Compl. ¶ 103.

C. **The Statute of Limitations -- Plaintiff Choh**

"[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." Zenith Radio Corp. v. Hazeltine Rsch., Inc., 401 U.S. 321, 339 (1971). The statute of limitations for a federal antitrust claim expires "four years

after the cause of action accrued." Id. (quoting 15 U.S.C.
§ 15b).

The defendants contend that plaintiff Choh's claim is time-
barred because he alleges that "[b]ut for the Ivy League
Agreement, Brown would have awarded Choh a full athletic
scholarship and compensated/reimbursed him for the athletic
services he provided to Brown," Compl. ¶ 23, but Choh enrolled
at Brown more than four years before this action was filed on
March 7, 2023. See id. ("Choh . . . attended Brown University
from September 2017 until May 2022, when he graduated.").

Choh does not dispute that he enrolled at Brown more than
four years before this action was filed. Rather he maintains
that his claim is timely under the continuing violation
doctrine. "[I]n the case of a 'continuing violation,' . . .
'each overt act that is part of the violation and that injures
the plaintiff,' e.g., each sale to the plaintiff, 'starts the
statutory period running again, regardless of the plaintiff's
knowledge of the alleged illegality at much earlier times.'" US
Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 68–69 (2d
Cir. 2019) (quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 189
(1997)). Choh argues that his claim satisfies the requirements
of the continuing violation doctrine "because the University
Defendants decline, every year, to award athletic scholarships
or compensation for athletic services for the year; and every

year in which Defendants continued the Agreement, during Choh's tenure at Brown, inflicted new and accumulating injury on him." Pls.' Opp'n at 49-50 (citing Compl. ¶ 23). But Choh does not satisfy the requirements for pleading a claim under the continuing violation doctrine.

In US Airways the court adopted the rule that had been adopted by the Sixth, Eighth, and Ninth Circuits for determining whether the continuing violation doctrine applies. The court stated:

> The Sixth Circuit has concluded that "[a]n overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." [DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996)] (internal quotation marks omitted); see also Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999) ("[E]ven if the payment agreement constituted a continuing violation ... the individual payments ... were only a manifestation of the previous agreement. The individual payments therefore do not constitute a 'new and independent act,' as required to restart the statute of limitations."); Varner v. Peterson Farms, 371 F.3d 1011, 1019-20 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." (citations omitted)); Eichman v. Fotomat Corp., 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations."). We agree. A contract is a vehicle for determining at the time of contracting what should happen at some time thereafter. So, like the Sixth, Eighth, and Ninth Circuits, we think of the performance of a contract as a manifestation of the

> "overt act," the decision to enter the contract, rather than an independent overt act of its own.

US Airways, 938 F.3d at 68–69; see also In re Google Digital Advertising Antitrust Litigation, No. 21-CV-3446 (PKC), 2024 WL 895155, at *30 (S.D.N.Y. Mar. 1, 2024) ("[The] Complaint describe[d] a repeated manifestation of the same overt act – enforcement o[f] a limit on the number of line items permitted in header bidding – and not new and independent acts. The claim directed to line-item caps does not describe a continuing violation."); Nastasi & Associates, Inc. v. Bloomberg, L.P., No. 20-CV-5428 (JMF), 2024 WL 641263, at *4 (S.D.N.Y. Feb. 15, 2024) (holding that a scheme to manipulate the price of contractors' bids did not reset the statute of limitations for prior injuries each time a new bid was entered); Giordano v. Saks Inc., 654 F. Supp. 3d 174, 192 (E.D.N.Y. 2023) ("[A]rtificially suppressed wages paid by Defendants as a result of the no-hire agreement do not" "make their otherwise untimely claims timely."); Kenmore Mercy Hosp. v. Daines, No. 09-CV-162S, 2011 WL 4368564, at *4 (W.D.N.Y. Sept. 19, 2011) (holding that new instances of applying an established policy do not reset the limitations period for old instances).

Applying the standard articulated in US Airways to this case, Choh first felt the adverse impact of the Ivy League Agreement no later than when he enrolled at Brown University in

September 2017. His claim accrued by then and the statute of limitations began running. The failure of Brown to award him an athletic scholarship or compensation for athletic services during the remainder of his time at Brown was simply a manifestation of the overt act, namely Brown's decision to enter into the most recent version of the Ivy League Agreement. That version of the Ivy League Agreement was simply "a vehicle for determining at the time of contracting what should happen at some time thereafter," namely at the time when Choh enrolled at Brown University. US Airways, 938 F.3d at 69.

Therefore plaintiff Choh's claim must also be dismissed because it is barred by the applicable statute of limitations.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 153) is hereby GRANTED, and the Complaint is dismissed.

The deficiencies in the Complaint that are the basis for granting the motion to dismiss are substantive in nature, and nothing in the plaintiff's papers suggests that they could amend the Complaint to overcome these substantive deficiencies. (Compare Pls.' Opp'n at 40 n.30). Consequently, the court is not dismissing the Complaint with leave to amend, and any motion for leave to amend the Complaint must be filed within 30 days and comply with Local Rule 7(f). See Long Island Anesths. PLLC v.

United Healthcare Ins. Co. of N.Y. Inc., No. 22-CV-04040 (HG),

2023 WL 8096909, at *8 (E.D.N.Y. Nov. 21, 2023). If a motion to

amend is not timely filed, this case will be closed.

It is so ordered.

Dated this 9th day of October 2024, at Hartford,

Connecticut.


<u>          /s/AWT          </u>
Alvin W. Thompson
United States District Judge